**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------------------X

THE CHARTER OAK FIRE INSURANCE COMPANY,
FIRST FLORIDIAN AUTO AND HOME INSURANCE COMPANY,
THE PREMIER INSURANCE COMPANY OF  MASSACHUSETTS,
THE PHOENIX INSURANCE COMPANY, THE STANDARD FIRE
INSURANCE COMPANY, THE AUTOMOBILE INSURANCE
COMPANY OF HARTFORD, CONNECTICUT, FARMINGTON
CASUALTY COMPANY, FIDELITY AND GUARANTY
INSURANCE UNDERWRITERS, INC., FIDELITY AND
GUARANTY INSURANCE COMPANY, UNITED STATES
FIDELITY AND GUARANTY COMPANY, CONSTITUTION
STATE SERVICES, LLC, ST. PAUL MERCURY INSURANCE
COMPANY, ST. PAUL PROTECTIVE INSURANCE COMPANY,
ST. PAUL FIRE AND MARINE INSURANCE COMPANY, ST.
PAUL GUARDIAN INSURANCE COMPANY, THE TRAVELERS
INDEMNITY COMPANY, THE TRAVELERS INDEMNITY
COMPANY OF AMERICA, THE TRAVELERS INDEMNITY
COMPANY OF CONNECTICUT, TRAVELERS PROPERTY
CASUALTY COMPANY OF AMERICA, TRAVELERS CASUALTY
AND SURETY COMPANY, TRAVELERS LLOYDS OF TEXAS
INSURANCE COMPANY, TRAVELERS PERSONAL INSURANCE
COMPANY, TRAVELERS PERSONAL SECURITY INSURANCE
COMPANY, TRAVCO INSURANCE COMPANY, TRAVELERS
PROPERTY CASUALTY INSURANCE COMPANY, TRAVELERS
CASUALTY COMPANY OF CONNECTICUT, and TRAVELERS
CASUALTY AND SURETY COMPANY OF AMERICA,

> Plaintiffs,

> v.

> AL RAJHI BANK, NATIONAL COMMERCIAL BANK,
> SAUDI BINLADIN GROUP, MOHAMED BINLADIN
> COMPANY, MOHAMED BINLADIN ORGANIZATION,
> THE MUSLIM WORLD LEAGUE,
> INTERNATIONAL ISLAMIC RELIEF ORGANIZATION,
> WORLD ASSEMBLY OF MUSLIM YOUTH,
> AL HARAMAIN ISLAMIC FOUNDATION, and
> DALLAH AVCO TRANS ARABIA,

> Defendants.

-----------------------------------------------------------------------------------X

Case No.

_____

**COMPLAINT**

**JURY TRIAL**
**DEMANDED**

This Action
Relates to:
In re: Terrorist
Attacks on
September 11,
2001

(03-MD-1570-
GBD-SN)

Plaintiffs, The Charter Oak Fire Insurance Company, First Floridian Auto and Home Insurance Company, The Premier Insurance Company of Massachusetts, The Phoenix Insurance Company, The Standard Fire Insurance Company, The Automobile Insurance Company of Hartford, Connecticut, Farmington Casualty Company, Fidelity and Guaranty Insurance Underwriters, Inc., Fidelity and Guaranty Insurance Company, United States Fidelity and Guaranty Company, Constitution State Services LLC, St. Paul Mercury Insurance Company, St. Paul Protective Insurance Company, St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company, The Travelers Indemnity Company, The Travelers Indemnity Company of America, The Travelers Indemnity Company of Connecticut, Travelers Property Casualty Company of America, Travelers Casualty and Surety Company, Travelers Lloyds of Texas Insurance Company, Travelers Personal Insurance Company, Travelers Personal Security Insurance Company, Travco Insurance Company, Travelers Property Casualty Insurance Company, Travelers Casualty Company of Connecticut, and Travelers Casualty and Surety Company of America, by and through the undersigned counsel, alleges the following upon information and belief:

## THE PARTIES

1.      Plaintiff, The Charter Oak Fire Insurance Company, is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business located at One Tower Square, Hartford, Connecticut. At all times material hereto, The Charter Oak Fire Insurance Company was engaged in the business of issuing policies of insurance.

2.      Plaintiff, First Floridian Auto and Home Insurance Company, is a corporation organized and existing under the laws of the State of Florida with its principal place of business located at 7840 Woodland Center Boulevard, Tampa, Florida.  At all times material hereto, First

Floridian Auto and Home Insurance Company was engaged in the business of issuing policies of insurance.

3.      Plaintiff, The Premier Insurance Company of Massachusetts, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, The Premier Insurance Company of Massachusetts was engaged in the business of issuing policies of insurance.

4.      Plaintiff, The Phoenix Insurance Company, is a corporation organized and existing under the laws of the State of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, The Phoenix Insurance Company was engaged in the business of issuing policies of insurance.

5.      Plaintiff, The Standard Fire Insurance Company, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, The Standard Fire Insurance Company was engaged in the business of issuing policies of insurance.

6.      Plaintiff, The Automobile Insurance Company of Hartford, Connecticut, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, The Automobile Insurance Company of Hartford, Connecticut was engaged in the business of issuing policies of insurance.

7.      Plaintiff, Farmington Casualty Company, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower

Square, Hartford, Connecticut.  At all times material hereto, Farmington Casualty Company was engaged in the business of issuing policies of insurance.

8.      Plaintiff, Fidelity and Guaranty Insurance Underwriters, Inc., is a corporation organized and existing under the laws of the State of Wisconsin with its principal place of business located at One Tower Square, Hartford Connecticut.  At all times material hereto, Fidelity and Guaranty Insurance Underwriters, Inc. was engaged in the business of issuing policies of insurance.

9.      Plaintiff, Fidelity and Guaranty Insurance Company, is a corporation organized and existing under the laws of the State of Iowa, with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, Fidelity and Guaranty Insurance Company was engaged in the business of issuing policies of insurance.

10.     Plaintiff, United States Fidelity and Guaranty Company, is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, United States Fidelity and Guaranty Company, was engaged in the business of issuing policies of insurance.

11.     Plaintiff, Constitution State Services, LLC, is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, Constitution State Services LLC was engaged in the business of claim administration and recovery services.

12.     Plaintiff, St. Paul Mercury Insurance Company, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, St. Paul Mercury Insurance Company was engaged in the business of issuing policies of insurance.

13.     Plaintiff, St. Paul Protective Insurance Company, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.   At all times material hereto, St. Paul Protective Insurance Company was engaged in the business of issuing policies of insurance.

14.     Plaintiff, St. Paul Fire and Marine Insurance Company, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, St. Paul Fire and Marine Insurance Company was engaged in the business of issuing policies of insurance.  Pursuant to a merger in 2003, St. Paul Fire and Marine Insurance Company is the legal successor in interest to St. Paul Insurance Company of Illinois. At all times material hereto, St. Paul Insurance Company of Illinois was engaged in the business of issuing policies of insurance.   Pursuant to a merger in 2016, St. Paul Fire and Marine Insurance Company is the legal successor in interest to St. Paul Fire and Casualty Company. At all times material hereto, St. Paul Fire and Casualty Company was engaged in the business of issuing policies of insurance.

15.     Plaintiff, St. Paul Guardian Insurance Company, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.   At all times material hereto, St. Paul Guardian Insurance Company was engaged in the business of issuing policies of insurance.

16.     Plaintiff, The Travelers Indemnity Company, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, The Travelers Indemnity Company was engaged in the business of issuing policies of insurance.  Pursuant to a merger, The Travelers Indemnity Company is the legal successor in interest to The Travelers Insurance

Company.  At all times material hereto, The Travelers Insurance Company was engaged in the business of issuing policies of insurance.

17.     Plaintiff, The Travelers Indemnity Company of America, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, The Travelers Indemnity Company of America was engaged in the business of issuing policies of insurance.

18.     Plaintiff, The Travelers Indemnity Company of Connecticut, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, The Travelers Indemnity Company of Connecticut was engaged in the business of issuing policies of insurance.

19.     Plaintiff, Travelers Property Casualty Company of America, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, Travelers Property Casualty Company of America was engaged in the business of issuing policies of insurance.  The Travelers Property Casualty Company of America is the legal successor in interest to Travelers Indemnity Company of Illinois.  At all times material hereto, Travelers Indemnity Company of Illinois was engaged in the business of issuing policies of insurance.

20.     Plaintiff, Travelers Casualty and Surety Company, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, Travelers Casualty and Surety Company was engaged in the business of issuing policies of insurance.

21.     Plaintiff, Travelers Lloyds of Texas Insurance Company, is a corporation organized and existing under the laws of the State of Texas with its principal place of business located at One Tower Square, Hartford Connecticut.  At all times material hereto, Travelers Lloyds of Texas Insurance Company was engaged in the business of issuing policies of insurance.

22.     Plaintiff, Travelers Personal Insurance Company, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, Travelers Personal Insurance Company was engaged in the business of issuing policies of insurance.

23.     Plaintiff, Travelers Personal Security Insurance Company, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, Travelers Personal Security Insurance Company was engaged in the business of issuing policies of insurance.

24.     Plaintiff, Travco Insurance Company, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, Travco Insurance Company was engaged in the business of issuing policies of insurance.

25.     Plaintiff, Travelers Property Casualty Insurance Company, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, Travelers Property Casualty Insurance Company was engaged in the business of issuing policies of insurance.

26.     Plaintiff, Travelers Casualty Company of Connecticut, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, Travelers Casualty Company of Connecticut was engaged in the business of issuing policies of insurance.

27.     Plaintiff, Travelers Casualty and Surety Company of America, is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business located at One Tower Square, Hartford, Connecticut.  At all times material hereto, Travelers Casualty and Surety Company of America was engaged in the business of issuing policies of insurance.

28.     At all times relevant hereto, Plaintiffs were engaged in the business of insurance. Pursuant to applicable policies of insurance, Plaintiffs and/or their predecessors in interest made payments in compensation for injuries suffered by nationals of the United States to their persons, properties and businesses by reason of the September 11th Attacks, and are thereby subrogated to the rights of recovery of those nationals of the United States.

29.     The losses which are the subject of this action have not been the subject of a prior claim against these Defendants.

30.     Defendant Al Rajhi Bank ("Al Rajhi Bank"), formerly known as al Rajhi Banking and Investment Company, is a Saudi-based international financial institution, with a principal place of business located at Olaya Street, Riyadh, Saudi Arabia.  Al Rajhi Bank maintains operations throughout the world, providing a broad range of financial services, including Shariah compliant finance products and services, to individual and institutional clients.

31.     Defendant National Commercial Bank ("NCB") is a Saudi-based international financial institution, with a principal place of business located at King Abdul Aziz Street, Jeddah,

Saudi Arabia. NCB maintains operations throughout the world, providing a broad range of financial services, including Shariah compliant finance products and services, to individual and institutional clients.

32.     Defendant Saudi Binladin Group ("SBG") is a Saudi-based construction conglomerate founded by Osama bin Laden's father and controlled to this day by the bin Laden family, with a principal place of business located in Jeddah, Saudi Arabia.

33.     Defendant Mohamed Binladin Company ("MBC") is a Saudi Arabia-based company with a principal place of business located in Jeddah, Saudi Arabia. It was created by Osama Bin Laden and 59 other members of his family.  It performs construction and other work largely in the Middle East.

34.     Defendant Mohamed Binladin Organization ("MBO") is a Saudi Arabia-based company with a principal place of business located in Jeddah, Saudi Arabia. It grew out of the business activities of the patriarch of the Binladin family, Mohamed Binladin over the past century.  It was reorganized into SBG and MBC in 1989.

35.     Defendant Muslim World League ("MWL") is a Saudi Arabia-based charitable organization with its principal place of business in Mecca, Saudi Arabia. It was founded in 1962 largely by members of the Muslim Brotherhood and acts as a proselytizing organization. It is the parent of Defendant International Islamic Relief Organization.

36.     Defendant International Islamic Relief Organization ("IIRO") is a Saudi Arabia-based charitable organization with its principal place of business in Jeddah, Saudi Arabia.  IIRO provides emergency relief assistance in Muslim countries worldwide as well as undertakes proselytizing activity.  It is often co-located with its parent the MWL.  At

least two offices of the IIRO and a senior official have been declared Specially Designated Global Terrorist ("SDGT") by the U.S. government for their support to al Qaeda.

37.     Defendant World Assembly of Muslim Youth ("WAMY") is a Saudi Arabia-based charitable organization with its principal place of business in Riyadh, Saudi Arabia. WAMY is a proselytizing organization for the ultra conservative version of Islam known as Wahhabism.  WAMY focuses on radicalizing youth via educational facilities and youth camps.

38.     Defendant Al Haramain Islamic Foundation ("al Haramain") is a Saudi Arabia-based charitable organization with its principal place of business in Riyadh, Saudi Arabia. Al Haramain is closely affiliated with the Kingdom of Saudi Arabia's Ministry of Islamic Affairs.  All branches of al Haramain, as well as senior officials, have been declared SDGTs for their support to al Qaeda.

39.     Defendant Dallah Avco ("Dallah Avco"), formerly known as Dallah Avco Trans Arabia, is a Saudi Arabia-based company with a principal place of business in Jeddah, Saudi Arabia.  Dallah Avco is a subsidiary of Dallah al Baraka, a Saudi conglomerate owned by Saleh Kamel.  Dallah Avco operates largely in the field of aviation and is a major contractor to the Saudi aviation industry under the Ministry of Defense.

## I.    <u>JURISDICTION</u>

40.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (federal question).

41.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claims asserted herein occurred in this district.

## II.     NATURE OF THE ACTION

42.     This is a suit for recovery of damages suffered by nationals of the United States by reason of the September 11, 2001 terrorist attacks upon the United States. The claims against the defendants are predicated on their activities in support of al Qaeda in the years leading up to the September 11, 2001 terrorist attacks, through which the defendants aided and abetted those attacks and conspired with al Qaeda in relation to same, as well as the defendants' own related acts of international terrorism, involving violations of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 et seq. *See e.g.* 18 U.S.C. §§ 2339A, 2339B, and 2339C.  By virtue of their acts in support of al Qaeda and the September 11, 2001 terrorist attacks, as described herein, the defendants are subject to civil liability for Plaintiffs' injuries pursuant to § 2333 of the ATA, under theories of both primary and secondary liability.

## III.     FACTUAL BACKGROUND

43.     On September 11, 2001, nineteen members of the al Qaeda terrorist organization, fifteen of whom were citizens of the Kingdom of Saudi Arabia, hijacked four commercial airliners, and used those planes as weapons in a coordinated terrorist attack upon the United States and its citizens (the "September 11th Attacks").

44.     The September 11th Attacks resulted in the tragic loss of several thousand lives, personal injuries to countless other persons, and property damage on a catastrophic scale, including the complete destruction of the World Trade Center Complex.

45.     For al Qaeda and its adherents and supporters, the September 11th Attacks were the culmination of a more than decade long campaign to carry out spectacular terrorist attacks against the United States, set in motion with the formation of al Qaeda in 1988.

46.     The success of the September 11th Attacks was made possible by the lavish sponsorship al Qaeda received from its material sponsors and supporters, over more than a decade leading up to September 11, 2001.

47.     As further detailed below, Defendants provided material support to al Qaeda over a period of many years, with knowledge of al Qaeda's intent to use resources provided to it to conduct terrorist attacks against the United States, and with the intent that al Qaeda would in fact use the support they provided to achieve that objective.

48.     As further detailed below, the support provided by Defendants enabled al Qaeda to obtain the global strike capabilities necessary to carry out the September 11th Attacks, and was essential to the success of those attacks.

## IV.     THE ORIGINS OF AL QAEDA

49.     Al Qaeda has its origins in the jihad against the Soviet occupation of Afghanistan, which served as a rallying point for Islamic extremists in the Middle East, who flocked to Afghanistan to wage "jihad" against the Soviet Union.

50.     Osama bin Laden traveled to Afghanistan in 1980 to participate in the jihad, and gained prominence during this period for his role in establishing the financial and logistical infrastructure that sustained the Arab-Afghan fighters, commonly referred to as the mujahideen. According to the Final Report of the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission"):

> Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost world-wide organization. This organization included a financial support network that came to be known as the "the Golden Chain," put together mainly by financiers in Saudi Arabia and Persian Gulf states. Donations flowed through charities and other non-governmental organizations (NGOs). Bin Ladin and the "Afghan Arabs" drew largely on funds raised by this network, whose agents roamed world markets to buy arms and supplies for the mujahideen or "holy warriors."

9/11 Report at p. 55.

51.     Throughout the Afghan jihad, the financial support provided by the "Golden Chain" donors flowed to the Arab jihadists through a network of purported charities and Islamic relief organizations, which also provided travel documents, transportation, training, facilities, arms, physical assets, and other support to the mujahideen.

52.     Saudi-based "da'awa" organizations established to propagate the austere Wahhabi variant of Islam formed the core of this support network, including among others the MWL, IIRO, Saudi Red Crescent Society, al Haramain, WAMY, and Rabita Trust.

53.     This network of ostensible charities and relief organizations established a vast financial and logistical infrastructure to support the mujahideen opposition to the Soviet occupation of Afghanistan.

54.     At the conclusion of the Afghan jihad, bin Laden determined that the network that supported the mujahideen in Afghanistan should not be abandoned, but rather adapted to serve as a foundation for waging a global jihad against all of the perceived enemies of Islam, and in particular, the United States.

> April 19, 1988 brought victory for the Afghan jihad. Moscow declared it would pull its military forces out of Afghanistan within the next nine months. As the Soviets began their withdrawal, the jihad's leaders debated what to do next.

> Bin Ladin (and Abdullah Azzam) agreed that the organization
> successfully created for Afghanistan should not be allowed to
> dissolve. They established what they called a base or foundation (al
> Qaida) as a potential general headquarters for future jihad.

9/11 Report at p. 56

## V.      AL QAEDA'S OBJECTIVES AND TACTICS

55.     In establishing al Qaeda in 1988, bin Laden sought to create a multi-national

Islamic army to challenge the perceived domination of the democratic West, in furtherance of the

ultimate objective of establishing a Pan-Islamic Caliphate.

56.     For bin Laden and his followers and supporters, the United States was the source

of all problems confronting the Muslim world, to be destroyed at all costs.  Accordingly, the United

States has been, since al Qaeda's inception, the primary target of bin Laden's organization.

57.     The centerpiece of bin Laden's strategy to fight the United States involved staging

high profile terrorist attacks against America and its citizens.  Bin Laden firmly believed that such

attacks would serve to demonstrate that America was nothing more than a paper tiger, and rally

Muslims throughout the world to al Qaeda's cause.  Pursuant to this strategy, "Plans to attack the

United States were developed with unwavering single-mindedness throughout the 1990s."  9/11

Report at p. 48.

58.     As a complement to the efforts to attack the United States through terrorist strikes,

al Qaeda also sends its members to fight U.S. interests and military personnel in conflict regions

throughout the world.

59.     In this context, al Qaeda has been deeply involved in fighting U.S. interests, through

both traditional forms of combat and terrorist attacks, in Syria, Iraq, Yemen, Afghanistan, Pakistan,

Bosnia, Chechnya, Kosovo, Sudan, Kashmir, Turkey, Indonesia, Malaysia, Algeria, the

Philippines, Somalia, Kenya, Tanzania and Egypt.

60.     Al Qaeda's military operations bolster the organization's image among certain segments of the Muslim world (particularly within Saudi Arabia), thereby facilitating al Qaeda's ongoing recruiting and fundraising efforts.   These campaigns also afford the organization an efficient vehicle to provide new members with battle experience, in preparation for terrorist operations and the ongoing military conflict with the United States.   In addition, al Qaeda's financial and operational support for local Islamist and separatist movements has allowed al Qaeda to co-opt local conflicts and organizations to its own ends.   As a result, many pre-existing terror and extremist organizations evolved into al Qaeda proxies, thereby extending al Qaeda's operational capabilities, resources, and sphere of influence.

61.     Al Qaeda's dual strategy of attacking the United States through acts of terrorism and through armed combat in regional conflicts and jihad campaigns fueled al Qaeda's growth and development in the years leading up to the September 11th Attacks, and directly enhanced the organization's global strike capabilities. Indeed, as the 9/11 Commission observed:

> By the time he issued his February 19, 1998 declaration of war, bin Ladin had nurtured (the al Qaeda) organization for nearly ten (10) years. He could attract, train, and use recruits for ever more ambitious attacks, rallying new adherents with each demonstration that his was the movement of the future.

9/11 Report at p. 55.

## VI.     THE CRITICALITY OF AL QAEDA'S INFRASTRUCTURE TO THE 9/11 ATTACKS

62.     The support al Qaeda amassed from its supporters during the thirteen years leading up to September 11, 2001 also enabled bin Laden to build the global infrastructure required to plan, coordinate, and stage the September 11th Attacks.

63.     As the 9/11 Commission correctly concluded, the "9/11 attack was a complex international operation, the product of years of planning."  In this regard, the 9/11 Report confirms

that plans for the Attacks were carefully vetted through al Qaeda's most senior leadership over a period of nearly six years, while those leaders were safely ensconced in training camps and safe houses funded by al Qaeda's financial supporters; that the individuals selected to participate in the September 11th Attacks were chosen from an enormous pool of potential candidates, all of whom were recruited, trained, and indoctrinated with funds provided by the organization's supporters; and that details of the plans were revised up until the last minute, through a sophisticated global communication network capable of evading the surveillance and intelligence operations of the United States and its allies, the development and existence of which also was dependent on the financial sponsorship of al Qaeda's supporters.

64.    The September 11th Attacks were, in turn, themselves an adaptation of several earlier al Qaeda plots targeting the civil aviation system, dating to the early 1990s, which were developed using the resources provided by al Qaeda's sponsors and supporters.

65.    Indeed, al Qaeda's efforts to use aircraft as weapons in a terrorist strike began in earnest no later than 1993, when bin Laden sent Ihab Mohammed Ali, a naturalized United States citizen who joined al Qaeda in 1990, to the United States to obtain pilot training. Using al Qaeda funds, Ali underwent training at the Airman Flight School in Norman, Oklahoma, the same flight school where al Qaeda would later send Zacarias Moussaoui to obtain pilot training for purposes of his role in attacking the American homeland.  When Ali returned to Sudan after completing his training, bin Laden asked him to assassinate Egyptian President Hosni Mubarak by crashing a plane into Mubarak's aircraft midair.  The plot became infeasible when the aircraft Ali was to use for the attack was damaged during training, but the knowledge acquired by al Qaeda in developing the plot directly enhanced its capacity to carry out sophisticated terrorist attacks using planes as weapons.

66.     Around the same time, Khalid Sheikh Mohammed ("KSM"), the mastermind of the September 11th Attacks, and his nephew Ramzi Yousef, were in the process of developing a plot to bomb twelve U.S. commercial airplanes over the Pacific Ocean as they flew from Asia to the United States, known as the "Bojinka" or "Manila Air" plot.  The plot was disrupted by the Philippine National Police in January 1995 when a chemical fire erupted in an apartment used by Yousef and Abdul Hakim Ali Hashim Murad to plan for the attacks.

67.     The cell that hatched the Bojinka plot, which included KSM and Yousef, was associated with Abu Sayyef Group, an al Qaeda affiliate in the Philippines, and supported by al Qaeda through the Philippine branch of the IIRO, headed by bin Laden's brother-in-law Mohammed Jamal Khalifa.

68.     In relation to the Bojinka plot, KSM and Yousef conducted extensive evaluations of civil aviation security protocols, to identify vulnerabilities that could be exploited for purposes of terrorist attacks. The knowledge and expertise acquired in that context, using funding provided by al Qaeda through the IIRO, were vital to the planning and development of the 9/11 plot.

69.     Not long after the Philippine National Police disrupted the Bojinka Plot, KSM, who was well aware U.S. authorities were chasing him, fled to Afghanistan, where he arranged to meet with Osama bin Laden in Tora Bora in 1996.  At the meeting, KSM briefed bin Laden on the Bojinka plot, and a proposal building on that effort that would involve training pilots who would crash planes into buildings in the United States. That proposal would become the 9/11 operation.

70.     According to the 9/11 Commission, KSM brought the 9/11 operation proposal to bin Laden specifically because "KSM knew that the successful staging of such an attack would require personnel, money, and logistical support that only an extensive and well-funded organization like al Qaeda could provide." 9/11 Report at p. 149.

71.     As these facts confirm, the seeds for the attacks carried out on September 11, 2001 were planted by al Qaeda many years earlier, and cultivated for more than a decade through al Qaeda's continuous investment in developing terrorist plots involving the civil aviation system, a campaign that was funded by the ongoing contributions of its wealthy patrons and dependent upon the infrastructure that facilitated al Qaeda's global operations.

72.     Based on the findings of its investigation concerning al Qaeda's development during the 13 years preceding the September 11th Attacks, the evolution of al Qaeda's efforts to target the United States through plots involving the civil aviation system, and the relationship between al Qaeda's global infrastructure and the organization's operational capability to plan, coordinate and mount the September 11th Attacks, the 9/11 Commission reached the following conclusions regarding the basic organizational requirements for staging a sophisticated terrorist attack:

> A complex international terrorist operation aimed at launching a catastrophic attack cannot be mounted by just anyone in any place. Such operations appear to require
>
> Time, space, and ability to perform competent planning and staff work;
>
> A command structure able to make necessary decisions and possessing the authority and contacts to assemble needed people, money, and materials;
>
> Opportunity and space to recruit, train, and select operatives with the needed skills and dedication, providing the time and structure required to socialize them into the terrorist cause, judge their trustworthiness, and hone their skills;
>
> A logistics network able to securely manage the travel of operatives, move money, and transport resources (like explosives) where they need to go;
>
> Access, in the case of certain weapons, to the special materials needed for a nuclear, chemical, radiological, or biological attack;

Reliable communications between coordinators and operatives; and

Opportunity to test the workability of the plan.

73.     Consistent with the findings of the 9/11 Commission, U.S. counter-terrorism officials have repeatedly affirmed the critical importance of al Qaeda's broader infrastructure and resources to its capacity to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks, including the September 11th Attacks, as reflected by the following statements:

> There are some who question the effectiveness of our strategy to prevent terrorism by attacking the financing that supports it. They note that terrorist attacks themselves cost very little money to carry out – the trivial cost of a suicide belt or similar device – and then leap to the conclusion that our efforts to combat terrorism by attacking terrorist resources are wasted or futile.
>
> The 9/11 Commission wisely rejected this point of view. In the first place, the cost of financing terrorist activity cannot be measured by the cost of a primitive destructive act. The maintenance of those terrorist networks, like al Qaeda, which threaten our national security, is expensive – even if a particular attack does not cost much to carry out. As the 9/11 Commission explained, groups like al Qaeda must spend money for many purposes – to recruit, train, plan operations, and bribe corrupt officials for example. If we can eliminate or even reduce their sources and conduits of money, we can degrade their ability to do all of these things, and thus can make them less dangerous.

Testimony of Stuart A. Levey, Undersecretary of Terrorism and Financial Intelligence, August 23, 2004.

> As this Committee knows well, tracking and combating terrorist financing are critical facets of our overall efforts to protect our citizens and other innocents around the World from terrorist attacks…. While any single terrorist attack may be relatively inexpensive to carry out, terrorist groups continue to need real money. They depend on a regular cash flow to pay operatives and their families, arrange for travel, train new members, forge documents, pay bribes, acquire weapons and stage attacks. Disrupting money flows stresses terrorist networks and undermines their operations. In recent months, we have seen at least one instance of what we look for most – a terrorist organization indicating that it

> could not pursue sophisticated attacks because it lacks adequate
> funding.

Testimony of Stuart A. Levey, Undersecretary of Terrorism and Financial Intelligence, before the House Financial Services Subcommittee on Oversight and Investigations, July 11, 2006.

> (T)errorist organizations require significant funding. Although individual terrorist attack may be inexpensive, terrorist organizations require far more than explosives to sustain themselves. They need money to train, recruit, pay operatives and their families, travel, bribe officials, procure cover and false documents, as well as purchase arms. If implemented effectively, targeted financial sanctions can put terrorist organizations in a financial box, effectively depriving them of the resources they need to conduct this range of activity.

Prepared remarks of Daniel L. Glaser, Acting Assistant Secretary for Terrorist Financing and Financial Crimes before the Annual Meetings Program of Seminars: The Importance of Expanding Targeted Financial Transactions Programs Around the Globe: Challenges and Opportunities, September 23, 2005.

> The primary reason why combating the financing of terrorism efforts are both necessary and important is that terrorist groups need money. Although mounting an individual terrorist attack is relatively inexpensive, the cost to maintain the infrastructure to support terrorist activities is high. Terrorist networks need cash to train, equip and pay operatives, to secure materials and to promote their cause. To eliminate or reduce the cell's means of raising and transferring funds is to significantly degrade that cell's capabilities.

*The Money Trail: Finding, Following and Freezing Terrorist Finances*, Michael Jacobsen and Matthew Levitt (Deputy Assistant Secretary for Intelligence and Analysis of the Treasury Department from 2005 – 2007), November 2008, at p. 3.

> Although manning a terrorist attack is relatively inexpensive, the cost to maintain a terrorist infrastructure is high. Terrorist networks need cash to train, equip and pay operatives and their families and to promote their causes. Recruiting, training, traveling, bribing corrupt officials and other such activities also cost money. Limiting their ability to raise funds therefore limits their ability to function.

*Follow the Money – The Obama Administration Should Continue to Track How Terrorists get Their Money*, Michael J. Jacobsen and Matthew Levitt, December 23, 2008

74.   Given the financial needs of al Qaeda and other global terrorist organizations that

threaten our national security, Congress has concluded that money is the lifeblood of terrorism,

and that any contribution to a terrorist organization furthers acts of terrorism. The State Department has affirmed in proceedings before the United States Supreme Court that "[t]he experience and analysis of the U.S. government agencies charged with combating terrorism strongly suppor[t]" Congress's findings on those points.

75.     In light of those conclusions, the United States has affirmed that the imposition of civil liability on sponsors and supporters of terrorism pursuant to the ATA is an important component of the United States' national security strategy, which serves to deter the financing of terrorism and thereby deprive terrorist organizations of the resources needed to carry out sophisticated terrorist attacks, like the September 11th Attacks. As Deputy Secretary of State Anthony J. Blinken recently affirmed in an affidavit filed on behalf of the United States in proceedings before a federal district court in the Southern District of New York:

> The ability of victims to recover under the ATA also advances U.S. national security interests. The law reflects our nation's compelling interest in combatting and deterring terrorism at every level, including by eliminating sources of terrorist funding and holding sponsors of terrorism accountable for their actions. Imposing civil liability on those who commit or sponsor acts of terrorism is an important means of deterring and defeating terrorist activity. Further, compensation of victims at the expense of those who have committed or supported terrorist acts contributes to U.S. efforts to disrupt the financing of terrorism and to impede the flow of funds or other support to terrorist activity.

## VII.    AL QAEDA'S FOUNDATION OF SUPPORT IN SAUDI ARABIA: WEALTHY DONORS, PURPORTED CHARITIES, AND ISLAMIC BANKS

76.     Given the global infrastructure and resource needs necessary to stage spectacular international terrorist attacks against the United States, the acquisition of the global strike capabilities employed by al Qaeda on September 11, 2001 required massive funding on an ongoing basis over a period of many years, through secure and reliable channels.

77.     Indeed, in the wake of the September 11th Attacks, U.S. counter-terrorism officials estimated that al Qaeda required $35 million annually to sustain the infrastructure that supported the September 11th Attacks, a view that was endorsed by the 9/11 Commission as well.  Al Qaeda's budget included approximately $20 million in annual support for the Taliban alone, in exchange for which bin Laden and al Qaeda received safe haven in Afghanistan and other support from the Taliban regime, from at least 1996 through September 11, 2001.  The safe haven provided by the Taliban under this arrangement was essential to the success of the September 11th Attacks.  As former CIA and National Security Council official Bruce Riedel has explained, "Without the Taliban safe haven before 9/11, the attacks never would have occurred.  Al Qaeda needed its Afghan sanctuary."

78.     Osama bin Laden satisfied the immense fundraising needs required to finance al Qaeda's safe haven in Afghanistan and build an infrastructure capable of carrying out sophisticated international terrorist attacks by adapting the network developed during the Afghan jihad, relying from al Qaeda's inception on contributions from wealthy supporters (primarily in Saudi Arabia), who knowingly directed donations to al Qaeda through Saudi-based Islamic da'awa organizations (frequently described as "charities") closely affiliated with bin Laden's terror organization.  In many cases, these wealthy donors also held positions of authority or influence with one or more of al Qaeda's charity fronts, and used businesses under their control to provide essential support and assistance to bin Laden and al Qaeda.

79.     As the United Nations Security Council Committee concerning al Qaeda and the Taliban succinctly explained:

> From its inception, al-Qaida has relied heavily on charities and donations from its sympathizers to finance its activities. Charities provide al-Qaida with a very useful international channel for soliciting, collecting, transferring and distributing the funds it

needs for indoctrination, recruitment, training, and logistical and operational support. These funds are often merged with and hidden among funds used for other legitimate humanitarian or social programs. Al-Qaida supporters and financiers have also established front charity networks whose main purpose is to raise and deliver funds to al-Qaida. The roots of these charity networks stem from the anti-Soviet Jihad in Afghanistan during the 1980s. During that time, al-Qaida could draw on a number of state-assisted charities and other deep pocket donors that supported the anti-Soviet cause.

80.     U.S. intelligence and government reports similarly confirm the essential support provided to al Qaeda by wealthy donors with longstanding connections to Osama bin Laden.  For example, the 9/11 Commission's staff *Monograph on Terrorist Financing* states that after bin Laden relocated al Qaeda from Sudan to Afghanistan in 1996, he "drew on the ties to wealthy Saudi nationals that he developed during his days fighting the Soviets in Afghanistan" to reinvigorate al Qaeda, and that purported charities were "used as conduits to transfer funds from donors to al Qaeda leaders," providing funding "to the tune of approximately $30 million per year."

81.     A November 14, 2002 CIA report titled "Saudi-Based Financial Support for Terrorist Organizations" similarly confirms that "Saudi Arabia is a key base of financial support for al-Qa'ida" and that "Most of the money originates from wealthy individuals, fundraisers who solicit smaller donations, and diversions from non-governmental organizations (NGOs)."

82.     A separate April 25, 2002 CIA report concerning sources of al Qaeda's vast financing, titled "Identifying Al-Qa'ida's Donors and Fundraisers:  A Status Report," likewise concludes that "wealthy individuals in the Arabian Peninsula and grassroots supporters from around the world are critical funding sources for al-Qa'ida," and documents how wealthy financiers within al Qaeda's inner-circle use purported charities and businesses as middlemen in an effort to conceal their roles in channeling resources to bin Laden's organization:

Donors generally channel money intended for terrorist-related activities through middlemen – including nongovernmental organizations (NGOs), mosques, fundraisers, and businessmen – rather than giving the funds directly to Bin Ladin or other senior al Qa-ida members. This practice hides the donors' role and allows them to deny knowing the funds went to terrorists.

83.     The "charities" that operated hand-in-glove with al Qaeda within this framework during the years leading up to the September 11th Attacks included a number of the Saudi organizations that had worked closely with bin Laden during the Afghan jihad, such as the MWL, IIRO, Saudi Red Crescent Society ("SRC"), and Rabita Trust.  In addition, several Saudi "charities" formed in the years following al Qaeda's establishment served as critical components of al Qaeda's infrastructure as well, including Al Haramain Islamic Foundation, Saudi High Commission for Relief of Bosnia & Herzegovina ("SHC"), Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC"), WAMY, Al Haramain al Masjil al Aqsa, and Muwafaq Foundation (a/k/a Blessed Relief).

84.     These Saudi-based so-called charities were not merely fronts for supporting al Qaeda, but fully integrated components of al Qaeda's financial and logistical support infrastructure, which were repeatedly implicated in the sponsorship of al Qaeda and other terrorist organizations during the years preceding the September 11th Attacks in public reporting in the Arab world.  In addition to serving as the conduits for the vast majority of the funding provided by al Qaeda's wealthy patrons, these organizations were intimately involved in all aspects of al Qaeda's operations, and allowed al Qaeda to use their infrastructures and resources as platforms for carrying out terrorism.  As further detailed in the allegation of facts concerning the terrorist activities of the so-called charities included below and as Exhibit A, al Qaeda's charity collaborators have: (1) raised and laundered funds on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaeda; (2) channeled donated funds to Islamic

terrorist organizations, fighters and associated separatist movements, including al Qaeda; (3) provided financial and logistical support and physical assets to Islamic fighters and terrorists, including al Qaeda; (4) directly participated in al Qaeda's terrorist activities, including the planning, coordination, funding and execution of terrorist attacks; (5) permitted Islamic fighters and terrorists, including al Qaeda members, to use ostensible employment with their organizations as a vehicle for gaining access to conflict regions, thereby allowing those individuals to carry out militant and terrorist activities in those areas; (6) performed reconnaissance within conflict regions on behalf of Islamic terrorist organizations and separatist movements, including al Qaeda; (7) served as liaisons to localized terrorist organizations on behalf of al Qaeda, thereby assisting al Qaeda in expanding its operational base and sphere of influence; (8) funded and facilitated shipments of arms and supplies to Islamic terrorist organizations and associated separatist movements, including al Qaeda; (9) funded camps used by al Qaeda and associated jihadist organizations to train soldiers and terrorists, including camps used to train the September 11th hijackers; (10) actively recruited new members for Islamic terrorist organizations and associated separatist movements, including al Qaeda; (11) worked throughout the World to spread al Qaeda's jihadist ideology and draw new adherents to its cause; (12) served as channels for distributing information and documentation within Islamic terrorist organizations and associated separatist movements, including al Qaeda, and from Islamic terrorist organizations and separatist movements to the media; (13) disseminated publications designed to advance al Qaeda's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds that they are "infidels" who do not deserve to live; and (14) openly advocated for young Muslims to take up arms against Western and democratic societies, including the United States.

85.     Given the intimacy of the so-called charities' collaborations with al Qaeda and their complete integration into al Qaeda's infrastructure, Juan Zarate ("Zarate"), who served as both deputy national security advisor for combatting terrorism and the first ever assistant secretary for the Treasury for terrorist financing and financial crimes, observed in his book *Treasury Wars* that "Distinguishing between some of the international Wahhabi organizations and terrorist support networks was nearly impossible, especially when support for Al Qaeda and support for spreading Wahhabi beliefs seemed to blend together so seamlessly.  This was true in the work of some of the branches of Saudi-based institutions, such as the International Islamic Relief Organization (IIRO)."

86.     Because charities generally do not generate revenue on their own, the financial support and other assistance that flowed through al Qaeda's integrated charity fronts was deeply reliant and dependent upon the financial contributions from al Qaeda's wealthy patrons.   In addition, because of the scope and complexity of al Qaeda's global operations, al Qaeda required access to the international banking system to facilitate the distribution of its funds, including unusual transactions carried out through its charities' accounts, without triggering any of the regulatory devices developed by the international banking system to identify illicit financial transactions.  Several of al Qaeda's wealthy sponsors, including in particular Suleiman al Rajhi and Khalid bin Mahfouz, provided essential assistance on that front as well, through banks under their control.

87.     In the wake of the September 11th Attacks, the United States determined that the fight against al Qaeda and prevention of future attacks like those carried on September 11, 2001 urgently required that the United States disrupt and dismantle the financial and logistical support

network of wealthy donors, charities, and banks that had made 9/11 possible.  As Juan Zarate has

explained the mindset of U.S. national security and counter-terrorism officials at the time:

> The next attacks needed to be crippled and stopped. Following and disrupting the money flows within the Al Qaeda system became an imperative. The Al Qaeda financial networks – charities, deep-pocket donors, and front companies – and the means by which Al Qaeda moved money around the world – banks, couriers, wire transfers, hawaladars – would become our targets.

88.     With those goals in mind, U.S. intelligence and law enforcement agencies

established an array of new programs and inter-agency initiatives focused on identifying the

components of al Qaeda's support network, and embarked on a global campaign to dismantle al

Qaeda's material support infrastructure.

89.     These efforts received a critical boost in March of 2002, when Bosnian authorities

raided the Sarajevo offices of Benevolence International Foundation (BIF), another Saudi al Qaeda

front charity. During the raid, Bosnian police seized weapons, plans for making bombs, booby-

traps, and false passports.  Even more significantly, authorities recovered a computer hard drive

containing a trove of internal al Qaeda documents chronicling the terrorist organization's

formation and details of its financial and material support infrastructure, stored in a file named

"Tareekh Osama" (Osama's History).

90.     In a subsequent federal prosecution of BIF's Chief Executive Officer, Enaam

Arnaout, the Department of Justice presented a detailed analysis of the most significant documents

within the Tareekh Osama file, based on the U.S. government's analysis of the documents

themselves, testimony provided by former al Qaeda members, and intelligence gathered from other

sources. *See* Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator

Statements, *United States of America v.  Enaam Arnaout*, Case No. 02-CR-892 (N.D. Ill., filed

Jan. 6, 2003), available at http://fl1.findlaw.com/news.findlaw.com/wsj/docs/bif/usarnaout10603

prof.pdf, and incorporated herein by reference.

91.     In that filing, the United States revealed that the Tareekh Osama file included a handwritten list of al Qaeda's most important wealthy donors – "the people referred to within al Qaeda as the 'Golden Chain.'"

92.     According to Zarate, "Prominent and wealthy names long familiar to law enforcement appeared on the list.  Not surprisingly, many of these men were prominent Saudis – *such as Suleiman al Rajhi and Khalid bin Mahfouz*." (emphasis supplied).

93.     Among others, the list also identified the "bin Laden brothers" as key donors to their sibling Osama bin Laden's terrorist organization.

94.     The 9/11 Commission both expressly endorsed and extensively relied upon the Department of Justice's analysis and treatment of the Tareekh Osama documents, including the Golden Chain, in its Final Report, and the Department of Treasury has cited inclusion on that list as a basis for designating individuals as al Qaeda sponsors pursuant to Executive Order 13224.

95.     In addition, Jamal al Fadl, who served as al Qaeda's finance manager during the 1990s and became a cooperating witness for the United States after defecting from bin Laden's organization, authenticated the Golden Chain document in testimony provided to U.S. officials, confirming that it identified members of the "Golden Chain," whom al Fadl described as "wealthy individuals from the Gulf region who provided Bin Laden and Al Qaeda with money on a regular basis."

96.     The funding provided by the Golden Chain donors, including Suleiman al Rajhi, Khalid bin Mahfouz and bin Laden family members, was critical to the development of the al Qaeda organization, sustained al Qaeda in the years leading up to the September 11th Attacks, and enabled bin Laden to acquire the resources essential to those Attacks. Indeed, the 9/11

Commission specifically concluded that bin Laden "enjoyed a strong financial position in Afghanistan, *thanks to Saudi and other financiers associated with the Golden Chain*." (emphasis supplied).

97.     These wealthy patrons were "not just passive contributors, but demanding investors in a cause.  Over time, the donor class would grow increasingly demanding of Al Qaeda, asking to hear directly from bin Laden and requiring that their funds be leveraged to launch significant attacks." *Treasury Wars* at p. 80.

98.     In the years since the discovery of the Golden Chain, a broad spectrum of evidence has emerged, principally as a result of U.S. and international counter-terrorism investigations, documenting myriad connections between members of the Golden Chain and components of al Qaeda's financial and logistical infrastructure, and confirming that the support provided to al Qaeda by several members of the Golden Chain extended well beyond their financial contributions.

99.     This evidence confirms that Suleiman al Rajhi and Khalid bin Mahfouz were particularly active in using multiple platforms under their control to provide various forms of support to al Qaeda, and places both at the very center of al Qaeda's financial and logistical support network.  Most significantly to the present action, and as detailed below, both aggressively deployed the banks they respectively controlled, Al Rajhi Bank and NCB respectively, to provide financial services, funding and other support to bin Laden and al Qaeda.  In addition, both established their own alleged charities to serve as fronts for delivering material support and resources to al Qaeda.

100.    This evidence likewise demonstrates that bin Laden family members who directed and controlled the family construction conglomerate, Saudi Binladin Group ("SBG"), where

Osama bin Laden was a shareholder for many years following al Qaeda's formation, used their

company to provide critical construction services and other assistance to al Qaeda, both in Sudan

and Afghanistan.

101.    During the many years that Al Rajhi Bank, NCB, and SBG were providing essential

support to al Qaeda, bin Laden's intent to use that support to plan and carry out terrorist attacks

against the United States was well known to those organizations and their principals.

102.    In fact, upon returning to Saudi Arabia at the conclusion of the Afghan jihad and

resuming his position with SBG, bin Laden made no effort to conceal his jihadist ambitions in

public speeches within the Kingdom.  Bin Laden was greeted upon his return as a hero by many

in the Saudi populace, who were astonished that a wealthy member of the Saudi elite had risked

his life to carry out jihad.  Bin Laden was in great demand to give speeches and interviews, and

made clear in his statements his continuing dedication to jihad against the perceived enemies of

Islam.

103.    Speaking in 1988, bin Laden expressly affirmed what he believed to be the personal

obligation of all Muslims to wage jihad against the enemies of Islam, stating as follows:

> The blessing of jihad in the cause of God – the peak of true Islam,
> which people in this age have forgotten is a religious duty…Praise
> be to God for allowing us to perform jihad in Afghanistan as he did
> for the best of men, our Prophet, may God's peace and prayers be
> upon him…I would like to advise my brother Muslims in all parts
> of the East and West to take the initiative and leave what they are
> doing to assist in raising the banner of jihad for the cause of God.
> This banner is the best banner and the mujahidin are the best
> people…May God accept our and your prayers and our urging of
> believers to perform jihad in order to deter the infidel forces and be
> truthful.

104.    Speaking in 1990 to an audience of hundreds in the Bin Laden family mosque in

Jeddah, bin Laden singled out the United States as the primary target of this global jihad, asserting

that "[t]he Americans won't stop their support of Jews in Palestine until we give them a lot of blows. They won't stop until we do jihad against them."

105.    In that same year, bin Laden organized and funded the travel of an estimated 4,000 mujahideen fighters to Afghanistan for training, as part of his ongoing efforts to build his jihadist army.

106.    Bin Laden continued to deliver diatribes against the United States after relocating to Sudan.  In early 1992, bin Laden and the al Qaeda leadership issued a fatwa calling for jihad against the Western "occupation" of Islamic lands, specifically singling out the United States for attack. *See* 9/11 Report at pp. 57, 59.

107.    In the ensuing years bin Laden gave frequent lectures in which he declared the need to cut off "the head of the snake," referring to the United States.

108.    In 1996 bin Laden issued his notorious fatwa, tellingly entitled "Declaration of War against the Americans Occupying the Land of the Two Holy Places," asserting that "the occupying American enemy is the principal and the main cause of the situation. Therefore efforts should be concentrated on destroying, fighting and killing the enemy until, by the Grace of Allah, it is completely defeated."

109.    In his equally famous 1998 fatwa, bin Laden declared "The ruling to kill the Americans and their allies – civilians and military – is an individual duty for every Muslim who can do it in any country in which it is possible to do it…." and "We – with God's help – call on every Muslim who believes in God and wishes to be rewarded to comply with God's order to kill the Americans and plunder their money wherever and whenever they find it."

110.    Al Qaeda demonstrated its intent to use resources provided to it by its sponsors to attack the United States through its actions as well, as confirmed by its role in the 1992 attacks on

U.S. soldiers in the Battle of Mogadishu, 1993 World Trade Center bombings, 1995 Bojinka plot, 1996 Khobar bombing attacks, 1998 bombings of U.S. embassies in Africa, and 2000 attack on the USS Cole.

111.    Even more fundamentally, bin Laden's status as an organizational leader of a jihad movement and his ambition to target America were well known to bin Laden's inner-circle, including the members of the Golden Chain.   To begin with, these prominent Saudis were intimately familiar with bin Laden's role as a logistical, financial and operational organizer of the Afghan jihad, and specifically aware that bin Laden and the other young Saudis who had traveled to Afghanistan to wage jihad had no intention of abandoning the cause.   From their own roles in supporting the Afghan jihad, these wealthy donors also knew that several of the chief organizers of the Afghan jihad network remained embedded in senior positions within the Saudi charities, and therefore had access to the resources of those charities in relation to their ongoing jihadist efforts.   And, the jihadist worldview bin Laden was promoting was firmly grounded in Wahhabi ideology, and shared by al Qaeda's wealthy patrons.

112.    It was within this framework that Al Rajhi Bank, NCB and SBG delivered their critical support and sponsorship to bin Laden and al Qaeda.

## AL RAJHI BANK

113.    Al Rajhi Bank is a Saudi Arabia based financial institution focusing on shariah compliant banking and investment products, with over five hundred (500) branch offices within the Kingdom.

114.    Founded in 1957 by Suleiman al Rajhi and his brother Saleh al Rajhi, Al Rajhi Bank was, at all times material hereto, a family owned enterprise. Suleiman Abdel Aziz al Rajhi was the Chairman, Managing Director, and largest shareholder of Al Rajhi Bank during all times

relevant to this action. Saleh Abdulaziz al Rajhi is the eldest brother of Suleiman and has been Chairman of Al Rajhi Bank.  Numerous al Rajhi family members have held senior positions in Al Rajhi Bank as well.

115.    Based on evidence demonstrating that Al Rajhi Bank was one of al Qaeda's most essential and critical partners in the years preceding 9/11, U.S. national security and counter-terrorism officials made the disruption of Al Rajhi Bank's support for al Qaeda a central focus of their effort to dismantle al Qaeda's financial and logistical support infrastructure.

116.    The nature and scope of the collaboration between Al Rajhi Bank and al Qaeda that prompted the United States to focus on the bank were detailed in a 2003 Report of the Central Intelligence Agency. According to that report:

> Al-Rajhi Bank: Conduit for Extremist Finance (S/NF)
>
> Islamic extremists have used Al-Rajhi Banking & Investment Corporation (ARABIC) since at least the mid-1990s as a conduit for terrorist transactions, probably because they find the bank's vast network and adherence to Islamic principles both convenient and ideologically sound. Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank. Reporting indicates that senior al-Rajhi family members control the bank's most important decisions and that ARABIC's principal managers answer directly to Sulayman. The al-Rajhis know they are under scrutiny and have moved to conceal their activities from financial regulatory authorities.

117.    The Wall Street Journal ("WSJ") reviewed the 2003 report, along with other reports authored by the CIA and other U.S. agencies concerning Al Rajhi Bank's extensive sponsorship of al Qaeda and allied terrorist organizations, and issued a detailed report in 2007 describing the principal findings of U.S. intelligence investigations. *See* July 26, 2007 Report by Glenn Simpson of the Wall Street Journal, titled *U.S. Tracks Saudi Bank Favored By Extremists*.

118.    According to the WSJ, the U.S. intelligence reports confirm that Al Rajhi Bank played a critical role in facilitating the terrorist activities of al Qaeda's integrated charity fronts,

and "describe how Al Rajhi Bank has maintained accounts and accepted donations for Saudi charities that the U.S. and other nations have formally designated as fronts for al Qaeda or other terrorist groups." For example, the intelligence reports indicate that Al Rajhi Bank maintained at least twenty-four (24) accounts and handled unusual transactions for the Al Haramain Islamic Foundation, "a charity that Treasury officials say has acted as a front for al Qaeda in 13 countries." The report states that in 2000, a top official from al-Haramain deposited $130,000 in $1,000 traveler's checks into an Al Rajhi account in Riyadh. According to a U.S. indictment, the funds were then sent to al-Qaeda fighters in Chechnya. In connection with the resulting federal prosecution of an al Haramain official, the U.S. government issued an administrative subpoena to Al Rajhi Bank, requesting that Al Rajhi Bank produce documents relevant and essential to the prosecution. Al Rajhi Bank refused to comply.

119.    Consistent with Suleiman al Rajhi's inclusion on the Golden Chain, the intelligence reports reviewed in the article also document the longstanding involvement of Suleiman al Rajhi and al Rajhi family members in supporting extremists through purported charities, explaining that "Mr. Al Rajhi and family members have been major donors to Islamic charities that are suspected by Western intelligence agencies of funding terrorism, according to CIA reports and federal-court filings by the Justice Department."

120.    Confirming the depth of Al Rajhi Bank's commitment to supporting al Qaeda and related terrorist organizations, the "2003 CIA Report claims that a year after Sept. 11, with a spotlight on Islamic charities, Mr. Al Rajhi ordered Al Rajhi Bank's board 'to explore financial instruments that would allow the bank's charitable contributions to avoid official Saudi scrutiny.'" A few weeks earlier, "Mr. Al Rajhi 'transferred $1.1 billion to offshore accounts – using

commodity swaps and two Lebanese banks – citing a concern that U.S. and Saudi authorities might freeze his assets.'"

121.    The 2003 CIA Report also discusses efforts by Suleiman and Saleh al Rajhi to conceal and disguise unusual transfers through purported charities.  The report says that Suleiman and Saleh transferred $4 million to parties in Germany and Pakistan in December 1998 using "a unique computer code to send funds at regular intervals to unspecified recipients, suggesting that they were trying to conceal the transactions and that the money may have been intended for illegitimate ends."

122.    The U.S. investigations also confirmed that al Qaeda and other terrorist organizations had absolute confidence in Al Rajhi Bank's commitment to their terrorist cause, as reflected by the United States' finding that extremists "ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen" to use Al Rajhi Bank.

123.    Consistent with those directives, U.S. investigations have identified numerous instances in which al Qaeda members used accounts at Al Rajhi Bank to fund and facilitate terrorist attacks.  For example, money was funneled to the Hamburg, Germany al Qaeda cell through the Al Rajhi Bank to businessmen Mahmoud Darkazanli and Abdul Fattah Zammar, who in turn provided the al Qaeda cell of September 11th hijackers with financial and logistical support. Through Al Rajhi Bank, September 11th hijacker Abdulaziz al Omari received funds into his Al Rajhi Bank Account Nos.: ----------6080, ----0061, and Visa Debit Card No. ---- - ----- ---- -5747. Al Omari frequently utilized a credit card drawn on Al Rajhi Bank in the planning of the attacks. On September 7, 2001, four days before the 9/11 attacks, al Omari received a wire transfer from Al Rajhi Bank, Buraidah Branch, Jeddah, Saudi Arabia.

124.    Further, Mamduh Mahmud Salim, convicted mastermind of the 1998 embassy bombings in Kenya and Tanzania, was carrying records of an Al Rajhi account when arrested in Germany in 1998.

125.    U.S. investigations also documented very hands-on dealings between Al Rajhi Bank and terrorists at operational levels.  In this regard, the 2003 CIA Report says that Al Rajhi Bank couriers "delivered money to the Indonesian insurgent group Kompak to fund weapons purchases and bomb-making activities."  Kompak is an al Qaeda affiliate, which also received funding through al Haramain Islamic Foundation.

126.    A separate November 16, 2001 U.S. intelligence memo states that a money courier for Osama bin Laden's second-in-command, Ayman al Zawahiri, traveled on a visa that Al Rajhi Bank had obtained for him.  And, when authorities raided the Kenya home of Wadi el Hage, the al Qaeda member who served as Osama bin Laden's personal secretary and is currently serving a life sentence for his role in the embassy bombings, his address book contained personal contact information for Saleh al Rajhi.

127.    Consistent with the findings of U.S. intelligence agencies, Zacarias Moussaoui, the only al Qaeda member convicted to date for involvement in the September 11th Attacks, has testified that Osama bin Laden personally described Al Rajhi Bank to him as "like a good brother." Moussaoui explained that Al Rajhi Bank was responsible for "moving money around" for al Qaeda, and was one of the main supporters of the Saudi charity fronts used by al Qaeda, including the Al Haramain Islamic Foundation.

128.    Faced with a wealth of compelling evidence of Al Rajhi Bank's long-standing material support for al Qaeda, "officials from the National Security Council, CIA, Treasury and State Departments debated a proposal for legal and political action against the bank, including the

possibility of covert operations such as interfering with the bank's internal operations," according to the WSJ. U.S. officials further debated designating the bank pursuant to Executive Order 13224, an action that can only occur where persons knowingly "assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism."  Ultimately, U.S. officials chose to seek reforms of the bank via direct negotiations with the Saudi government, and there have since been significant leadership and managerial changes at the bank.  Of particular note, Suleiman al Rajhi stepped down as head of the bank and relinquished his control over it.

129.    U.S. State Department diplomatic cables confirm the urgency and gravity of the engagements between U.S. officials and their Saudi counter-parts concerning Al Rajhi Bank's sponsorship of al Qaeda.  The cables indicate that U.S. officials conveyed their "real concerns about the financial activities facilitated by Al-Rajhi" to senior Saudi officials, and sought unprecedented reform at Al Rajhi Bank in the years following the September 11th Attacks.

130.    According to a September 27, 2004 cable titled *"Terrorist Financing: Al-Rajhi Bank,"* Treasury Assistant Secretary Juan Zarate met with Saudi banking officials and explained that the United States needs "to be assured that Al-Rajhi is doing everything possible regarding compliance and cooperation.  Particular accounts of concern need to be investigated and the bank's compliance structure needs to be reviewed."

131.    After U.S. officials "provided the Saudi government with information documenting specific instances of terrorists using the Al Rajhi Bank, including information about specific accounts and transactions of interest," Saudi Arabia agreed to conduct a joint review with Treasury Department officials "to ensure the institution is not operating in a way that provides safe haven for the financial transactions of terrorists and their supporters."

132.    A November 25, 2004 diplomatic cable titled *"Joint Examination of Al Rajhi Bank Through the Joint Terrorist Financing Task Force,"* bluntly explains the reason underlying the diplomatic engagements with the Saudis concerning the bank, confirming that Al Rajhi Bank had been "used by al Qaida and like-minded terrorist groups."

133.    Separate evidence reveals that Al Rajhi Bank both funded and provided financial services to virtually all of al Qaeda's most critical charity fronts, including the MWL, IIRO, WAMY, Benevolence International Foundation ("BIF"), Al Haramain Islamic Foundation, and the Saudi High Commission for Relief of Bosnia & Herzegovina ("SHC"), among others.

134.    In addition to maintaining accounts and facilitating transactions for those organizations, Al Rajhi Bank advertised the existence and numerical designation of the accounts it maintained for those charities throughout the Muslim world, thereby assisting them in their fundraising activities.  In addition, Al Rajhi Bank contributed its own zakat and haram funds to these and other al Qaeda fronts.  At all times relevant, Al Rajhi Bank and the al Rajhi family members, including Suleiman al Rajhi, were expressly aware that the charities for which Al Rajhi Bank provided financial services and funding were al Qaeda fronts, and that the bank was being used as a vehicle for laundering funds on behalf of, and transferring funds to, that terrorist organization.  Nevertheless, Al Rajhi Bank continued to maintain those accounts and to directly fund the charities.

135.    The intimacy of Al Rajhi Bank's collaboration with al Qaeda's integrated charity arms in furtherance of al Qaeda's terrorist activities, and the bank's specific intent that its services and funding on behalf of those charities would be used by al Qaeda to attack the United States, is illustrated by the relationships and course of dealings among Al Rajhi Bank, Suleiman al Rajhi, and the IIRO.

136.    According to a U.S. State Department diplomatic cable, "Usama bin Ladin used the entire IIRO network for his terrorist activities."

137.    As further reflected by the factual allegations as to the IIRO set forth below, the IIRO worked hand-in-glove with al Qaeda on both financial and operational levels throughout the world, and was repeatedly implicated in terrorist activities in the years preceding the September 11th Attacks.   Numerous IIRO offices were raided in connection with al Qaeda- related terrorism investigations prior to 9/11, and several IIRO branches were closed as a result of those investigations.   These actions against the IIRO were closely monitored by IIRO's senior leadership in Saudi Arabia, and widely reported in media in Saudi Arabia and in the countries where the actions took place.   Meanwhile, internal financial reporting within the IIRO confirmed extensive financial irregularities and diversions within its global offices.

138.    Throughout the period during which the IIRO was repeatedly implicated in terrorist activities, Al Rajhi Bank maintained numerous accounts for the IIRO, providing a full complement of financial services with respect to those accounts, while also working with the IIRO to solicit donations to those accounts.   In certain cases, Al Rajhi Bank and the IIRO made little effort to hide the fact that donations to those accounts would be used to support terrorist activities.   For instance, Al Rajhi Bank handled IIRO "charitable" contributions intended to benefit suicide bombers by directing Al Igatha (IIRO) Journal advertisements toward needs in Somalia, Sri Lanka, India, and the Philippines under IIRO Account No. ----- for "the action most loved by Allah."

139.    Al Rajhi Bank also collected charitable donations on behalf of Sanabel al Kheer ("Seeds of Charity"), the financial/investment arm of the IIRO, depositing the donations into Sanabel's Al Rajhi Bank Account No. -----.   Sanabel al Kheer, which the IIRO owns and controls, was established to make investments to support the IIRO's charitable operations.   Like the IIRO,

Sanabel al Kheer was repeatedly implicated in terrorist activities in the years prior to 9/11 as well. Of particular note, an FBI investigation implicated the U.S. arm of Sanabel al Kheer in the financing of the African embassy bombing attacks.

140.    Meanwhile, several senior Al Rajhi Bank officials were simultaneously serving as senior officials of the IIRO and/or Sanabel. Most notably, Suleiman al Rajhi served on the Executive Council of the IIRO, along with several other members of the Golden Chain. Suleiman al Rajhi also served on the Board of Trustees of Sanabel, Inc., the U.S.-based arm of Sanabel al Kheer, again along with another member of the Golden Chain. Thus, Suleiman al Rajhi was simultaneously the head of Al Rajhi Bank, and a senior official of several of the very al Qaeda charity fronts extensively sponsored and supported by Al Rajhi Bank.

141.    By virtue of the leadership positions held by Al Rajhi Bank officials within the IIRO and Sanabel al Kheer, including most notably those held by Suleiman al Rajhi himself, those Al Rajhi Bank officials received express and repeated notifications of the pervasive involvement of the IIRO and its affiliates in supporting al Qaeda and terrorist activities.  Indeed, in addition to the widespread public reporting concerning the terrorism investigations of the various IIRO offices, those investigations were closely monitored by IIRO leadership in Saudi Arabia, including by the members of the IIRO Executive Committee.

142.    In the face of this information, Al Rajhi Bank continued to provide funding and a broad range of financial services to the IIRO and Sanabel al Kheer, with an express awareness that those entities were deeply integrated into al Qaeda's infrastructure, and using the services and funding provided by Al Rajhi Bank to advance al Qaeda's efforts to attack the United States.

143.    Al Rajhi Bank was generous in its support of other of al Qaeda's charity arms as well, providing not only financial services but significant funding as well.  Al Rajhi Bank's own

contributions to al Qaeda charities included: a 1994 $533,333 donation to the Saudi High Commission ("SHC"); a 1995 $400,000 donation to the SHC; and an $80,000 donation to the SHC in 1996; while collecting donations for Bosnia.

144.    The evidence concerning Al Rajhi Bank's sponsorship of al Qaeda through multiple platforms under the direction of Suleiman al Rajhi is, in turn, simply part of a far broader mosaic of evidence demonstrating Suleiman al Rajhi's pervasive ties to terrorism, unwavering dedication to al Qaeda's terrorist agenda, and extensive use of organizations under his control to support al Qaeda and affiliated terrorist organizations.

145.    For example, Suleiman al Rajhi established, founded, financed, and was the namesake of the SAAR network of "charities" and front groups organized at 555 Grove Street in Herndon, Virginia.  Until its dissolution, the SAAR Network was comprised of over 100 entities at this single address, with overlapping officers and directors set up to launder money to al Qaeda and international terrorism.  According to the Department of Defense, "the SAAR network includes more than 100 Muslim think tanks, charities and companies.  The al-Rajhi family utilized SAAR to fund Islamic extremist organizations and has ties to al Qaida."

146.    In March 2002, the entities comprising the SAAR network were raided under a federal search warrant by the U.S. Treasury Department.  Known as Operation Green Quest, federal authorities were looking for "potential money laundering and tax evasion activities and their ties to terrorist groups such as . . . al Qaeda as well as individual terrorists . . . (including Osama bin Laden)."  Authorities said that the probe of the Herndon groups was the largest federal investigation of terrorism financing in the world.  An affidavit from Homeland Security agent David Kane said that the SAAR network in Herndon had sent more than $26 million in untraceable

money overseas and that the leaders of the organization "have committed and conspired to . . . provide material support to foreign terrorist organizations."

147.    Suleiman al Rajhi also was a member of the board of directors of Akida Bank in the Bahamas, a SDGT entity pursuant to Executive Order 13224. Akida Bank was run by Youssef Nada, a noted terrorist financier, with whom Suleiman al Rajhi had a close and longstanding relationship.

148.    Suleiman al Rajhi also enjoyed a long and ongoing relationship with Ahmed Idris Nasreddin, yet another SDGT. Nasreddin and Nada are both founders and directors of Bank al Taqwa, itself a SDGT that operated from the Bahamas. According to the U.S. Treasury Department, "Usama bin Laden and his al-Qaida organization received financial assistance from Youssef Nada. Al Taqwa provides investment advice and cash transfer mechanisms for al Qaida and other radical Islamic groups."

149.    Suleiman al Rajhi also managed the National Commercial Bank budget of the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC").  In 1999, U.S. officials sent a written request to the U.N. Peacekeeping Force in Pristina, Kosovo advising that officials of the SJRC were "associates of Osama bin Laden" and were using the SJRC to help bin Laden "move money and men to and from the Balkans."

150.    Suleiman al Rajhi and members of the al Rajhi family also used Al Rajhi Bank to transfer large sums to the Third World Relief Agency ("TWRA"), a purported charitable organization that became an integral component of al Qaeda's support infrastructure.  In particular, a U.N. sponsored audit of the TWRA's financial and administrative records uncovered two (2) transfers of money totaling $53,287.70 sent by "Sulaiman Al Rajhi" to the TWRA account in June and July of 1993, and three (3) transfers totaling $155,894.28 to the TWRA by "Saleh Alabdulaziz

Alrajhi and Brothers" in 1993 and 1994. The 9/11 Commission found that Osama bin Laden used the TWRA to covertly provide support for terrorist activities.

151.    In 2013 the United States Senate Permanent Subcommittee on Investigations issued a report entitled *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing*, in which it surveyed much of the foregoing evidence concerning Al Rajhi Bank's terrorist connections.  Succinctly describing the import of the various, independent sources of evidence and connections to terrorism, the report states: "Taken together, the information – the Al Qaeda Golden Chain document, the 2002 search of Al Rajhi-related entities in Virginia, the 2003 CIA report, the 2005 al Haramain Foundation indictment and trial, the 2007 media reports, the 2010 refusal to provide bank documents in a terrorist-financing trial, and the multiple links to suspect banks and accountholders – present an unusual array of troubling allegations about a particular financial institution."

152.    As reflected by the above and confirmed by U.S. investigations, a broad spectrum of evidence demonstrates that Suleiman al Rajhi was not merely a critical individual donor to al Qaeda, but an active architect and manager of al Qaeda's global financial and logistical support network, who, along with others, actively deployed Al Rajhi Bank's resources to advance al Qaeda's continuous efforts to attack the United States. The support and services Al Rajhi Bank provided to al Qaeda were essential to the development and maintenance of the infrastructure employed by al Qaeda to carry out the September 11th Attacks, and designed to assist al Qaeda in attacking the United States.

## NATIONAL COMMERCIAL BANK

153.    National Commercial Bank ("NCB") was established in 1950 by Salim bin Mahfouz, father of Khalid bin Mahfouz.

154.    With his father's death in 1996, Khalid bin Mahfouz became President and CEO of NCB, and its principal shareholder with control over more than 50% of the bank's capital. Khalid bin Mahfouz served as President and CEO of NCB until he was pushed out of that position by Saudi authorities in 1999.

155.    Khalid bin Mahfouz's support of terrorism through financial institutions under his control began years before al Qaeda's formation, and continued through the September 11th Attacks.

156.    Throughout the 1980s and early 1990s, NCB was closely related to, and often worked in collaboration with, the Bank of Credit and Commerce International ("BCCI"), a banking institution in which Khalid bin Mahfouz held a substantial equitable interest and served as the CEO.

157.    Under Khalid bin Mahfouz, BCCI was directly implicated in supporting terrorism. Specifically, in the course of targeting BCCI for laundering drug money, the CIA discovered BCCI's extensive involvement in manipulating certain financial markets, arms trafficking, and supporting international terrorism. A federal investigation into BCCI's operations further revealed extensive involvement in corrupt practices, including money laundering, hiding assets, and the obstruction of a Senate investigation.

158.    The 1992 U.S. Senate Investigative Report on the so-called "BCCI affair" linked the bank under bin Mahfouz to financial funding of the Afghan war, and supporting terrorism. According to the Report:

> BCCI may have been moving money through the National Bank of Oman to fund the war in Afghanistan. The bank's role began to surface in the mid-1980's (…). This was confirmed in the Wall Street Journal of 23 October 1991 which quotes a member of the late General Zia's cabinet as saying 'It was Arab money that was pouring through BCCI.' The Bank which carried the money on from

Oman to Pakistan and into Afghanistan was National Bank of Oman, where BCCI owned 29%.

\*\*\*\*\*\*\*\*\*\*

In the course of targeting BCCI for laundering drug money, the CIA learned of BCCI's involvement in manipulating certain financial markets, in arms trafficking, and in supporting international terrorism, including handling the finances of Sabri Al-Bannah or Abu Nidal, and his terrorist organization.

\*\*\*\*\*\*\*\*\*\*

BCCI's support of terrorism and arms trafficking developed out of several factors. First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI-London and other branches directly from Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny. Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities. Finally, to the extent that pragmatic considerations were not sufficient of themselves to recommend BCCI, the bank's pan-third world and pro-Islam ideology would have recommended it to Arab terrorist groups.

159.    As a result of the investigations, Khalid bin Mahfouz was indicted on charges of participation in a Scheme to Defraud in the First Degree in violation of New York Penal Law §190.65, in connection with his acts and omissions relative to BCCI Holdings and certain related entities. Khalid bin Mahfouz paid over $200 million in fines to settle the matter and avoid prosecution.

160.    Nonetheless, Khalid bin Mahfouz continued to support terrorist causes, including al Qaeda in particular, through NCB and other entities under his control in the ensuing years.

161.    Testifying before Congress just weeks after the September 11th Attacks, Vincent Cannistraro, the former Central Intelligence Agency Chief of Counterterrorism Operations, described NCB's relationship with Osama bin Laden as follows:

> How does the al-Qaeda organization fund its worldwide network of cells and affiliated groups? Several businessmen in Saudi Arabia and in the Gulf contribute monies. Many of these contributions are given out of a sense of Islamic solidarity. But much of the money is paid as "protection" to avoid having the enterprises run by these men attacked. There is little doubt that a financial conduit to bin Laden was handled through the National Commercial Bank, until the Saudi government finally arrested a number of persons and closed down the channel. It was evident that several wealthy Saudis were funneling contributions to bin Laden through this mechanism.

162.    The use of NCB by wealthy Saudi businessmen to transfer large sums of money to al Qaeda was confirmed by Zacarias Moussaoui, a key member of the terror organization. Moussaoui, personally handpicked by Osama bin Laden to build an electronic database to record the identities of al Qaeda's financial donors, their contributions and the sources of those monies, provided sworn testimony that he personally reviewed and documented financial transactions benefiting al Qaeda involving NCB.

163.    For his own part, Khalid bin Mahfouz has acknowledged making a $270,000 contribution to Osama bin Laden in 1988, contemporaneous with the establishment of al Qaeda.

164.    In the years that followed, NCB's support for al Qaeda under Khalid bin Mahfouz would mirror that of Al Rajhi Bank. Like Al Rajhi Bank, NCB served as one of al Qaeda's preferred banks for many years, providing financial services for many of al Qaeda's "charity" fronts, including the MWL, IIRO, WAMY, Muwafaq Foundation (a/k/a Blessed Relief Foundation), Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC"), and Al Haramain Islamic Foundation, among others.

165.    Muwafaq Foundation played an especially prominent role in NCB's material sponsorship of al Qaeda, and its activities serve to underscore Khalid bin Mahfouz's centrality within the al Qaeda financial and logistical support infrastructure.

166.     Not long after making his $270,000 contribution to Osama bin Laden, Khalid bin Mahfouz founded the Muwafaq Foundation ("Muwafaq") in 1991, personally choosing Yassin Abdullah Kadi to help him manage the organization's operations.  Al Kadi is an Executive Order 13224 Specially Designated Global Terrorist ("SDGT"), and was hired by bin Mahfouz to establish NCB's Islamic Banking Division.

167.     Muwafaq was registered in the Channel Islands, had numerous fund raising offices in Europe and the United States and was operational in Pakistan, Afghanistan, Sudan, Somalia, Philippines and the Balkans.

168.     Abdulrahman bin Mahfouz, Khalid bin Mahfouz's son, has publicly stated that Khalid bin Mahfouz provided up to $30 million for Muwafaq's operations. Kadi also made significant contributions to Muwafaq, from his personal fortune.

169.     In establishing Muwafaq, bin Mahfouz and Kadi sought to create a platform for al Qaeda's global expansion and the advancement of al Qaeda's jihad against the United States.

170.     Consistent with their vision, bin Mahfouz and Kadi opened a Muwafaq branch in Sudan when al Qaeda established operations in that country in the early 1990s.  Around this same time, Kadi acknowledges having personally met with bin Laden in Sudan.

171.     For the next decade, the Muwafaq Foundation provided resources through offices located around the world to support al Qaeda's jihad against the United States. Muwafaq served as a front for laundering contributions from wealthy al Qaeda sympathizers, and permitted al Qaeda fighters to use ostensible employment with Muwafaq as a vehicle for gaining access to conflict regions, thereby allowing them to carry out terrorist activities on behalf of al Qaeda in those areas. Muwafaq funded al Qaeda training camps in Afghanistan and Bosnia, and directly participated in al Qaeda operations. In 2001, Muwafaq merged directly into al Qaeda.

172.    In a November 29, 2001 letter from David D. Aufhauser, Department of the Treasury General Counsel, to Switzerland's M. Claude Nicati, Substitut du Procureur General, Mr. Aufhauser provided details concerning the Muwafaq Foundation's role in providing cover for members of al Qaeda and other terrorist organizations:

- A number of individuals employed by or otherwise associated with the Muwafaq Foundation have connections to various terrorist organizations. Muhammad Ali Harrath, main activist of the Tunisian Islamic Front (TIF) in the United Kingdom, was associated with Muwafaq personnel in Bosnia and other TIF members worked at the Muwafaq Foundation. Syrian citizen Mahmoud Mehdi, once a director of the Muwafaq Foundation in Pakistan, was a member of Al Qa'ida and the Al-Faran terrorist group responsible for the kidnapping of Westerners in Kashmir.

- The Muwafaq Foundation also provided support to HAMAS and the Abu Sayyaf Organization in the Philippines.

- Following the dissolution of MK [Makhtab al Khidamat] in early June 2001 and its absorption into Al-Qa'ida, a number of NGOs formerly associated with MK, including Muwafaq, also merged with Al-Qa'ida.

- From 1993, the head of the European offices of the Muwafaq Foundation was Ayadi Chafiq Bin Muhammad, who has been identified as Mr. Kadi's closest associate. Ayadi Chafiq fought in Afghanistan in the 1980s and is known to be associated with the Tunisian Islamic Front (TIF) in Algeria and Nabil Ben Mohammad Salah Maklouf, its leader. Mr. Chafiq was expelled from Tunisia because of his membership in the TIF.

- Mr. Kadi's actions and those of his Muwafaq Foundation and businesses fit this pattern and give rise to a reasonable basis to believe that they have facilitated terrorist activities.

173.    From the date of the Muwafaq Foundation's creation, NCB provided financial services and other support to facilitate Muwafaq's central role in advancing al Qaeda's jihad against the United States, serving as an efficient conduit for wealthy Saudi businessmen to transfer funds to al Qaeda.

174.    NCB's role in this process was confirmed by a German Internal Intelligence Service investigation of Muwafaq, which found that "one route [for the sponsorship of al Qaeda] was the

transfer of large sums from the National Commercial Bank to Islamic (charities).  These included Muwafaq el Kheiriya and Islamic Relief [IIRO]. There are institutional links between Muwafaq and Usama bin Laden's network."

175.    INTERPOL intelligence reports filed of record by the U.S. government in legal proceedings in the United States District Court for the District of Columbia, in support of Kadi's continued designation pursuant to Executive Order 13224, include details of a single transaction in which NCB transferred $2 million to Dr. Salim Bin Mahfouz, an official of Muwafaq in Europe. Dr. bin Mahfouz then transferred $500,000 to Chafiq Ayadi, the Specially Designated Global Terrorist Kadi appointed to head Muwafaq's European Operations at the suggestion of Wa'el Jelaidan, a founding member of al Qaeda. Dr. bin Mahfouz transferred an additional $1.4 million to an apparent shell company in Florida, which he had formed with a senior official of Taibah International, another designated al Qaeda front.

176.    In media reports published by Reuters and USA Today in 1999, U.S. intelligence sources stated that an investigation of NCB conducted by Saudi government officials had uncovered that $3 million from five of Saudi Arabia's prominent business leaders' accounts was transferred to Muwafaq.

177.    From the date of the Muwafaq Foundation's establishment until its merger into al Qaeda, NCB maintained close and intimate organizational connections with Muwafaq.

178.    As indicated above, the Muwafaq Foundation was established by NCB's then chairman, Khalid bin Mahfouz, and the architect of NCB's Islamic banking division, Yassin Abdullah Kadi.

179.    In his Statement to the U.S. Treasury Department's Office of Foreign Assets Control, Kadi himself confirmed that he and bin Mahfouz jointly conceived Muwafaq when Kadi

was working "with KBM for NCB." Further explaining his role in NCB, Kadi has stated that "KBM [bin Mahfouz] turned to me to help in realizing this ambition ['to convert NCB from a bank which offered purely conventional banking services to one that could also offer Islamic banking products']. To do this, we established a new department within NCB called the "Islamic Banking Department." Kadi has further explained that he was "a member of the Islamic Banking Services Committee, which was formed by the National Commercial Bank in July 1997 and on which I served until December 8, 2009. This is a committee responsible for the strategic development of Islamic banking services which was chaired by the CEO of the NCB. I served on this committee with other senior bank officials."

180.    By his own design, Khalid bin Mahfouz hand-picked designated terror financier Kadi, with whom he maintained a "close personal relationship," to oversee the establishment and operation of the Muwafaq Foundation and NCB's Islamic Banking division.

181.    Khalid bin Mahfouz similarly appointed several other senior NCB personnel to positions in the management structure of Muwafaq Foundation. Abdulrahman bin Mahfouz served as a Board member and Trustee of Muwafaq, and simultaneously held numerous senior positions in NCB, including: Vice President; Deputy General Manager; Member of the Board of Directors; and Chairman of the Management Committee of NCB.

182.    Mohamed al Ali al Qari bin Eid ("al Gari") was a founding Board member of Muwafaq in the United States, and in collaboration with Yassin Abdullah Kadi, developed Islamic Finance at NCB. Al Gari was also appointed as NCB's Sharia Board Advisor, giving him authority over the use and attribution of NCB's zakat funds. Zakat is a mandatory donation within Islam.

183.    Throughout the time he was working for "NCB," Kadi was also responsible for the management and operations of the Muwafaq Foundation, along with Khalid bin Mahfouz, who also played an active role in directing Muwafaq's operations.

184.    Throughout the time he and bin Mahfouz were directing Muwafaq's operations, Kadi admits having close relationships with senior al Qaeda officials, including founding al Qaeda member and close bin Laden associate Wa'el Jelaidan, who held senior leadership positions in the IIRO and SJRC and played a central role in the terrorist activities of those al Qaeda charity front organizations.

185.    During the period that Jelaidan served as Director of the SJRC, Kadi acknowledges providing support to the SJRC through an Albanian company Kadi owned.  Kadi has stated that he has known Jelaidan as a family friend since the 1980's.

186.    In relation to the management and operation of the Muwafaq Foundation, Kadi acknowledges having consulted with Jelaidan, and appointed terrorist operatives to run Muwafaq offices on the basis of Jelaidan's recommendation. In fact, Kadi has stated that he "was first introduced to [Specially Designated Global Terrorist] Chafiq Ayadi in Zagreb, Croatia, by Wa'el Juladain in or around 1992" and further "recommended Chafiq Ayadi for the management" of the Muwafaq Foundation. Kadi would hire Ayadi to head Muwafaq's European operations upon the recommendation of Jelaidan in 1992.

187.    Kadi has longstanding ties to many other senior terrorist operatives including Muhammad Salah, a high-level HAMAS operative and Specially Designated Global Terrorist under Executive Order 12947, and Dr. Abdul Latif Saleh, founder of the Albanian Islamic Jihad.

188.    As a result of its intensive investigation of Kadi, the United States concluded that his ties to senior members of al Qaeda and several affiliated terrorist organizations could not be

viewed as a coincidence, but rather reflected Kadi's own central role in al Qaeda's financial network. According to the 2001 U.S. Treasury Department's Evidentiary Memorandum in Support of the Designation of Yassin al Kadi Pursuant to Executive Order 13224:

> Yassin Al Qadi is an experienced and sophisticated businessman and financier. He has operated companies, including investment vehicles and banks, in many corners of the world. He is presumed to be capable of understanding his investments, his companies, and his charities, and of being responsible for the actions of those entities which he founds, funds and/or controls.

> Al Qadi's defense, however, to all the charges that he has supported terrorist through his provision of funds to Muwafaq and other entities he controls and the persons with ties to terrorists is that either there is no evidence that these entities and individuals have been involved in terrorism, or that to the extent that they were, this involvement was beyond his knowledge.

> There is, however, substantial and credible evidence that both Muwafaq as an entity, and many of the individuals charged with operating it and distributing its funds, were engaged in a longstanding pattern of supporting terrorist and extremist causes. This evidence comes from both classified and unclassified sources.

> Al Qadi admits his longstanding and intimate association with SDGT Julaidan, SDGT Chafiq Ayadi, Dr. Abdul Latif Saleh, and Amir Mehdi. The latter three individuals have been, according to the information available to OFAC arrested and/or deported from their countries of operation because of associations with terrorists, and Julaidan is a known close associate of Usama Bin Ladin. Each one of these individuals handled significant sums of money provided to him by Al Qadi.

> It strains credulity that Al Qadi could have unintentionally found himself in a repeating cycle of hiring individuals based on his assessment of their character and that these individuals kept deceiving him about their intents on providing his funds to terrorists and extremists. These are individuals who Al Qadi had opportunity to personally observe over a period of years, and he gave them significant sums of money to handle on his behalf. Indeed, Al Qadi continues to refer to Julaidan and others as trustworthy and does not question their motives.

In making this determination no one element, no one contact, no one accusation of funding is taken as being determinative of the assessment that Al Qadi has been providing support to terrorists through his actions. [Redacted text] associated with Al Qadi that have connections with terrorism and dating over too long a time period, to give credence to a defense that all of the reports are in error. OFAC concludes that when considering the number of sources, the number of activities and length of time, the totality of the evidence, both classified and unclassified provides a reason to believe Yaseen Al Qadi has funded terrorist and extremist individuals and operations.

189.    The Treasury Department Evidentiary Memorandum provides further details concerning Kadi's and Muwafaq's al Qaeda sponsorship and terrorist activities:

- Of these seven [Muwafaq] offices/operations:

- Sudan: Closed by Kadi following publication of *Africa Confidential* article inking Muwafaq to 1995 attempt on President Mubarak, and ceased operations in 1996 at about the same time that Bin Ladin left Sudan. Additionally A.L-QADI is quoted as saying the office provided assistance to "jihad activities."

- Pakistan: Headed by Amir Mehdi, [REDACTED]. The Pakistan government on March 21, 1995 raided the office and Medhi was arrested on May 29, 1995. The office shut shortly thereafter.

- Ethiopia: Closed in 1995 by the Ethiopian government subsequent to the Africa Confidential report.

- Europe: Headed by Chafiq Ayadi, who is designated as an SDGT and was a leader of the radical Tunisian Islamic Front.

- Albania: Office was headed by Dr. Abdul Latif Saleh who founded the Albanian Islamic Jihad, and who was deported from Albania in 1999 for his links to terrorism.

- AL-QADI hired Chafiq Ayadi, an SDGT designated at the same time as AL- QADI on October 12 2001, to head Muwafaq's European operations upon the recommendation of Wa'el Julaidan in late 1992.

- Kadi states in his submissions that during the 1990 to 1991 time period he was working with Khalid Bin Mahfouz for National Commercial Bank, and that they developed a relationship of mutual trust and respect. During this time period Bin Mahfouz told AL-QADI that he wanted to start charity [Muwafaq] in memory of his parents.

- According to press accounts, in 1998, the Saudi government audited the Jeddah-based National Commercial Bank and found that $3 million in bank funds was funneled improperly to Muwafaq (a.k.a Blessed Relief), which allegedly transferred the money to bin Laden.

- There is however substantial and credible evidence that both Muwafaq as an entity, and many of the individuals charged with operating it and distributing its funds, were engaged in a longstanding pattern of supporting terrorist and extremist causes. This evidence comes from both classified and unclassified sources.

190. Consistent with the foregoing findings, the United States designated Kadi as a "Specially Designated Global Terrorist" under Executive Order 13224 on October 12, 2001, describing him as "a Saudi businessman whose companies span the Middle East, Europe, North America and South Asia, [who] has been consistently identified as a financial supporter of Usama bin Laden and other known extremists for more than a decade."

191. The United States government summarized its findings regarding the Muwafaq Foundation's terrorist activities in a filing supporting Kadi's continued designation as a terrorist sponsor and supporter pursuant to Executive Order 13224. The United States explained that under Kadi's leadership Muwafaq served as "an al Qaeda front that receives funding from wealthy Saudi businessmen" and that there exists "substantial and credible evidence that both Muwafaq as an entity, and many of the individual charged with operating it and distributing its funds, were engaged in a long-standing pattern of supporting terrorist and extremist causes." The government presented the following additional details of the Muwafaq Foundation's deep participation in al Qaeda's jihad:

- Kadi hired Amir Mehdi to be the local director of Muwafaq's operation in Pakistan in 1992. In 1995, the Pakistani Government raided the offices and arrested Mehdi after he had handled and distributed Muwafaq funds for over two years. A news organization reported that the arrest of Ramzi Yousef for the first World Trade Center bombing prompted the raid on the Muwafaq office in Islamabad.

- Muwafaq provided logistical support and financial support for Al-Gama'at Al-Islamiya, a mujahadin battalion in Bosnia. That organization was designated as an SDGT on October 31, 2001.

- Muwafaq transferred $500,000 to terrorist organizations in the Balkans in the mid-1990s.

- "[I]n the mid-1990s, Muwafaq was involved in providing financial support for terrorist activities of the mujaheddin, as well as arms trafficking from Albania to Bosnia. Some involvement in the financing of these activities had also been provided by Usama bin Ladin."

- "As of late 2001, . . . [Kadi] continued to finance various fundamentalist institutions and organizations in the Balkans after Muwafaq ceased operations there in 1996," including two entities that were designated as SDGTs in early 2002 – The Revival of Islamic Heritage Society's Pakistan and Afghanistan offices and the Bosnia-Herzegovina branch of the Al-Haramain Foundation.

192.    The Muwafaq Foundation also features prominently in a 1996 Central Intelligence Agency Report concerning the involvement of Islamic NGO's in terrorist activities ("1996 CIA Report"), which notes that Muwafaq "helps fund the Egyptian Mujahedin battalion in Bosnia, according to foreign government service, and it also funds at least one training camp in Afghanistan."

193.    Ayman Awad, a participant in the Bosnian jihad and former employee of the Muwafaq Foundation, confirmed during testimony before the International Criminal Tribunal for the Former Yugoslavia that Muwafaq assisted al Qaeda fighters in gaining entry into the Balkans to participate in the jihad. According to Awad: "I said that I worked for a humanitarian organisation. I joined the organisation, the Mowafaq foundation, thinking that they were organising training for soldiers in Bosnia and Herzegovina, for Bosniak soldiers in Bosnia and Herzegovina.  I wanted to work as an interpreter and translator, and I also wished to participate in the fighting."

194.     In a June 17, 1996 interview with Osama bin Laden in Cairo, bin Laden expressed his support for "the Muwaffaq Society in Zagreb."

195.     As these facts demonstrate, Khalid bin Mahfouz and Yassin al Kadi established Muwafaq Foundation to serve as an extensive platform for supporting al Qaeda's efforts to attack the United States on a range of fronts, and operated the purported charity as an arm of al Qaeda itself.  And, they used NCB to deliver critical funding to Muwafaq Foundation for those purposes, until international terrorist investigations led the alleged charity to simply merge into al Qaeda itself.

196.     NCB similarly provided material support and resources to al Qaeda via the IIRO, SJRC, WAMY and MWL.

197.     For instance, NCB provided funds and financial support to IIRO over a period of many years, including maintaining and servicing numerous accounts for IIRO and its endowment fund Sanabel al Khair.  NCB also donated its own funds to the organization.

198.     The investigation of NCB conducted in or around 1998 revealed that over a 10 year period, $74 million was funneled by NCB's Zakat Committee to the IIRO.

199.     The NCB investigation stated that direct donations were "received through those [NCB] facilities to the Red Crescent Saudi Committee, International Islamic Relief Organization and Muwafaq Foundation."

200.     The SJRC also received valuable financial services from NCB which allowed the organization to provide direct financial and logistical support to al Qaeda for several years leading up to the 9/11 attack.  Under the supervision of Suleiman Abdul Aziz al Rajhi, NCB also managed the budget of the SJRC.

201.    In addition to maintaining the SJRC's bank accounts, NCB actively promoted those accounts on behalf of the organization.  Advertisements running in multiple issues of the Muslim World League Journal in 2000 and 2001 openly solicited funds and directed donors to SJRC accounts managed by NCB and Al Rajhi Bank.

202.    NCB opened two "shared accounts" with Al Rajhi Bank (Special Joint account #22 and #33) for the IIRO as a member of the SJRC, thereby allowing the SJRC to serve as a conduit for funneling donations to al Qaeda fighters in Kosovo and Chechnya.

203.    NCB also maintained and serviced at least eight accounts for the Muslim World League and at least two accounts for WAMY.

204.    Given their prominent roles within al Qaeda's financial infrastructure, active participation in facilitating the sponsorship of al Qaeda, and personal involvement in the creation of charity platforms to support al Qaeda's operations, NCB officials Khalid bin Mahfouz and Yassin Abdullah Kadi necessarily were aware through a variety of channels of the terrorist activities of the Muwafaq Foundation, IIRO, and SJRC at all relevant times.

205.    NCB was also placed on notice of the terrorist activities of the Muwafaq Foundation, IIRO and SJRC through media reports and widely publicized governmental investigations.

206.    As the Treasury Department's Evidentiary Memorandum in Support of the Designation of Yassin al Kadi Pursuant to Executive Order 13224 makes clear, the terrorist activities of the Muwafaq Foundation were the subject of numerous public reports prior to September 11, 2001, and several of Muwafaq's offices were closed by foreign governments between 1995 and 1999.  Further, forced closures of the IIRO and Al Haramain offices in Kenya in 1998 were similarly reported by a number of media outlets when Kenyan officials banned those

organizations for supporting terrorism.  Likewise, the IIRO's support for the Abu Sayyaf Group, al Qaeda's affiliate in the Philippines, was widely reported upon by the press during this same time frame.  Prominent media reports also documented the SJRC's role in facilitating the movement of "money and men to and from the Balkans" for Osama bin Laden.

207.    Collectively, the evidence documenting the intimate dealings among Khalid bin Mahfouz, Yassin al Kadi, NCB and numerous components and members of al Qaeda's core structure, including Osama bin Laden himself, firmly establish that NCB knowingly used its infrastructure and resources to advance al Qaeda's campaign to attack the United States, with the intent that the resources they provided to bin Laden would be used for that specific purpose.

### SAUDI BINLADIN GROUP
### MOHAMED BINLADIN COMPANY
### MOHAMED BINLADIN ORGANIZATION

208.    Saudi Binladin Group, the family construction business operated and controlled by Osama bin Laden and his brothers, was an integral part of the al Qaeda network from the terrorist group's earliest days and provided assistance that was essential to establishing the network and capabilities that would ultimately carry out the September 11th Attacks.

209.    Throughout the period of the "holy war" against the Soviet occupation of Afghanistan of the 1980s, the bin Laden family construction business supported Osama bin Laden and his jihadist activities with significant contributions of money and construction equipment, used to build the infrastructure for training and sheltering the mujahideen fighters.

210.    According to the 9/11 Commission's *Monograph on Terrorism Financing,* Osama bin Laden received about a million dollars per year in support from his family starting in 1970 – $20-25 million in all, therefore, and at least $5 million since the beginning of al Qaeda.

211.    Contemporaneous with the conclusion of the Afghan jihad and formation of al Qaeda, the construction business called the Mohamed Binladin Organization ("MCO") and

founded in the 1930s by Osama bin Laden's father, Mohammed bin Awad bin Laden, was reorganized into Saudi Binladin Group ("SBG") and the Mohamed Binladin Company ("MBC"). The MBO also continued as an active entity.

212.    Osama, together with nineteen of his brothers, was one of the founding shareholders of SBG who controlled and operated the closely held family business. To this day, SBG is owned and operated by members of the bin Laden family.  Osama also held shares in the newly formed MBC alongside 59 brothers, sisters and other family members.

213.    Following the withdrawal of Soviet forces from Afghanistan, Osama bin Laden returned to Saudi Arabia to work for SBG. Between 1989 and 1991, while working for SBG, Osama continued to establish the infrastructure for his al Qaeda network, including finding a new haven to serve as a base of operations for al Qaeda.

214.    Despite the active support of the Arab countries, in particular Saudi Arabia which funded and transported the Arab *mujahideen*, at the conclusion of the war neither Saudi Arabia nor other Arab countries wanted to host these ideologically trained killers.  Pakistan, the front-line state which had hosted the mujahideen during the war in Afghanistan was also anxious to get rid of the Arab fighters.

215.    Osama bin Laden ultimately found the safe haven he was seeking when, in 1989, just as the Afghan jihad was ending, radical Muslim Brotherhood leader Hassan al Turabi led a *coup d'état* and seized power in Sudan.  According to the 9/11 Commission, one of his first acts was to send emissaries to Osama bin Laden with an offer for him to relocate his new group, al Qaeda, to Sudan, "in an ongoing war against African Christian separatists in southern Sudan and also to do some road building.  Turabi and the National Islamic Front in return would let bin Laden use Sudan as a base for worldwide business operations and for preparations for jihad." *See* 9/11

Report at p. 57.  Bin Laden was in a perfect position to make this *quid pro quo* arrangement because of his role coordinating the activities of SBG and al Qaeda.

216.    Osama bin Laden accepted Turabi's invitation and began moving his terror organization to Sudan in 1991.  While in Sudan, bin Laden established numerous businesses to provide income for al Qaeda's operations.  These business ventures included: Wadi al-Aqiq Company, Ltd, a holding firm; Ladin International Company, an import/export business; Taba Investment Company, Ltd., a currency trading firm; al-Hijrah for Construction and Development, a construction enterprise which performed several significant infrastructure projects on behalf of the ruling National Islamic Front; and the Themar al Mubaraka Company, an agricultural business.

217.    Throughout the early 1990s, the agreement went as planned: Osama bin Laden enjoyed a refuge for building up and training al Qaeda, including the launch of attacks against U.S. military forces en route to Somalia in 1992.  Meanwhile, SBG, with Osama's personal oversight, helped arrange infrastructure projects for the Turabi regime, including the construction of a new airport in Port Sudan and a major road linking Khartoum to the northern part of the country.

218.    One of the first major contracts SBG undertook, if not the first, was a major contract awarded by the Turabi regime to its "Binladin Overseas" affiliate for the construction of the airport in Port Sudan.

219.    The airport construction project took place between February 1990 and mid-1992, the exact period of time in which al Qaeda was relocating from Afghanistan/Pakistan to Sudan. Osama bin Laden, still a SBG principal at the time, had an oversight role with the Port Sudan airport project.

220.    According to affidavit testimony provided by Musa Dawoud Musa Mustafa, the SBG Project Manager responsible for executing and constructing the Port Sudan airport, Osama

bin Laden visited the Port Sudan construction site accompanied by Sudanese government officials while he served as a shareholder and director of SBG.

221.    Turabi himself confirmed Osama bin Laden's involvement in the Port Sudan Airport project in a 1998 interview with the Arabic-language MBC TV:

> For those who know nothing about Saudi Arabia, Bin Laden has the biggest family and construction company that builds roads and institutions.  *He came to Sudan as a branch of this company.  He built the road linking Khartoum to the north, which could have been extended to reach Port Sudan.  He also built the Port Sudan airport.*  He stayed away from the social life in Sudan.  He also set up an agriculture project in Sudan.  He was a struggler, and he had full US and Arab backing when he was struggling in Afghanistan.  After that, he was not expelled from Sudan by the Sudanese and did not leave because he hated Sudan. He just did not want to cause an embarrassment in the relations with Saudi Arabia, which stripped him of his nationality.

222.    Osama bin Laden's continuing financial support from SBG and continuing business ties on the various construction projects they were pursuing helped strengthen Osama's ties with his hosts from the National Islamic Front.

223.    Indeed, while SBG and Osama bin Laden were performing lucrative construction work in Sudan, a period during which Osama remained an SBG shareholder and director, Sudan was that safe haven in which Osama could grow al Qaeda from a small jihadist army to what the 9/11 Commission Report deemed "a true global terrorist network."

224.    During his refuge in Sudan, SBG and the bin Laden family continued to facilitate financial transfers to Osama bin Laden.  For instance, on October 28, 1991, the family transferred $482,034.37 (Osama's original deposit, plus accrued interest, less banking fees) to his half-brother Haider for Osama's use, and "there is no indication it was withheld from Osama." *See* Steven Coll, *The Bin Ladens*, at p. 383. In total, bin Laden received at least $5 million in distributions from SBG following the formation of al Qaeda until SBG *allegedly* severed ties with Osama bin Laden.

225.    According to the 9/11 Commission Report, Osama bin Laden used his time in

Sudan, while still an SBG principal, to build his terrorist army:

> Bin Ladin moved to Sudan in 1991 and set up a large and complex
> set of intertwined business and terrorist enterprises. In time, the
> former would encompass numerous companies and a global network
> of bank accounts and nongovernmental institutions. Fulfilling his
> bargain with Turabi, Bin Ladin used his construction company to
> build a new highway from Khartoum to Port Sudan on the Red Sea
> coast. Meanwhile, al Qaeda finance officers and top operatives used
> their positions in Bin Ladin's businesses to acquire weapons,
> explosives, and technical equipment for terrorist purposes. One
> founding member, Abu Hajer al Iraqi, used his position as head of a
> Bin Ladin investment company to carry out procurement trips from
> Western Europe to the Far East. Two others, Wadi al Hage and
> Mubarak Douri, who had become acquainted in Tucson, Arizona, in
> the late 1980s, went as far afield as China, Malaysia, the Philippines,
> and the former Soviet states of Ukraine and Belarus.

> Bin Ladin's impressive array of offices covertly provided financial
> and other support for terrorist activities. The network included a
> major business enterprise in Cyprus; a "services" branch in Zagreb;
> an office of the Benevolence International Foundation in Sarajevo,
> which supported the Bosnian Muslims in their conflict with Serbia
> and Croatia; and an NGO in Baku, Azerbaijan, that was employed
> as well by Egyptian Islamic Jihad both as a source and conduit for
> finances and as a support center for the Muslim rebels in Chechnya.
> He also made use of the already-established Third World Relief
> Agency (TWRA) headquartered in Vienna, whose branch office
> locations included Zagreb and Budapest. (Bin Ladin later set up an
> NGO in Nairobi as a cover for operatives there.)

> Bin Ladin now had a vision of himself as head of an international
> jihad confederation. In Sudan, he established an "Islamic Army
> Shura" that was to serve as the coordinating body for the consortium
> of terrorist groups with which he was forging alliances. It was
> composed of his own al Qaeda Shura together with leaders or
> representatives of terrorist organizations that were still independent.
> In building this Islamic army, he enlisted groups from Saudi Arabia,
> Egypt, Jordan, Lebanon, Iraq, Oman, Algeria, Libya, Tunisia,
> Morocco, Somalia, and Eritrea. Al Qaeda also established
> cooperative but less formal relationships with other extremist groups
> from these same countries; from the African states of Chad, Mali,
> Niger, Nigeria, and Uganda; and from the Southeast Asian states of
> Burma, Thailand, Malaysia, and Indonesia. Bin Ladin maintained

connections in the Bosnian conflict as well. The groundwork for a true global terrorist network was being laid.

Bin Ladin also provided equipment and training assistance to the Moro Islamic Liberation Front in the Philippines and also to a newly forming Philippine group that called itself the Abu Sayyaf Brigade, after one of the major Afghan jihadist commanders. Al Qaeda helped Jemaah Islamiya (JI), a nascent organization headed by Indonesian Islamists with cells scattered across Malaysia, Singapore, Indonesia, and the Philippines. It also aided a Pakistani group engaged in insurrectionist attacks in Kashmir. In mid-1991, Bin Ladin dispatched a band of supporters to the northern Afghanistan border to assist the Tajikistan Islamists in the ethnic conflicts that had been boiling there even before the Central Asian departments of the Soviet Union became independent states.

This pattern of expansion through building alliances extended to the United States. A Muslim organization called al Khifa had numerous branch offices, the largest of which was in the Farouq mosque in Brooklyn. In the mid 1980s, it had been set up as one of the first outposts of Azzam and Bin Ladin's MAK. Other cities with branches of al Khifa included Atlanta, Boston, Chicago, Pittsburgh, and Tucson. Al Khifa recruited American Muslims to fight in Afghanistan; some of them would participate in terrorist actions in the United States in the early 1990s and in al Qaeda operations elsewhere, including the 1998 attacks on U.S. embassies in East Africa.

*See* 9/11 Report at pp. 57-58.

226.    Osama bin Laden's terrorist agenda directed at harming the United States was no secret to the other principals within SBG or his family during this period. In fact, bin Laden's hatred for the United States was longstanding, dating to the U.S.'s role in the 1982 war between Israel and Lebanon when U.S. warships protected the Israelis invading Lebanon. "As I looked at those demolished towers in Lebanon," bin Laden would later recall, "it entered my mind that we should punish the oppressor in kind and that we should destroy towers in America in order that they taste some of what we tasted." *See* Lawrence Wright, *The Looming Tower*, at p. 151.

227.    Given their familial relationship and the family's role in supporting Osama bin Laden during the Afghan jihad, it is beyond any reasonable doubt that Osama's family members

were aware of his plans to carry out jihad against the United States from the time of al Qaeda's formation in 1988, and they were certainly aware of his intentions to attack America by 1990 given Osama's pronouncement at the family's own Jeddah mosque (telling an audience of hundreds that "[t]he Americans won't stop their support of Jews in Palestine until we give them a lot of blows. They won't stop until we do jihad against them."), and his personal investment in the creation of an Islamic army.

228.     Shortly thereafter, Iraq invaded Kuwait and Osama bin Laden sent a message to the Saudi Royal Family, offering to form and lead an army of 30,000 Afghan war veterans to expel Saddam Hussein from Kuwait.  His offer was firmly rejected and U.S. troops were stationed in Saudi Arabia. This action, more than anything else, is what prompted Osama bin Laden's animus towards the Saudi rulers and further compelled him and other senior al Qaeda leadership to issue a formal *fatwa* in 1992 specifically calling for jihad against the United States and other Western allies.  As the 9/11 Commission Report concluded:

> In August 1990, Iraq invaded Kuwait. Bin Ladin, whose efforts in Afghanistan had earned him celebrity and respect, proposed to the Saudi monarchy that he summon mujahideen for a jihad to retake Kuwait. He was rebuffed, and the Saudis joined the U.S.-led coalition. After the Saudis agreed to allow U.S. armed forces to be based in the Kingdom, Bin Ladin and a number of Islamic clerics began to publicly denounce the arrangement. The Saudi government exiled the clerics and undertook to silence Bin Ladin by, among other things, taking away his passport….
>
> Bin Ladin began delivering diatribes against the United States before he left Saudi Arabia. He continued to do so after he arrived in Sudan. In early 1992, the al Qaeda leadership issued a fatwa calling for jihad against the Western "occupation" of Islamic lands. Specifically singling out U.S. forces for attack, the language resembled that which would appear in Bin Ladin's public fatwa in August 1996. In ensuing weeks, Bin Ladin delivered an often-repeated lecture on the need to cut off "the head of the snake."

*See* 9/11 Report at pp. 57, 59.

229.    The 9/11 Commission Report further noted, "Though novel for its open endorsement of indiscriminate killing, Bin Ladin's 1998 declaration was only the latest in the long series of his public and private calls since 1992 that singled out the United States for attack." See 9/11 Report at p. 48.

230.    With the issuance of the 1992 *fatwa*, SBG and others were fully aware that any support provided to Osama bin Laden would inevitably support a violent attack against the United States.

231.    True to his word, in December 1992, Osama bin Laden struck his first violent blow against the U.S. with the attempted bombing of U.S. military personnel staying in a hotel in Aden, Yemen, where U.S. troops often stayed en route to Somalia.

232.    U.S. intelligence was confident of Osama bin Laden's role in the attack. As the Congressional Joint Inquiry into Intelligence Community Activities before and after the Terrorist Attacks of September 11, 2001 noted:

> In December 1992, as U.S. military forces were deploying to Somalia as part of a United Nations operation to provide humanitarian assistance to a starving population, Islamic extremists attacked a hotel in Aden, Yemen housing U.S. service members supporting that operation. *An Intelligence Community paper from April 1993 concluded that "[Bin Ladin's] group almost certainly played a role" in that attack.* An article from an April 1993 National Intelligence Daily also took note that three to four hundred Islamic militants had received training the previous year at military camps in Afghanistan funded by Persian Gulf Arabs. One camp was run by an Egyptian and funded by Bin Ladin.

233.    By early 1993, Osama bin Laden's terrorist activities were so well known that U.S. and global news media were reporting that al Qaeda was targeting the United States. According to Chris Hedges, "*Muslim Militants Share Afghan Link*," The New York Times (March 28, 1993):

> Yemeni officials contend that Afghanistan veterans in Yemen, financed by Osama Binladen, a wealthy Saudi militant and former Afghan guerrilla now living in Khartoum, Sudan, have been behind

a series of attacks, including two bombs in Aden hotels last year that killed an Australian tourist.

234.    Not *only* was he attacking American interests in Yemen, but as the 9/11

Commission Report found, in nearby Somalia as well:

> After U.S. troops deployed to Somalia in late 1992, al Qaeda leaders formulated a fatwa demanding their eviction. In December, bombs exploded at two hotels in Aden where U.S. troops routinely stopped en route to Somalia, killing two, but no Americans. The perpetrators are reported to have belonged to a group from southern Yemen headed by a Yemeni member of Bin Ladin's Islamic Army Shura; some in the group had trained at an al Qaeda camp in Sudan.
>
> Al Qaeda leaders set up a Nairobi cell and used it to send weapons and trainers to the Somali warlords battling U.S. forces, an operation directly supervised by al Qaeda's military leader. Scores of trainers flowed to Somalia over the ensuing months, including most of the senior members and weapons training experts of al Qaeda's military committee. These trainers were later heard boasting that their assistance led to the October 1993 shoot down of two U.S. Black Hawk helicopters by members of a Somali militia group and to the subsequent withdrawal of U.S. forces in early 1994.

 *See* 9/11 Report at pp. 59-60.

235.    As former al Qaeda member Jamal al Fadl testified in 2001 at the U.S. Embassy

bombing trial, Osama bin Laden told his al Qaeda comrades in late 1993 that the American army

had come to the Horn of Africa, "and we have to stop the head of the snake. .... He said that the

snake is America, and we have to stop them. We have to cut the head and stop them."

236.    Moreover, given the generations of strong ties between the bin Ladens and the

Saudi Royal Family, dating back decades to the billions of dollars' worth of construction work that

SBG's predecessor organization did on behalf of the Saudi Kingdom including the royal palace

and expansion of the holy places in Mecca, it is beyond any reasonable doubt that whatever Saudi

intelligence further learned about Osama's jihadist's ambitions was shared with bin Laden family

members in conjunction with their efforts to persuade him to return to the Kingdom.

237.    Indeed, former Saudi Intelligence Director Prince Turki al Faisal al Saud made clear in a February 2006 event with the Council on Foreign Relations that they were "aware" of Osama's role as the head of an Islamic jihadist army no later than 1989:

> I met Osama bin Laden five times in my life as intelligence director. Mid-'80s to end of 1989 or beginning of 1990 was the last time I saw him. And when the withdrawal of Soviet troops in Afghanistan occurred, bin Laden and his supporters within Afghanistan—and by the way, that's where al Qaeda was born. As I like to—prefer to say, the al Qaeda was born in the hills of Afghanistan rather than in the deserts of Saudi Arabia. And they decided that they were going to form a group that will, in their view, protect Muslim interests throughout the world as they identified themselves as being the primary claimants to the credit of driving the Soviets out of Afghanistan.
>
> And so, by 1990 when I last saw him at the beginning of that year, he had come to me with a proposition that he wants to bring his Mujahedeen as he called them, to liberate the then-Marxist regime in south Yemen. And I advised him that that was not the right time to do it because there were other factors playing there politically and economically. South Yemen was being—not a favorite word of mine—weaned away from the Soviet Union at that time. So, he left and that was the last that I saw of him.
>
> He then remained in the kingdom for another two years after that, sometimes going to mosques and preaching without taking permission to do so and being arrested for doing that and reprimanded and then let go.
>
> And I think at the end of 1992—perhaps Mr. Rubin can correct me on that—he asked for permission to leave Saudi Arabia. And he left and went to Afghanistan. And he went from there in—end of 1993 he went to the Sudan, and that's when he began operating against the kingdom from the Sudan. He was stripped of his Saudi citizenship in 1994. His financial assets were frozen at that time and even his personal family disowned him in public at that time.
>
> By 1996, he moved from the Sudan to Afghanistan and it went on from there. *So we were pretty much aware of bin Laden from the very beginning, if you like.* Not perhaps so much in terms of how dangerous he could be, but as he grew and as his movement grew, people became more aware of his danger.

*See* "A Conversation with Prince Turki al-Faisal," Council on Foreign Relations (February 13,

2006).

238.    As the chairman of SBG and bin Laden family leader, Bakr bin Laden maintained

close relationships with the most senior representatives of the Kingdom, including the King

himself:

> Apart from Osama, the primary source of concern in Bakr's world
> seemed to be his relationship with the al-Saud… Bakr would leap to
> open the door deferentially for even a minor royal. He seemed to
> worry chronically about the disposition of the major Al-Saud on
> whom his business relied – Crown Prince Abdullah, of course, but
> also Prince Salman, the governor of Riyadh, and Abdulaziz bin
> Fahd, the son of the disabled king.

*See* Steven Coll, *The Bin Ladens*, at p. 500:

239.    Given the problems which Osama bin Laden's activities presented to SBG's

business interests, the company itself had strong reason to closely monitor Osama's activities and

statements at all times. As a result, SBG was uniquely aware of Osama bin Laden's jihadist

activities from the earliest date.

240.    Any support SBG provided Osama bin Laden from 1988 onwards, and certainly by

1990, was done with the awareness that it was for the benefit of Osama's plans for terrorist strikes

against America.

241.    Nevertheless, the bin Laden family members and principals of SBG continued to

knowingly provide significant support to Osama bin Laden in furtherance of his jihadist activities.

242.    SBG's controlling shareholders had intimate knowledge of al Qaeda's objectives,

coordinated closely with al Qaeda leadership, and provided extensive support to al Qaeda with the

intent of furthering its objectives and harming the United States.  They did so in part through their

actions undertaken through SBG.

243.    For instance, SBG provided cover for Mohammed Jamal Khalifa, a founding

member of al Qaeda operative and Osama bin Laden's brother-in-law. The Mohammed Binladin

Company ("MBC"), which SBG concedes is part of its same corporate structure, sponsored Khalifa's visa application to the United States. Khalifa, who was appointed to head the Philippines branch office of the International Islamic Relief Organization ("IIRO") following his participation in the Afghan jihad, used the IIRO as a platform for al Qaeda's expansion into Southeast Asia and personally orchestrated IIRO's funding and support for the Abu Sayyaf Group and other terrorist organizations in the region.

244.     As Osama bin Laden's role in anti-American terrorism was becoming more widely known abroad, SBG and MBC began to take steps to erase the formal ties between Osama bin Laden and the family-owned companies.

245.     The 9/11 Commission's staff *Monograph on Terrorist Financing* noted that these steps here were not undertaken by SBG voluntarily, but rather only occurred because the government compelled SBG to take some public action:

> From about 1970 until 1993 or 1994, Usama Bin Ladin received about a million dollars per year—adding up to a significant sum, to be sure, but not a $300 million fortune. In 1994 *the Saudi government forced the Bin Ladin family to find a buyer for Osama's share of the family company and to place the proceeds into a frozen account.*

246.     SBG claimed that it and MBC had severed financial ties with Osama bin Laden in 1993, prior to any inkling that Osama harbored anti-American sentiment, and that such severance was complete, totally and effective by 1993. However, strong evidence suggests SBG's and MBC's continued links and support to Osama and al Qaeda persisted.

247.     In fact, SBG directors and Bin Laden family members kept a financial lifeline open to Osama throughout the decade leading into the September 11th Attacks.

248.     In addition to SBG itself, the MBO was a loosely organized set of businesses established by Mohammed bin Awad bin Laden, father of Osama, Bakr, and the other SBG

principals.   Following Mohammed's sudden death in 1967, King Faisal appointed trustees to oversee the organization.

249.    By 1988, many of Mohammed's sons had taken on managerial roles within the organization.  Bakr bin Laden, a senior brother in the family, began the process of reorganization of the businesses.  According to SBG, "In 1989, as part of the natural progression in the growth of the company, various autonomous divisions were created under the umbrella of the Saudi Binladin Group    (SBG)."    *See*    http://web.archive.org/web/20010814095646/www.saudi-binladin-group.com/history.htm.

250.    Again, SBG had twenty founding shareholders.  All were sons of Mohammed bin Laden, including Osama.

251.    One of the companies put under the umbrella of SBG was the Mohammed Binladin Company ("MBC"), whose shareholders included all the sons, daughters and wives of Mohammed bin Laden. Osama had shares in MBC as well as SBG.

252.    Bakr bin Laden initiated action against Osama at a January 1993 MBC board meeting to prohibit payment to Osama of his share of their profits. As Chairman of SBG, Bakr allegedly instructed SBG to do the same.

253.    In June 1993, shortly after U.S. intelligence had concluded that Osama bin Laden was behind the Yemen attack and the New York Times published similar claims, SBG claims that both it and MBC passed resolutions divesting Osama of his ownership of the shares. Osama's "divested" shares in the company were transferred solely to his brother and SBG shareholder Ghaleb bin Laden, who had previously supported Osama during the Afghan mujahedeen campaign.  The corporate resolutions state that the actions were taken at the request of Osama, and that Osama himself designated Ghaleb as the recipient of his stake.

254.    Ghaleb reportedly delivered as much as $50,000 in cash directly to Osama in Afghanistan during the battle for Jalalabad in April 1989.

255.    The SBG resolution itself does not reflect an involuntary divestment of one already shunned by the family; it states that Osama was "represented by his lawful attorney" who "wishes" and "desired" to assign his shares to his brother Ghaleb, who did not pay for them.

256.    Bakr bin Laden has represented in sworn affidavit testimony that the value of Osama bin Laden's shares was placed in a trust in 1993 ("the money was placed in a trust outside of Osama's control. . . My family took those actions in June 1993").

257.    In early 1999, in the aftermath of the 1998 U.S. Embassy bombings in East Africa, a United States National Security Council task force called the UBL Finances Sub-Group headed by a Treasury official travelled to Riyadh.  The Saudis refused them access to the Binladin family but did tell the Americans that the funds belonging to Osama from his divested shares were not being held in a Saudi bank.

258.    The Saudi officials also told the Americans there were no documents describing the process by which Osama was divested of his shares nor of the dispersal of the funds.

259.    In fact, the value of those shares was not placed in trust until April 2000, 7 years later, when Ghaleb deposited $9.8 million into an account at NCB.

260.    Critically, the $9.8 million deposited in 2000 represented only the value of the shares in 1993, not the distributions related to the shares over the intervening seven years.  Those distributions remained unaccounted for.

261.    This discrepancy becomes even more significant when coupled with the fact that over that same period Ghaleb was formally entitled to the benefits of holding Osama's shares, he and his brother Bakr bin Laden, using SBG's business address, invested substantial sums in Bank

al Taqwa from November 1993 until March 2000.  Other funds were invested with Bank al Taqwa

by MBC shareholders Iman and Huda Bin Laden.  Shortly after 9/11, Bank al Taqwa was named

by the U.S. Treasury Department as a terrorist entity for its activities in support of al Qaeda since

the 1980s.

262.    In a January 4, 2002 letter from U.S. Department of the Treasury Deputy General

Counsel George B. Wolfe to Claude Nicati, Substitut du Procureur General of Switzerland, some

of Bank al Taqwa's activities were "providing indirect investment services for Al Qa'ida, investing

funds for bin Laden, and making cash deliveries on request to the Al Qa'ida organization."

263.    These allegations are consistent with the indirect investment of Osama bin Laden's

funds in Bank al Taqwa by SBG and MBC.

264.    Beyond the material support, SBG and MBC principals maintained contact with

Osama bin Laden via personal visits, letters, telephone calls, and via intermediaries during the

years he took refuge in Sudan and Afghanistan.

265.    SBG principals Omar bin Laden and Ghaleb bin Laden both were in phone contact

with Osama after this disaffiliation – Omar in 1995, and Ghaleb repeatedly in 1998 in advance of

the U.S. Embassy bombings.

266.    Moreover, Osama's written contact with SBG and MBC principals was pervasive

and certainly not antagonistic.

267.    In December, 1993 while in Sudan, Osama wrote to SBG, MBC, his brother Bakr

and the rest of his family requesting the money he is owed as a partner in the companies.  MBC

replied explaining that Osama could access his funds when he returned to Saudi Arabia.  The tone

of both letters is friendly not bitter, and the dispute between them seems closer to an oversight or

clerical error than of a bitter struggle over an inheritance or the waging of battle over divvying up

of corporate assets.

268.    Consistent with this evidence that Osama bin Laden retained the support of his family long after they claimed to have disowned him, Michael Scheuer, the Chief of the CIA's Bin Laden Unit from 1996 through 1999, has stated that "There is no solid evidence to suggest that [Osama] bin Laden ever found anything but warmth and acceptance from the family."  Scheuer has cast doubt on the claims by Bakr bin Laden and other family members that the family disavowed Osama bin Laden and withheld his share of the profits from SBG.  On this point, Scheuer cites the following statement of Sa'd al-Faqih, one of bin Laden's colleagues in the Islamic Awakening movement in Saudi Arabia in the early 1990s:

> There is a very interesting thing in the structure of [the Islamic] family. You are obligated to support your family members…. Well, [the bin Ladens] have to say that [that they disowned Osama]. They have to pretend to be cutting off bin Laden. But in all actuality they admire him, they respect him…I do not claim that all…the bin Laden brothers do.  But quite a significant number of them work hard to get [rid of] what they see as sinful money – which has to reach the rightful owner.

269.    In line with Scheuer's assessments and al-Faqih's observations, Zacarias Moussaoui testified on the basis of his personal dealings with Osama bin Laden that Osama bin Laden continued to maintain strong ties to his family and enjoy the support of his family and SBG long after al Qaeda relocated from Sudan to Afghanistan. According to Moussaoui, who was resident in al Qaeda's operational base in Kandahar, Afghanistan and in direct contact with Osama bin Laden between 1998-2000, Osama regularly welcomed bin Laden family members visiting from Saudi Arabia in Afghanistan. When Osama's mother visited her son in Afghanistan, Moussaoui described it as a "significant event," "a festivity" marked by the shooting of weapons such as rocket propelled grenades (RPG) and machine guns.  Moussaoui also testified that the bin Laden family shipped construction equipment to bin Laden in Afghanistan, through Pakistan.

When told that SBG had made several representations in court proceedings that the bin Laden family and SBG had severed all ties with Osama in 1994, Moussaoui called it a "complete lie" and "absolute lie."

270.    Osama bin Laden left Sudan in 1996 under international pressure and returned to Afghanistan. By that point, he had launched al Qaeda as a sophisticated global terrorist network. It was well on its way to further attacks on the United States, including the 1998 bombing of American embassies in Kenya and Tanzania, the 2000 bombing of the U.S.S. Cole, and ultimately the September 11th Attacks. None of this would have been possible without SBG's and MBC's close coordination and support, including its arrangements with the Sudanese government that guaranteed a safe haven for al-Qaeda, direct financial support to Osama bin Laden during his time in Sudan, and continued financial lifelines after his departure.

## THE MUSLIM WORLD LEAGUE

271.    Founded in 1962, the Muslim World League ("MWL") is among the world's largest Islamic charitable organizations, with offices in more than thirty (30) countries. The MWL serves as an umbrella organization for a number of other Islamic charities, commonly referred to as bodies or members of the League, including the International Islamic Relief Organization ("IIRO"), World Assembly of Muslim Youth ("WAMY"), Al Haramain Islamic Foundation, Al Haramain Al Masjed Al Aqsa Foundation, and Rabita Trust, among others.

272.    The MWL's close affiliation with Osama bin Laden and other high ranking al Qaeda officials dates to the 1980's. During the war against the Soviet occupation of Afghanistan, Abdullah Azzam, bin Laden's spiritual mentor and partner in Makhtab al Kidhmat, headed the office of the MWL in Peshawar, Pakistan, which served as the rear base for mujahideen operations. That office was thereafter led by Wa'el Jelaidan, who also served as Director General and a

member of the Board of Trustees of Rabita Trust, a financial arm of the MWL. Wa'el Julaidan is

a founding member of al Qaeda. On September 6, 2002, the United States Department of Treasury

designated Jelaidan as a Specially Designated Global Terrorist pursuant to Executive Order 13224.

The Treasury Department statement regarding the designation provided as follows:

> Wa'el Hamza Julaidan, a Saudi citizen, is an associate of Osama bin
> Laden. Julaidan fought with bin Laden in Afghanistan in the 1980s.
> Julaidan is also associated with several individuals and entities
> linked to al Qaida, including bin Laden's lieutenants, Ayman al
> Zawahri, Abu Zubaida, and Mohammed Atef; and the organizations:
> Maktab al Khidmat, the Rabita Trust, and al- Gamma al Islamiya.
> These individuals and entities have been previously designated
> under President Bush's Executive Order and by the United Nations.
>
> Bin Laden himself acknowledged close ties to Julaidan during a
> 1999 interview with al-Jazeera TV. When referring to the
> assassination of al Qaida co-founder Abdullah Azzam, bin Laden
> stated that "we were all in one boat, as is known to you, including
> our brother, Wa'el Julaidan." Julaidan has established contacts with
> several known Islamic extremists, including bin Laden's principal
> lieutenant, Ayman al-Zawahri. Another bin Laden lieutenant, Abu
> Zubaida, claimed that he had accompanied Julaidan from Pakistan
> to Kandahar, Afghanistan during the summer of 2000. Zubaida said
> that Julaidan met with bin Laden and senior bin Laden lieutenant
> Mohammed Atef soon after arriving in Kandahar.
>
> In February 2000, Julaidan was appointed to the Board of Trustees
> of the Rabita Trust and served as its director general. The Rabita
> Trust is an NGO designated under President Bush's Executive Order
> as an organization that provided logistical and financial support to
> al-Qa'ida.

> ### BASIS FOR DESIGNATION
>
> The United States has credible information that Wa'el Hamza
> Julaidan is an associate of Osama bin Laden and several of bin
> Laden's top lieutenants. Julaidan has directed organizations that
> have provided financial and logistical support to al-Qa'ida.
> Accordingly, the United States is designating Julaidan under
> Executive Order 13224 as a person who supports terror.

273.     Consistent with bin Laden's plan to adapt the network established for the Afghan

resistance to support al Qaeda's global jihad, al Qaeda has from its establishment used the MWL as a front to conceal the terrorist organization's existence and true purpose, as confirmed by documents seized throughout the world in conjunction with investigations into al Qaeda's global support infrastructure.

274.    Internal al Qaeda documents chronicling the formation of the organization, seized during a 2002 raid of the Sarajevo office of an al Qaeda front, the Benevolence International Foundation ("BIF"), confirm that al Qaeda planned from its inception to use the MWL and its subsidiary bodies, to include the IIRO, to provide support and cover for al Qaeda's operations.  A BIF computer file named "Tareekh Osama" (or "Osama's History") contained numerous documents regarding al Qaeda's formation and the participation of purported Islamic charities in al Qaeda's support infrastructure, including the MWL and IIRO.

275.    For instance, the files include a document on MWL/IIRO letterhead detailing a meeting between Abu Abdullah (a/k/a "Osama bin Laden"), Dr. Abdullah Omar Naseef, in his capacity as the Secretary General of the MWL, and others where it was agreed that al Qaeda attacks would be launched from MWL offices: "And if he is being subjected to any pressures, let it be a secret (*agreement*), in a way that [Muslim World] League offices will be opened as (*illegible*) for the Pakistanis, and the attacks will be launched from the (*these offices*) …").

276.    As the senior most official of the MWL and as a member of the Saudi government's Majlis al Shura, the advisory body to the Saudi King, Naseef had systematic interaction and dealings with the Kingdom's most senior officials, including senior members of the Saudi Royal Family.

277.    Dr. Naseef was also a member of the Board of Directors of Faisal Islamic Bank-Sudan ("FIBS"), which has long provided financial services and other forms of material support

to terrorist organizations, including al Qaeda. FIBS was implicated as an al Qaeda bank during the 2001 U.S. trial relating to the 1998 U.S. Embassy bombings in Kenya and Tanzania. FIBS was also one of the main founders of the Al Shamal Islamic Bank, the Sudanese bank Osama bin Laden helped establish in 1991 by providing $50 million in capital.

278.    During the 2002 searches of BIF's offices, investigators also recovered a list of orders from Osama bin Laden regarding the management of Islamic charities. On point 10 of his list, bin Laden urges the creation of a committee to receive and distribute donations to al Qaeda, and suggests the participation of the MWL, SRC and IIRO.

279.    Another al Qaeda document seized during the March 2002 raids, written on the joint letterhead of the MWL and IIRO, suggests using the name of the "League" as "an umbrella which you can stay under."

280.    Consistent with this plan, as head of the MWL, Dr. Naseef approved the appointment of Mohammed Jamal Khalifa, a founding al Qaeda member and Osama bin Laden's brother-in-law, to open a joint MWL/IIRO branch office in the Philippines contemporaneous with the formation of al Qaeda. As a result of that appointment, Khalifa was able to use the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia, and provide funds and other support for the 1993 World trade Center bombing and the 1995 "Bojinka" plot to simultaneously bomb multiple airlines while in transit to the United States. The Bojinka plot was conceived by September 11th mastermind Khalid Sheikh Mohammed, and was a precursor to the September 11th attacks (the "September 11th Attacks").

281.    Khalifa was tried in absentia by a Jordanian court for his involvement in a 1994 attack on a movie theater in Amman, Jordan by a local terrorist cell. One of Khalifa's co-defendants in that case, Abdul al Hasheikeh, testified at length concerning the impressive terrorist

platform Khalifa established in the Far East through the MWL and IIRO. Al Hasheikeh explained that he traveled from Jordan to the Philippines in July 1993 to meet with Khalifa and request his support for the Jordanian terrorist cell. According to al Hasheikeh: "The principal of the League's office in the Philippines is the named Mohammed Gamal Khalifa, a Saudi citizen, who is the in-law of Osama Ben Laden, a wealthy Saudi, who supports extremist Islamic organizations around the world and has training camps in Yemen."

282.    Al Hasheikeh testified that Khalifa established a terrorist training academy in the Philippines under the auspices of the IIRO called Dar al Imam al Shafi'i, and that Khalifa recruited al Hasheikeh to work as a teacher at the school.

283.    Khalifa was detained by U.S. law enforcement officials on December 16, 1994 by U.S. law enforcement officials as he was returning to the Philippines from San Francisco, California. Documents found in Khalifa's possession at the time of his arrest confirm al Hasheikheh's testimony, detailing that students at the Dar al Imam al Shafi'i received training in assassination, kidnapping, bombing churches, martyrdom operations, methods of torture, explosives and weapons.

284.    As al Qaeda developed and expanded its operations into new geographical regions over the years, the MWL extended its infrastructural support accordingly. In Bosnia, for instance, the MWL was instrumental in transferring hundreds of millions of dollars to al Qaeda and the Arab mujahideen in that region, including military equipment and weapons.

285.    As a "beacon" of Wahhabi ideology and propagation, the MWL took a leading role in rallying Muslims throughout the World to support al Qaeda's Bosnian jihad as well. In the April 20, 1992 edition of the *Al Alam Al Islami*, the Arabic edition of the MWL Journal, the MWL published an article by Isma'il Fath Alh Salamah calling for the Islamic world to prepare an army

for jihad for Allah. In the article, Salamah incites readers to fight all infidels, calls on them to gather weapons, and quotes militant verses praising jihad and terrorizing the enemies of Islam. In the August 10, 1992 edition of the *Al Alam Al Islami*, the MWL published a fatwa issued by Sheikh Muhmmad al Ghazali in reference to Bosnia. Al Ghazali's fatwa warns that any Muslim ignoring the plight of the Muslims in Bosnia is an infidel, and further asserts that the duty to help Muslims in Bosnia is a religious one akin to jihad. An article in the April 19, 1993 edition of *Al Alam Al Islami* similarly advocates that the first step to saving Bosnia is to equip the jihad fighters in Bosnia with everything necessary for jihad for Allah.

286.    MWL officials, including then Secretary General of the MWL, Dr. Abdullah Omar Naseef, have similarly issued statements calling for Muslims to support jihad in Bosnia and other regions of strategic importance to al Qaeda. For instance, in the April 17, 1992 edition of Al Alam Al Islami, Secretary General Naseef issued an announcement relating to the state of Muslim affairs in countries such as Bosnia-Herzegovina, the Philippines, Kashmir, Somalia, and Burma, stating that Muslims can have a role in caring for their Muslim brothers in these countries by carrying out jihad with their money and lives. At the time of that statement, al Qaeda was engaged in ongoing efforts to promote jihad in each of those countries.

287.    Intent on spreading the message that Muslims have a duty to carry out jihad in support of their Muslim brothers, Dr. Naseef sent a letter to the Saudi Arabian Minister of Religious Affairs in October 1992 advising of the recent recommendation from the "Conference of the Mosque's Message" that Friday sermons in the mosques should be used to spread belief in Allah and the study of the Islamic religion. Dr. Naseef recommended in his letters that Friday sermons should be used to revive the spirit of jihad.

288.    At an April 1993 press conference in Cairo, Dr. Naseef again stressed the

importance of providing money and weapons to Muslims in Bosnia. According to Naseef: "We cannot solve the problem of Bosnia with talks and not with action. We must act in all manners possible to equip the Muslims in Bosnia with financial support and military equipment."

289.    In May 1993, Dr. Naseef released a statement thanking Saudi Arabia's King Fahd for his contribution of $20 million which would be used for immediate relief of Muslims in Bosnia so that they may continue their jihad against the Serbs.

290.    Dr. Naseef similarly called on Muslims to support the Palestinian Intifada against Israel. In the March 23, 1992 edition of the Al Alam Al Islami, the MWL published a manifesto issued by Dr. Naseef urging Muslims to support jihad and the Palestinian Intifada, and further directing donations be deposited into a MWL bank account to support the Intifada. The bank account was identified as being at the National Commercial Bank, Account No. 01/14807000107.

291.    Ahmad Muhammad Ali, the MWL's Secretary General following Dr. Naseef, also called on Muslims to help the Bosnian people with funds and weapons.

292.    The MWL also played a role in supporting the 1998 U.S. Embassy bombings in Kenya and Tanzania. While working for the MWL in Kenya, Ihab Ali relayed messages between Osama bin Laden and Wadi El Hage in connection with the coordination of the bombings of the U.S. embassies. El Hage, who was convicted for his role in the embassy bombings, was himself at one time an employee of the MWL.

293.    The MWL also provided direct financial assistance to al Qaeda members involved in the attempted assassination of Egyptian President Hasni Mubarak in 1995.

294.    The MWL was further implicated in a terrorism finance investigation conducted jointly by the U.S. Department of Justice and the government of Spain. According to diplomatic cables authored by the State Department in June 2005, money was transferred by the Saudi

Embassy in Madrid to the MWL, which in turn transferred the funds to the Islamic Cultural Center ("ICC"), a prominent Islamic institution located in Madrid. Several million dollars that flowed through three accounts managed by the ICC between 1998 and 2003 were suspected of being "diverted to persons suspected of supporting international jihadist activities."

295.     The MWL further sponsored al Qaeda through its participation in the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC"), a body established by the Kingdom of Saudi Arabia to coordinate ostensible relief efforts among several charitable organizations under its control and direction in Kosovo and Chechnya. The other purported charities compromising the SJRC include the IIRO, Saudi Red Crescent Society, WAMY, al Haramain Foundation, Islamic Endowments and Makk Establishment, among others.

296.     The United Nations' mission in Kosovo declared that the SJRC in Pristina, Kosovo served as a cover for several al Qaeda operatives, including Adel Muhammad Sadi bin Kazam and Wa'el Hamza Julaidan, both of whom served as directors of the SJRC.

297.     Between 1998 and 2000, the Kingdom of Saudi Arabia, through the SJRC, diverted more than $74 million to al Qaeda members and loyalists affiliated with SJRC bureaus. Throughout this time, the Committee was under the supervision and control of Saudi Interior Minister Prince Naif bin Abdul Aziz.

298.     MWL officials have publicly acknowledged the organization's funds were being funneled to terrorist organizations. In an interview with Dr. Abdullah bin Saleh al Obaid, Secretary General of the MWL, published in The Muslim World magazine on July 21-27, 1997, al Obaid was asked about reports that the MWL's funds were being funneled to extremist groups. Al Obaid responded: "This is a closed chapter …. It has already been proven that there were people who exploited the situation and misused some funds …."

299. Despite Dr. Obaid's public admission, the State Department has made clear that "it has been an on-going challenge to persuade Saudi officials to treat terrorism financing emanating for Saudi Arabia as a strategic priority." According to a December 30, 2009 diplomatic cable originating from Secretary of State Hillary Clinton's office, titled Terrorist Finance: Action Request for Senior Level Engagement on Terrorism Finance, "donors in Saudi Arabia constitute the most significant source of funding to Sunni terrorist groups worldwide." Secretary Clinton further warned that "organizations such as the International Islamic Relief Organization (IIRO), Muslim World League (MWL) and the World Assembly of Muslim Youth (WAMY) … continue to send money overseas and, at times, fund extremism overseas."

300. The preceding paragraphs demonstrate that the Muslim World League knowingly and directly, financed and assisted Osama Bin Laden and other al Qaeda members in their planning and supporting the al Qaeda attack on America, including but not limited to the September 11 attacks through its founders, officers and employees.

### INTERNATIONAL ISLAMIC RELIEF ORGANIZATION

301. The International Islamic Relief Organization ("IIRO") is a subsidiary body of the Muslim World League ("MWL"), with offices throughout the globe.

302. IIRO's relationship with al Qaeda also grew out of IIRO's participation in the Afghan jihad in the 1980s, during which the IIRO worked within the network of ostensible charities to support the mujahideen. During the conflict Wa'el Hamza Jelaidan ran the IIRO offices in Peshawar, Pakistan, and was a leading supporter of jihad through the relief organization network. As a member of al Qaeda, Jelaidan remained in the Saudi da'awa infrastructure, serving as the director of the IIRO's Peshawar, Pakistan offices, an officer of the MWL, and later as a director of the SJRC.

303.    With the formation of al Qaeda, Jelaidan and the al Qaeda leadership continued to draw on the IIRO to support al Qaeda's global jihad, as documented by the previously discussed documents chronicling al Qaeda's formation.

304.    According to Jamal al Fadl, a former al Qaeda official who became a cooperating witness for the United States and testified at length in the African Embassy bombing trials, the IIRO provided false identification cards to al Qaeda members to enable them to cross the Pakistan-Afghanistan border for training at al Qaeda camps. Additionally, a June 2, 2004 FBI report summarizing an interview with al Fadl states that the IIRO office in Peshawar, under Jelaidan's leadership, facilitated the purchase of weapons for al Qaeda. According to the FBI report, "Julidan was one of Bin Laden's closest friends at the time."

305.    Other representatives of the IIRO in Pakistan provided funds for salary, travel and health benefits for al Qaeda members. For instance, the IIRO's branch office in Pakistan was managed by Abu Hamam al Saudi, who was also Osama bin Laden's cousin. Al Saudi would transfer IIRO funds to Madani al Tayyib, who would then distribute the amounts to individuals who were in charge of salary, travel, and health benefits for al Qaeda.

306.    The IIRO also played a critical role in supporting al Qaeda's expansion into the Far East, as discussed previously.

307.    Using IIRO funds and resources, Mohammed Jamal Khalifa established a network of charities, businesses, and Islamic institutions in the Philippines to support international terrorism. To assist Khalifa, Ramzi Yousef, a bomber of the World Trade Center in 1993, and Wali Khan Amin Shaw, also an IIRO employee in Pakistan, came to the Philippines. Yousef began training Philippine terrorist groups in bomb-making, while also conducting further research and refining his bomb-making technique.

308.    While working as the Director of the IIRO's Philippines branch, Khalifa maintained close connections with al Qaeda and employed members of the Abu Sayyaf Group, the al Qaeda proxy organization established by Khalifa using IIRO funds. According to a U.S. Department of the Treasury memorandum detailing the designation of the IIRO's Philippine and Indonesian branch offices and a senior IIRO official in Saudi Arabia: "The Abu Sayyaf Group [ASG] is the most violent of the separatist groups operating in the Southern Philippines and was designated as an SDGT pursuant to E.O. 13224 on September 24, 2001. It was formed in the early 1990's and received support and seed money from al Qaida."

309.    According to the U.S. government, one of the plots devised by Ramzi Yousef in conjunction with Khalifa and the IIRO office was to assassinate Pope John Paul II during a planned January 1995 visit to the Philippines and to simultaneously attack multiple U.S. airliners as they flew over the Pacific Ocean from Asia to the United States (the "Operation Bojinka" plot). According to a 1996 Central Intelligence Agency report regarding the involvement of Islamic charities in the sponsorship of terrorism, the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin." The CIA report further states that another high-ranking IIRO official in the Philippines leads Hamas meetings and that the majority of Hamas members in the Philippines are employed by the IIRO. Moreover, the "IIRO helps fund six militant training camps in Afghanistan," including camps from which al Qaeda planned, approved and coordinated the September 11th Attacks, and at which some or all of the September 11th hijackers received indoctrination and training.

310.    As mentioned above, American law enforcement officials detained Khalifa on December 16, 1994, as he was returning to the Philippines from San Francisco, California. FBI

documentation relating to his arrest identifies Khalifa as a "Known Terrorist." Traveling with Khalifa at the time of his detention was Mohamed Loay Bayazid, an al Qaeda founding member and top official who had tried to purchase uranium on behalf of al Qaeda.

311.    At the time of his arrest, the FBI discovered a trove of information in Khalifa's possession including documents referring to the plot to kill Pope John Paul II, as well as documentation identifying the curriculum for the Dar al Imam al Shafi'i in the Philippines. These documents confirmed that students at the school received training in assassination, kidnapping, bombing churches, martyrdom operations, methods of torture, explosives and weapons.

312.    At the time of his arrest, Khalifa was also an employee of the Mohamed Binladin Company.  His wife was also a shareholder of the company.

313.    Jamal al Fadl identified Khalifa as a close associate to Osama bin Laden.  During testimony as a cooperating witness for the United States, al Fadl stated that he knew Khalifa by his alias ("Abu Bara"), "who was close to bin Laden." According to al Fadl: "Hammam [IIRO's branch manager in Pakistan], Bara, and bin Laden are part of the group that has been around a long time."

314.    In connection with immigration proceedings following Khalifa's arrest, Philip C. Wilcox, Jr., the Department of State's Coordinator for Counterterrorism, submitted several letters to the immigration judge urging for Khalifa's continued detention. In a December 16, 1994 letter, Wilcox advised the Court that Khalifa financed a 1994 attack on a Jordanian movie theater, and that "the United Stated Government has evidence that Muhammad Jamal Khalifa, who has lived in the Philippines for a number of years, has provided financial support to the Philippine terrorist group Abu Sayyaf. We also have information that while in the Philippines he has been involved in organizations closely linked to Hamas…."

315.    In a December 20, 1994 letter the Court, Wilcox asserted that (i) Khalifa has provided support to terrorist groups in the Philippines; (ii) Khalifa has helped organize efforts by former fighters in Afghanistan to provide training and assistance to terrorists in the Philippines; (iii) Khalifa has extensive ties to Hamas; and (iv) Khalifa has ties to the terrorist organization Gama't Islamiya.

316.    Department of State cables following Khalifa's detention in the United States further detail Khalifa's and the IIRO's support for terrorist organizations and their activities in the Philippines and Afghanistan. For instance, a July 1994 cable from the American Embassy in Amman, Jordan concerning the Jordanian cinema bombing trial states that one of the defendants in the case worked "in the Imam al-Shafi center led by Muhammad Jamal Khalifa, another defendant who is an in-law of Saudi financier Usama Bin-Ladin."

317.    A December 1994 cable from the Secretary of State Warren Christopher's office states: "Khalifa is an officer of an Islamic NGO in the Philippines that is a known Hamas front and has financed terrorist operations. Khalifa is reported to be the brother in law of Usama Bin Laden, the Sudan-based financier of Islamic extremists. Khalifa is believed to have provided support to the Philippine terrorist group Abu Sayyaf." An additional December 1994 cable from the Secretary of State's office states that Khalifa is a "known financier of terrorist operations and an officer of an Islamic NGO in the Philippines that is a known Hamas front."

318.    An April 1995 cable from the American Embassy in Amman, Jordan to Secretary of State Warren Christopher discusses an attack by Abu Sayyaf Group, with possible assistance from Moro Islamic Liberation Front and Moro National Liberation Front, which left 53 people dead. According to the cable: "President Ramos said that Prime Minister Bhutto had disclosed to him the existence of training camps in Afghanistan where international terrorists, including ASG,

are being trained …. Mohammed Jamal Khalifa, the former head of the International Islamic Relief Organization in Manila, [i]s a principal financier of Abu Sayyaf."

319.    In an August 1993 interview concerning the Moro Islamic Liberation Front's call for jihad against the Philippine government, Sheikh Savila Salih, who was in charge of MILF's religious rulings, confirmed that MILF also received support from the IIRO: "The IIRO and other Islamic bodies who deal with the da'awa and aid, are the leaders of those who give the Front considerable support and are deserving of their gratitude."

320.    An October 2001 cable from the Secretary of State Colin Powell's office states that "Philippine authorities reported that Saudi national Muhammad Jamal Khalifa who ran two Islamic nongovernmental organizations in Manila was the major financier of the terrorists arrested there. Khalifa who has also been implicated in terrorist activities in Jordan is Bin Ladin's brother-in-law."

321.    An April 2004 cable from Secretary of State Colin Powell states that the IIRO is "tied to al-Qaida and other terrorist organizations. For example, IIRO has been cited as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime. IIRO has also been cited as the conduit for funds from Usama Bin Laden to terrorist organizations, specifically that the Abu Sayyaf cell in Manila was founded with money sent by Bin Laden to Mohamed Jamal Khalifa through IIRO."

322.    A June 2004 cable from the Secretary of State's office similarly details the IIRO's support for al Qaeda and the Abu Sayyaf terrorist group. According to the cable: "The USG believes that some elements of the International Islamic Relief Organization (IIRO) have been exploited by terrorists and their financiers as a means of transferring assets, providing organizational cover, or otherwise supporting extremist, violent operations." The cable further

states the "IIRO has been cited as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime. IIRO has also been cited as the conduit for funds from Usama Bin Laden to terrorist organizations, specifically that the Abu Sayyaf cell in Manila was founded with money sent by Bin Laden to Mohamed Jamal Khalifa through IIRO."

323.    A May 23, 2005 State Department cable titled, *Islamic NGOs in the Philippines*, also discusses the IIRO's illicit activities: "Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines."

324.    Prior to his death in January 2007, Khalifa confirmed in writing that all of his activities as Director of the IIRO in the Philippines were conducted under the direct supervision of the Saudi embassy.

325.    Other U.S. diplomatic cables have described the IIRO's illicit activities. For instance, an October 3, 2005 cable concerning OFAC Director Robert Werner's meetings a month earlier in Bahrain with the government's Minister of Finance, Minister of Social Affairs, and the Governor of the Bahrain Monetary Agency, details the closing of an IIRO bank account with Shamil Bank of Bahrain. According to information presented by Director Werner, the IIRO headquarters transferred over $7 million from the IIRO account at Shamil Bank to 18 different IIRO satellite offices. Among those transactions, the IIRO transferred funds from the Bahrain account to three Saudi Embassies. According to Director Werner, the second largest recipient of those funds was the IIRO's Djibouti branch office. Director Werner pointed out that the IIRO transactions represented a violation of the Kingdom's ban imposed on Saudi charities preventing

them from engaging in extraterritorial financial activities. In a follow-up meeting with the Governor of the Bahrain Monetary Agency on January 23, 2006, Treasury Undersecretary Stuart Levey thanked the Governor for closing the IIRO account which had been used to circumvent Saudi restrictions on sending money abroad.

326.     In an October 9, 2006 cable from the American Consulate in Jeddah, titled *IIRO Secretary-General Talks of Saudi Programs and Expansions*, IIRO Secretary-General Dr. Adnan Basha conceded that Islamic extremists have lectured at IIRO summer youth camps. Dr. Basha explained that the Ministry of Islamic Affairs is responsible for vetting both the programs and lecturers for all of IIRO's summer camps within the Kingdom, but that no such process was available to prevent radicals from passing their extremist ideologies on to young men and women at summer camps outside of Saudi Arabia.

327.     A February 13, 2007 cable originating from the U.S. Embassy in Khartoum, Sudan, identified the IIRO as "one of the major Saudi Arabian humanitarian organizations suspected of maintaining links with al-Qaeda." According to the U.S. government, "Usama bin Ladin used the entire IIRO network for his terrorist activities."

328.     A February 24, 2007 cable details a meeting between Assistant to the President for Homeland Security and Counterterrorism Francis Fragos Townsend with the Saudi Foreign Minister Prince Saud al Faisal at his home in Jeddah on February 6.  Townsend raised concerns of the U.S. government regarding the involvement of the Saudi Ambassador to the Philippines Muhammad Amin Waly in terrorism facilitation and his intervention to get two members of the IIRO released from prison.

329.    An August 22, 2007 diplomatic cable reported that the IIRO's branch office in Macedonia was closed and its members were expelled from the country in March 1995 amid concerns of terrorism financing.

330.    Finally, a November 3, 2008 cable authored by the U.S. Embassy in Dhaka, Bangladesh describes the freezing of IIRO accounts at Islami Bank Bangladesh as a result of terrorism financing investigations.

331.    On August 3, 2006, the U.S. Department of the Treasury designated the IIRO's Philippine and Indonesian branch offices and a senior IIRO official in Saudi Arabia, Abd al Hamid Sulaiman al Mujil, "for facilitating fundraising for al Qaida and affiliated terrorist groups." According to U.S. Treasury officials, "Abd Al Hamid Sulaiman Al-Mujil, a high- ranking IIRO official in Saudi Arabia, has used his position to bankroll the al Qaida network in Southeast Asia. Al Mujil has a long record of supporting Islamic militant groups, and he has maintained a cell of regular financial donors in the Middle East who support extremist causes." Often referred to as the "Million Dollar Man" for supporting Islamic militant groups, al Mujil provided donor funds directly to al Qaeda and is identified as a major fundraiser for the Abu Sayyaf Group and Jemaah Islamiyah.

332.    The August 3rd designation details al Mujil's long record of supporting terrorist organizations such as al Qaeda, Abu Sayyaf and Jemaah Islamiyah through the IIRO:

> Abd Al Hamid Sulaiman Al-Mujil (Al-Mujil) is the Executive Director of the IIRO Eastern Province (IIRO-EP) branch office in the Kingdom of Saudi Arabia. Al-Mujil has been called the "million dollar man" for supporting Islamic militant groups.
>
> Al-Mujil provided donor funds directly to al Qaida and is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI). Both ASG and JI are al Qaida- associated terrorist groups in Southeast Asia designated pursuant to the authorities of E.O. 13224. These terrorist groups are also on the United Nations

1267 Committee's consolidated list of individuals and entities associated with the Taliban, al Qaida and/or Usama Bin Ladin.

In 2004, Al-Mujil invited a Philippines-based JI supporter to Saudi Arabia under the cover of traveling for the hajj (the Muslim pilgrimage), and planned to provide him with cash to carry back to the Philippines to support organizations including JI.

Al-Mujil was also present in Afghanistan in the late 1990s and personally knew Usama Bin Ladin and deceased al Qaida co-founder Abdallah Azzam. Al-Mujil traveled continuously to meet with members of Bin Ladin's organization in Arab countries. In the 1990s, Al-Mujil established a relationship with senior al Qaida operational planner Khalid Shaykh Muhammad.

Al-Mujil has a long history of providing support to terrorist organizations. He has contributed direct financial assistance to ASG leaders, including Abdurajak Janjalani (deceased).

The Indonesian and Philippines branches of IIRO have received support from IIRO-EP, which in turn is controlled by Al-Mujil. Indeed, he is often responsible for authorizing payment transfers for IIRO Philippines (IIRO-PHL) and IIRO Indonesia (IIRO-IDN).

The Treasury Department's findings regarding the IIRO's branch offices in the

Philippines and Indonesia are just as damaging. According to the August 3rd designation:

The IIRO-PHL is a source of funding for the al Qaida-affiliated ASG. IIRO-PHL has served as a liaison for the ASG with other Islamic extremist groups. A former ASG member in the Philippines familiar with IIRO operations in the country reported that a limited amount of foreign IIRO funding goes to legitimate projects and the rest is directed to terrorist operations.

*\*\**

The IIRO Indonesia director has channeled money to two Indonesia-based, JI-affiliated foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment, transportation, logistics, and safe-havens. As of late 2002, IIRO-IDN allegedly financed the establishment of training facilities for use by al Qaida associates.

333.    In conjunction with the designations, the Saudi government imposed a travel ban on al Mujil, barring him from traveling outside of the Kingdom. The Saudis further froze his bank accounts, including an account at Al Rajhi Bank.

334.    However, despite assurances from Saudi officials that it had "shut down" the IIRO's Eastern Province Branch where al Mujil maintained his office and facilitated fundraising in direct support of al Qaeda, a March 2, 2009 State Department cable warned "that money continued to be funneled overseas from the Eastern Province Branch."

335.    The IIRO was also instrumental in supporting al Qaeda's operations in Bosnia, as one of the first da'awa organizations to enter the Balkans following the outbreak of the war. According to Dr. Farid Qurashi, former Secretary General of the IIRO: "From the very beginning of the Bosnia war, we were there to help."

336.    Former American mujahideen recruit Randall Todd Royer (a/k/a Ismail Royer), who participated in the Bosnian jihad, acknowledged that the IIRO's reputation as a front for jihad was well known in the Balkans: "It was well known that they helped get 'people' into Bosnia." Royer explained that another mujahideen fighter in Zenica had openly discussed his efforts to use the IIRO in order to obtain identity cards for fellow jihadists.

337.    In September 1992, Balkan press agencies published photos depicting the severed heads of Serb soldiers killed by foreign mujahideen collected in boxes. The photos were seized from the belongings of fallen Saudi Arabian jihadists, which also included an IIRO humanitarian worker identification card. The recovered card was labeled with the name and photo of "Khalil Abdel Aziz," a teacher from Saudi Arabia, and indicated that it had been printed by the Peshawar, Pakistan office of the IIRO.

338.    By mid-1993, the operations of the IIRO in Bosnia-Herzegovina were under the primary oversight of a Palestinian national known as Abdelaziz Zaher (a/k/a Abu Anas; Abu Enes) and his deputy, an Algerian national, Djamel Lamrani (a/k/a Abu Musab al Djazairi).  Zaher was expelled from his former residence in Belgrade in early 1993 after Serbian officials tied him to various organizations suspected of aiding armed fundamentalist militant groups, including the IIRO.

339.    Zaher's top lieutenant at the IIRO, Jamal Al-Jibouri, was personally responsible for oversight of a massive logistical operation to provide al Qaeda and al Qaeda affiliated Islamic militants in the Balkans with weapons and ammunition.

340.    While working for the IIRO, Zaher participated in the 1994 murder of British aid worker Paul Goodall near Zenica. Two days following the murder, Bosnian police arrested Saudi national Abdul Hadi al Qahtani, Abdu Khulud al Yemeni and Abu Enes (a/k/a IIRO chief Abdelaziz Zaher). At the time of his arrest, al Qahtani was carrying an identification card issued by the Zenica office of the Saudi High Commission.

341.    Following the arrest of the three men, Dr. Abdul Harith al Liby, deputy commander of the mujahideen, sent a letter to "authorized individuals" in the Bosnia- Herzegovina Military Police and security services requesting the release of the two "mujahideen" arrested alongside al Qahtani. Al Liby's letter identified both "Abu Enes" (Zaher) and al Qahtani interchangeably as "mujahideen" and as "employees" of "IGASE" (IIRO), who were detained by authorities while traveling in an IIRO employee-owned vehicle.

342.    Following the end of the war in Bosnia-Herzegovina in late 1995, Zaher and the IIRO continued their operations in the Balkans. The same year, "with the financial help of Selim Ben Mafuz, the executive director of 'Igasa' in Vienna," Zaher and other local IIRO organizers

founded two commercial enterprises, "Sahara" and "Isra-Trade" which allegedly were the recipient of suspicious financial transfers from "residential accounts of the H.O. 'Igasa.'"

343.    International law enforcement and intelligence investigations targeted the IIRO's mission in the Balkans as well. According to a guidebook on Islamic charitable organizations printed by NATO in April 1995, "the regional financial accountant for the IIRO, an Egyptian named Hossam Meawad Mohammad Ali, was detained by Croatian authorities in a raid in Zagreb" for his involvement in alleged criminal activity.

344.    In 1993, officials linked members of the Zagreb office of the IIRO to an Islamic extremist group headed by Muhammad Sa'd Darwish al Shazy, which was planning to conduct anti-Jewish bombings in Croatia. In addition to representatives of IIRO, al Shazy's organization included the heads of the Zagreb offices of the Saudi High Commission and the Kuwaiti Joint Relief Committee, representatives of the Human Relief International, and members of the Qatar Charitable Society.

345.    The IIRO's branch office in Vienna, Austria is linked to the Third World Relief Agency ("TWRA"), a purported charitable organization that became an integral component of al Qaeda's support infrastructure. Founded in 1987 in Vienna by Dr. El Fatih Ali Hassanein, a well-connected leader of the Sudanese National Islamic Front ("NIF") and fervent supporter of Osama bin Laden, the TWRA was a primary conduit for channeling financial, logistical, and operational support for al Qaeda's global jihad. Together with his brother, Sukarno Ali Hassanein, the Hassanein brothers simultaneously managed the IIRO's Vienna branch office, which shared office space with the TWRA.

346.    In September 1995, German authorities and members of the Austrian anti- terrorism task force raided the TWRA's Vienna headquarters, as well as the IIRO's office, uncovering a

trove of records detailing the transfer of approximately $220 million from radical Islamic organizations and Islamic countries in the Middle East to the Bosnian region. According to Western intelligence officials, at least half of the $220 million was used primarily to purchase and transport illegal weapons on behalf of the Bosnian government and foreign Arab fighters associated with Osama bin Laden's Islamic Army. The 9/11 Commission concluded that Osama bin Laden used the TWRA to covertly provide support for terrorist activities.

347.    Through its offices in Kenya, the IIRO provided direct financial and logistical support to al Qaeda terrorists involved in the 1998 bombings of the United States Embassies in Dar Es Salam, Tanzania and Nairobi, Kenya. As a result of an investigation into the involvement of the IIRO in the bombings, Kenyan officials deregistered the IIRO's Nairobi office.

348.    In October 2001, Pakistani officials identified and expelled some two dozen al Qaeda members who had been working for the IIRO in Pakistan.

349.    According to the Indian government, IIRO officials were behind the 1999 al Qaeda plot to attack the U.S. consulates in Madras and Calcutta, in response to the American military retaliation for the 1998 bombings of the United States Embassies in Dar Es Salaam, Tanzania and Nairobi, Kenya. The operational cell designated to carry out the planned attacks on the U.S. consulates was led by Sayed Abu Nesir, a Bangladeshi national who was directed to launch the attacks by Shaykh Ahmed al-Gamdin, Director of IIRO operations in Asia.

350.    During his subsequent interrogation, Abu Nesir declared that 40 to 50% of IIRO's charitable funds were being diverted to finance terrorist training camps in Afghanistan and Kashmir. Among other duties, Abu Nesir visited the training camps on behalf of IIRO to assess their funding needs. At the direction of al-Gamdin, Nesir himself attended one of the al Qaeda camps to receive training, where he met Osama bin Laden.

351.    Mahmoud Jaballah, head of IIRO's Canadian office, was arrested and jailed by Canadian officials based on his links to al Qaeda and Egyptian al Jihad. Jaballah was accused of having contact with al Qaeda operatives and had spent three years working for the IIRO in Pakistan.

352.    In 1991, the IIRO established a U.S. branch in Virginia, under the name International Relief Organization, Inc. ("IRO"). The IRO operated from offices at 360 South Washington Street, Washington, D.C., where it shared office space with the MWL. The Washington, D.C. offices of the IIRO and MWL were part of a complicated web of for-profit and ostensible charitable organizations within the United States, referred to by the U.S. government as the Safa Group or SAAR Network, the majority of which maintained offices at 555 Gross Street, Herndon, VA. The SAAR Network of businesses and charities was created to provide funding, money laundering and other material support to terrorist organizations, including al Qaeda. In March of 2003, federal authorities executed search warrants at the offices of IIRO in Washington, DC, in connection with an ongoing federal investigation of the illegal activities of the Northern Virginia and Washington based charities and for-profit enterprises within the SAAR Network. Through that investigation, federal authorities determined that the IIRO and MWL offices in Washington, DC provided funding and material support to al Qaeda and Hamas.

353.    The IIRO further sponsored al Qaeda through its participation in the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC"). As set forth herein, the SJRC offices in Pristine, Kosovo served as a cover for al Qaeda operatives. Furthermore, between 1998 and 2000, the Kingdom of Saudi Arabia, through SJRC, diverted more than $74 million to al Qaeda members and loyalists affiliated with SJRC bureaus.

354.    Not surprisingly, given the breadth of the IIRO's ties to al Qaeda, the United States has detained several IIRO officials and employees as "enemy combatants." In support of the continued detention of those individuals, the U.S. government has cited their affiliations with IIRO as a "primary factor" favoring detention, and expressly labeled the IIRO as an al Qaeda front.

355.    The U.S. government has identified the IIRO (a/k/a "Hay'at al-Igatha al- Islamiyya al-Alamiyah") as a Tier 1 Terrorist Non-Government Organization and a National Intelligence Priority Framework (NIPF) Counter-Terrorism (CT) Priority 2 Terrorist Support Entity (TSE). According to the United States, "Priority 2 TSEs have demonstrated sustained and active financial support for terrorist organizations willing to attack U.S. persons or interests, or provide witting operational support to Priority 2 terrorist groups."

356.    Detainee Samir N. Al Hasan (ISN No. 043) traveled to Afghanistan from Yemen in 1999 or 2000, attended the training camp at al Farouq, and became a bodyguard in August 2001. Al Hasan told U.S. authorities that he was in Afghanistan as a relief worker for the IIRO and that he received the position from the head of the IIRO. The United States government's unclassified evidentiary summaries relating to al Hasan assert: "The International Islamic Relief Organization was identified as an Islamic humanitarian organization with headquarters in Mecca, Saudi Arabia, and is financed by Usama bin Laden."

357.    Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) traveled from Saudi Arabia to Pakistan and Afghanistan in early 2001 and worked for "Al-Ighatha Al-Islamiya, International Islamic Relief Organization (IIRO)."  Balkhair was associated with the Taliban and al Qaeda, and stayed approximately 3 months in a Taliban guesthouse in Jalalabad, Afghanistan. Moreover, Balkhair's name was listed on a computer hard drive associated with a known terrorist and was further discovered on a list of al Qaeda mujahedin who were in Afghanistan. The unclassified

evidentiary summaries filed in support of Balkhair's continued detention at Guantanamo Bay state that "the International Islamic Relief Organization is a non-governmental organization, which has ties to Usama Bin Laden and the Abu Sayyaf Group."

358.     Detainee Said Muhammad Husayn Qahtani (Detainee No. 200) traveled multiple times from Saudi Arabia to Afghanistan between 2000 and 2001. In May 2000, Qahtani met and stayed with Abu Zubaydah in a safehouse while waiting to travel to Afghanistan. Moreover, during a trip in June 2000, Qahtani joined the Taliban against the Northern Alliance and spent a considerable amount of time on the front lines. Qahtani joined al Qaeda after giving an oath of allegiance ("al bay'ah") to Osama bin Laden, and further met 2 of the 9-11 hijackers – Saeed al Ghamdi and Ahmed Alnami. According to Department of Defense documentation, Qahtani contacted relief organizations such as the IIRO and al Haramain with the intention "to join a relief organization because those entities would offer him a way to get into Chechnya, whose borders were closed at that time. Once there, the detainee would be free to leave the relief organization and join the fighting."

359.     Detainee Abdallah Ibrahim al Rushaydan (ISN No. 343) was captured on December 10, 2001 on the border of Pakistan and Afghanistan. According to the U.S. government: "The International Islamic Relief Organization (IIRO) is also known as Al Hayat Al Igatha Al Islamiya Al Aalamiya. According to the media in Asia, the Islamic Non- government Organization known as the International Islamic Relief Organization (IIRO), which is managed by Osama Bin Laden's brother-in-law, has maintained links with the Abu Sayyaf group (ASG) in the Philippines. Executive Order 13224, which blocks property and prohibits transactions with persons who commit, threaten to commit, or support terrorism, designates the Abu Sayyaf Group as a global terrorist entity."

360.     Significantly, in response to the U.S. government's assertion that the IIRO is a front for terrorism, al Rushaydan testified that the IIRO "is a government organization managed by Dr. Adnan Basha who holds the rank of Minister. [IIRO] is a government organization under the Islamic World League and all charity organizations are under the Senior Director for charity organizations, Ameer Nayef (King Nayef), who is the Saudi Minister of Interior."

361.     Detainee Rashid Abd al Muslih Qaid al Qaid (ISN No. 344) traveled from his home in Saudi Arabia to Afghanistan in October 2001 with an individual who was identified as a member of the al Qaeda mujahideen. Al Qaid himself was also designated by the Saudi government as a high priority target. The United States government's unclassified evidentiary summaries relating to al Qaid state: "The detainee and both of his traveling companions, Al Nur and Wasim, traveled to carry out charity work in conjunction with a Saudi charity, al-ighatha al- khairia." "Al Ighatha is a large Saudi NGO with field offices worldwide, many of which are staffed by or support terrorists or mujahidin. The NGO is linked to al Qaida and other extremist NGOs."

362.     Detainee Ghanim Abd al Rahman Ghanim al Huwaymadi al Harbi (ISN No. 516) was working in the IIRO finance department in Jeddah during the summer of 2000. Al Harbi responded to a fatwa that requires all Muslims to train and be prepared to defend Islam at any time. Although he was prohibited from traveling outside of Saudi Arabia, al Harbi traveled to Afghanistan during the summer of 2001 via Bahrain and Pakistan. Al Harbi testified that he was a "governmental employee of a charitable organization" known as the International Islamic Relief Organization. In addition, al Harbi acknowledged during his testimony that he received training at the al Farouq camp in Afghanistan, a known al Qaeda facility, which he understood to be a "charity funded camp."

363.    Detainee Tariq Mahmoud Ahmed al Sawah (ISN No. 535) is a former relief worker for the IIRO in Bosnia and Croatia. Al Sawah testified that he chose to go to the Balkans region after watching videos depicting the atrocities committed by Serbs against Bosnians, and eventually joined the Bosnian Third Army, whose members were predominantly Arab Mujahideen fighters. Al Sawah admitted to being a member of the mujahideen since 1992. According to the U.S. government: "The International Islamic Relief Organization, also known as the World Islamic Relief Organization, is the largest Islamic charity organization in Saudi Arabia. International investigations have disclosed the organization has connections to terrorist financing activities and its field offices throughout the world have supported terrorist activity."

364.    Al Sawah was expelled from Bosnia in 2000 and traveled to Afghanistan where he attended the al Farouq training camp and further served as an advanced explosives trainer at the Tarnak Farm training camp. In 2002, he met Ayman al Zawahiri and also attended a banquet dinner with Osama bin Laden and a senior al Qaeda lieutenant. Moreover, al Sawah authored a 400 page manuscript containing bomb-making techniques and provided it to al Qaeda members. His design for a shoe bomb technically matched the design of the failed explosive device used by shoe bomber Richard Reid.

365.    Detainee Ahmed Hassan Jamil Suleyman (ISN No. 662), who performed volunteer work for the IIRO, was identified as a senior al Qaeda commander and trainer with contacts to Osama bin Laden, Sheikh al Liby and Abu Zubayda. Suleyman was also a member of Makthab al Khidmat and associated with Makhtab al Khidmat (the "Office of Services"). According to Department of Defense documentation: "The detainee occasionally would perform volunteer work with the International Islamic Relief Organization (IIRO). The IIRO has connections to terrorist organizations and has channeled funds to Islamic extremists from Afghanistan."

366.   Detainee Abdul Latif Elbanna (ISN No. 905) worked for the IIRO. The unclassified evidentiary summaries filed in support of Elbanna's continued detention at Guantanamo Bay state: "In 1990 the detainee worked at an Islamic Relief organization (IRO) called Haiat Ali Ghatha Al Islami Al Alamia.  He lived for free at a guesthouse owned by the charity in the Hayat Abad district of Peshawar. Fighters from Afghanistan stayed at the guesthouse. The International Islamic Relief Organization/Hay-at al-Igathat al-Islamiyya al- Alamiyah of Saudi Arabia is designated a Tier 1 Non-Governmental Organization having demonstrated sustained and active support for terrorist organizations willing to attack U.S. persons or interests."

367.   The preceding paragraphs demonstrate that the IIRO from Saudi Arabia used its IIRO branch offices around the world to knowingly and directly, finance and assist Osama Bin Laden and other al Qaeda members in their planning and support for the al Qaeda attack on America, including but not limited to the September 11 attacks through its founders, officers and employees.

## WORLD ASSEMBLY OF MUSLIM YOUTH

368.   The World Assembly of Muslim Youth ("WAMY") is also a subsidiary of the MWL. Founded in 1972 and headquartered in Riyadh, Saudi Arabia, WAMY has a physical and operational presence in at least 56 countries worldwide. In addition, WAMY conducts activities in many countries in which it does not maintain a formal physical presence, through its association and membership in other Islamic organizations and committees, including its membership in the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC").

369.   The operations of WAMY's branch offices are closely supervised and directed by WAMY's central leadership in Saudi Arabia, and functionally operate as agents of the central organization. WAMY's central authority in Saudi Arabia uses a variety of mechanisms to rigidly

control the branch offices. WAMY's General Assembly and Board of Trustees in Saudi Arabia set policies and procedures for all WAMY branch offices, and hand-pick the officials who run those branch offices. WAMY headquarters also selects the projects and causes for which funds are to be raised by the WAMY offices throughout the world. Funds raised by the branch offices are transferred back to the organization's headquarters, which then redistributes those funds to the regional offices, to be applied to projects and causes selected by WAMY's central leadership. WAMY's branch offices are required to submit detailed reports of their activities and finances to the central leadership in Saudi Arabia, for review and approval. High ranking WAMY officials from Saudi Arabia also conduct periodic inspections of the branch offices. In addition, by virtue of its close relationship with the Kingdom's government, WAMY is able to use the Kingdom's governmental apparatus throughout the world, including the embassies, to monitor the day to day activities of the branches.

370.   For more than a decade, WAMY has knowingly and intentionally used its international infrastructure as a tool for supporting the al Qaeda movement, on both the ideological and military fronts. As a result of the Kingdom of Saudi Arabia's extensive patronage, WAMY possesses a multi-million dollar annual budget. WAMY dedicates a significant portion of that budget to the publication and worldwide dissemination of literature calculated to promote the global jihadist agenda, convince young Muslims to reject the United States and democratic ideas as evil and non-Muslim, demonize Christians, Jews and non- Wahhabi Muslims, and convince young Muslims to engage in violent jihad against the West and Israel.

371.   Virulently anti-American, anti-Semitic and pro-jihadist propaganda pervade WAMY's "educational" publications. For example, under the heading "The Prophet asks for Jihad," the WAMY book *Islamic Views* says, "The Prophet Mohammad fought against the infidels

and the Jews till he triumphed over them and conducted himself about twenty invasions and he sent tens of regiments led by his companions for Jihad…Damn from Allah to the Jews who made graves of their prophets as Masjid."  Later, *Islamic Views* says Islam "is a religion of Jihad*"* and that jihad "was an answer for the Jews, the liars." "[T]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah." *Islamic Views* further exhorts Muslims to wage "Jihad against the Satan," and that "You should not back the Jews and the Christians and the Communists against the Muslims; the Communists, the Infidels, the Jews, and the Christians, those who do not believe in Mohammed. You should say they are infidels."

372.     The jihad WAMY advocates in its publications is intensely violent. According to a WAMY policy statement, "[a] Christian should be asked to repent. If he does not he must be killed." *See Written Statement of James B. Jacobsen, President of Christian Solidarity International,* submitted to the Sub-Committee of International Relations and Human Rights, Hearing on Persecution of Christians Worldwide, February 15, 1996. The book *Islamic Camps: Objectives, Program Outlines and Preparatory Steps*, prepared by WAMY's Camps and Conferences Unit and intended to serve as a manual for Islamic youth camps, suggests that youths attending WAMY camps be led in the following refrain:

> Hail! Hail! O Sacrificing Soldiers! To Us! To Us!
>
> So we may defend the flag on this Day of Jihad, are you miserly with your blood?!
>
> And has life become dearer to you? And staying behind sweeter?
>
> Is staying in this world of torment more pleasing to us?
>
> You are amongst those called upon by Destiny.
>
> Come! So we may revive the times of our predecessors!

373.    Through these and other WAMY publications, as well as the madrassas, camps, Islamic Centers, mosques, conferences and other events it sponsors, WAMY has provided the ideological foundation for the al Qaeda movement, and actively advocated young Muslims to take up arms and engage in violent jihad against the United States. In this regard, WAMY has played a critical role in al Qaeda's cultural assault on the United States and democratic institutions throughout the world.

374.    Consistent with the extremist agenda it advocates, WAMY has immersed itself deeply in the militant endeavors of the global jihadist movement as well, actively supporting the militant and terrorist activities of al Qaeda and associated organizations in Bosnia, Chechnya, Kosovo, Kashmir, Pakistan, South East Asia, the United States and elsewhere.

375.    WAMY's material support to al Qaeda began in the late 1980s in Pakistan and Afghanistan with its relationship with Lajnat al Bir al Islamiyah aka the Islamic Benevolence Committee ("LBI").

376.    While WAMY was located in Riyadh, Saudi Arabia, LBI was created in Jeddah in 1987 by Adel Batterjee as an organization to support Osama Bin Laden and the jihad in Afghanistan. According to the U.S. Department of Justice, one of its primary roles was to provide cover for foreign fighters travelling into Afghanistan.

377.    By 1989 it was operational in Pakistan and had close relations to the Saudi Red Crescent under Wael Jelaidan.

378.    WAMY was originally incorporated in Pakistan on October 29, 1989 as Lajnat al Bir al Islamiyah. From 1989 until 1996 in documents filed with the Pakistani authorities the entity was known as the "World Assembly of Muslim Youth (Lajnat al Birr al Islamiyah)". In December

1996, shortly after Osama Bin Laden relocated back to Afghanistan, the name was formally changed to WAMY Pakistan.

379.    WAMY Secretary General Maneh Johani was the Saudi Arabia-based chair of the supervising committee of WAMY/LBI and appointed the most senior officials of WAMY/LBI in Pakistan.

380.    From its founding in Pakistan the WAMY/LBI was staffed at the senior most levels with active supporters of Osama Bin Laden and al Qaeda including the chairman, Adel Batterjee, the President Ayman Khayat and another officer Enaam Arnaout.

381.    In 1991 LBI/WAMY published a hagiographic style biography and early history of Osama Bin Laden and the jihad in Afghanistan titled Arab Volunteers in Afghanistan.

382.    Abdullah Azzam, lauded Lajnat al Bir as providing the lion's share of help to the mujahideen in Afghanistan and Pakistan and particularly to the Jaji hospital which serviced the al Qaeda fighters.  In turn the LBI/WAMY supported the Abdullah Azzam Institute in Peshawar, Pakistan.

383.    WAMY/LBI provided weapons, logistics and communications support to al Qaeda from 1989 through the September 11th attacks on America.

384.    In 1993 and 1994 WAMY/LBI in Pakistan/Afghanistan wrote off $200,000 in advances and employee loans. The funds were never accounted for.

385.    As al Qaeda branched out from Pakistan and Afghanistan and relocated most of its infrastructure to Sudan, so did WAMY/LBI.

386.    In May 1991, following an agreement between al Qaeda and the Sudanese authorities, WAMY/LBI began operating in Sudan.  WAMY/LBI, renamed BIF in Sudan provided military, logistical, medical, educational and political support to al Qaeda and the families of its

members.  BIF worked closely with the Sudanese Popular Defense Forces, an organization that promoted a violent agenda against people in southern Sudan as well as against the United States. For more on the Popular Defense Force, see the section on NCB above.

387.    After Osama Bin Laden left Sudan in 1996, WAMY/LBI took on the formal ownership of bin Laden's bank in Sudan, al Shamal Islamic Bank, and Batterjee became the chairman of the bank.  Al Shamal, BIF and Batterjee continued to support al Qaeda financially. For more on al Shamal and its support to al Qaeda, see the sections on Prince Mohamed and Yasin Kadi above.

388.    In March 1992, the Benevolence International Foundation ("BIF") was incorporated in Illinois. The Statutes of the organization stated that its country of domicile was Liechtenstein, a country that maintained tight corporate secrecy at the time, its head office was to be in Chicago and the executive office in Jeddah, Saudi Arabia.  Batterjee, his nephew and Mazin Bahareth, the son of a key figure from the bin Laden family were the original founders. Enaam Arnaout from WAMY/LBI was tasked with running the organization.  According to the U.S. Department of Justice, LBI was renamed BIF.

389.    WAMY/LBI and BIF shared an address, PO Box 1055, Peshawar, Pakistan.

390.    They also shared an address Box 10845, Riyadh, Saudi Arabia.

391.    In Bosnia, WAMY/LBI, now called BIF supported the al Qaeda cells operating as part of the mujahideen forces.  It was also in Bosnia, that in 2002, during a joint raid of BIF offices by Bosnian police and the FBI, that the History of Osama archive was found.  As noted previously this archive contained a history of the birth of al Qaeda in Pakistan and Afghanistan.

392.    In Bosnia, BIF created false lists of orphans to cover expenses for the benefit of the mujahideen

393.    In the summer of 1998, BIF employed another founder of al Qaeda, Mahmdou Mahmoud Salim and sponsored his trip to Bosnia.  Salim was integral to the international business and procurement aspects of al Qaeda.

394.    BIF also purchased materials, including military boots from an al Qaeda company in Turkey owned by Salim.  For more on this company and its support to al Qaeda, see the section on Yasin Kadi.

395.    BIF also supported al Qaeda in Chechnya with weapons, other materials and again operated as cover for the movement of senior al Qaeda officials, in this case Saif al Islam al Masry into Chechnya.

396.    In 1999, the WAMY representative in Albania was expelled from the country by the authorities for his ties to Osama Bin Laden.

397.    The head of WAMY Canada, Mohamed Khatib was also part of BIF.  Khatib was simultaneously running the Muslim World League Canada.  In the 1980's he worked for the Saudi Cultural Office official in Denver.

398.    In October 2000, WAMY Canada opened a Bank of Montreal account and in Jan, 2001 the name on the account changed to "World Assembly of Muslim Youth O/A BIF."   The account was purportedly going to be used for the BIF orphan program. The account was closed 8 months later in June 2001.  The address for the account is that of the residence of the WAMY Canada President and the address of BIF Canada.

399.    In 2001, WAMY Canada, dependant on funds from WAMY Saudi Arabia sent over $50,000 to the BIF US orphan program. In Afghanistan the BIF US orphan program was closely tied to the Taliban and al Qaeda.

400.    WAMY funded a Chicago Institute which, in turn, funded BIF.

401.   The Islamic Cultural Center of Newark was a member of WAMY.  BIF had an office in the Newark building which had originally been purchased with funds from the Muslim World League and other Saudis.  On September 10, 2001, the building was visited by 9/11 hijacker, Samir Jarrah.

402.   WAMY's pervasive involvement in supporting al Qaeda fighters and associated local jihadist groups in regional conflicts was well documented prior to September 11, 2001. On December 5, 1992, the *New York Times* identified WAMY as a front for armed Islamic jihad in Bosnia. According to the article, *Muslims From Afar Joining "Holy War" in Bosnia*:

> The conflict between Serbs and Muslims in Bosnia and Herzegovina… has been adopted by Islamic fundamentalists as the newest holy war against Christian infidels bent on the destruction of Islam.

> In the last few weeks, the conflict has lured several hundred militants, many of them veterans of the war in Afghanistan, to volunteer for the Bosnian forces….

> The volunteers are sponsored by a variety of militant religious organizations and often have their expenses and plane fare covered…. Despite formal denials from the relief organizations, Saudi officials say an increasing amount of the charity on behalf of the Bosnians is now used to provide arms and logistical support for Arab volunteers.

> "Since August, most of the money raised for relief has been turned over to the Bosnians for weapons," a Saudi official…. The World Assembly of Muslim Youth, which organized relief operations in Afghanistan and is now deeply involved in the conflict in the Balkans, flies back wounded Saudi fighters and provides free medical care in the Saudi German hospital.

403.   Within the same article, Adel Batterjee, the then chairman of WAMY, acknowledged the organization's role in supporting armed Islamic jihad in Bosnia: "if a relief worker decides that he wants to join the fighting forces, we would not stop him…." Following the

September 11th Attacks, Adel Batterjee was formally designated as a terrorist sponsor and supporter pursuant to Executive Order 13224.

404. In May of 2000, Russian officials similarly accused the SJRC, the committee through which WAMY conducted activities in Chechnya, of financing and otherwise supporting Islamic terrorists and separatists in that region. According to a May 19, 2000 article in the Russian newspaper *ITAR-TASS*, *Chechen Separatists Said Funded by Several Foreign Sources*:

> The aid to Chechens fighting against Russia, is delivered from the organization of humanitarian assistance to Muslims of Kosovo and Chechnya (the SJRC)….
>
> Officially, the money is sent to Chechnya to be used for religious events and Islamic feasts, but is actually used to finance rebel troops [a representative of the Russian Federal Security Service (FSB)].
>
> According to available information, part of the money is transferred to banking accounts of some warlords, including Shamil Basayev and Khattab…
>
> Russia's security services are aware that these people are financing rebel forces, overseeing arms, food and medicine deliveries, as well as arranging treatment for the wounded and paying allowances to guerillas.

405. Significantly, Amir Khattab, one of the individuals who received financing directly from WAMY and the SJRC, is a senior al Qaeda member who was deployed to Chechnya by Osama bin Laden to organize al Qaeda's operations in that area. According to the 1998 Department of Defense Intelligence Report:

> In 1995, Khattab appeared in Chechnya to carry out a special mission assigned to him by Usama ben Laden to organize training camps for international terrorists…. He was a colonel, fought as a field commander, and was wounded in the hand. Khattab organized three training camps in the Vedeno and Nojai-Urt areas of the forested mountain zone. Graduation is held at the three camps every two months. They are very equipped, with firing range facilities and capabilities to create models of "sites of diversion," as well as classes for sappers and snipers.

406.    By no later than 1999, the details of bin Laden's direct links to Khattab and the Chechen mujihadeen were the subject of widespread reporting in the mainstream media. For instance, in August of 1999, NBC News published a report, U.S. Links bin Laden to Chechnya, stating that "Osama bin Laden is financing the Chechen operation in Dagestan…" The article, which was based on information provided by senior U.S. intelligence officials, explained that the "key bin Laden connection" to the Chechen jihadists was Amir Khattab, and that their relationship was so close that bin Laden was considering relocating from Afghanistan to areas of Chechnya under Khattab's control.

407.    In the United States WAMY supported the activities of the Foundation for Islamic Education.  This Foundation ran a "Jihad Camp" in Pennsylvania in August, 2001.

408.    Prior to the September 11th Attacks, WAMY officials made little effort to conceal their involvement in sponsoring armed jihad in Chechnya. To the contrary, at least within the Arabic press, WAMY officials openly acknowledged that the organization was deeply involved in sponsoring militant activities in Chechnya. For example, in a January 15, 2000 article published in *Al Jazeera* newspaper, *The Chechen Tragedy – The Reality and the Required Role*, Dr. Maneh al Johani, the Secretary General of WAMY, wrote as follows:

> [I] want to stress that these heroic Moslems, the Mujihadeen who are standing strong, deserve to receive our support and we must invest all of our energy in aiding them when they are being fed the taste of defeat once again. … It should be pointed out that WAMY has doubled its efforts and has placed all of its branches inside and outside of the Kingdom on alert to serve the Chechen issue and to implement the aid program for the Chechen refugees.
>
> 1.   The question that must be asked is: What do the Chechen Muslims need from us today?
>
> 2.   ***They need money to buy arms and ammunition.*** (emphasis supplied.)
>
> The Islamic awakening, which is growing, praise be to Allah, is that

> which worries the Communist East and Heretic West, and they are afraid they will awaken one day and the Muslims will demand payment of a poll tax.
>
> Triumph is coming and Islam will remain and Allah will rise and be victorious. I request Allah for our brothers Mujihadeen in Chechnya and Dagestan, stability, reinforcements and victory.

409.    Significantly, al Jahari published his call for Muslims to donate funds to WAMY to buy "arms and ammunition" for the "mujihadeen" in Chechnya and Dagestan well after the direct and close relationship between those militants and al Qaeda had been widely detailed in the media and elsewhere.

410.    Philippine officials also publicly implicated WAMY in the financing of terrorist activities in Southeast Asia in the years prior to the September 11th Attacks.  According to a January 15, 1999 article in the *Australian General News*, *Philippines Suspect Australian Group of Helping Rebels*, the government of the Philippines accused WAMY's Australian branch of financing the Moro Islamic Liberation Front ("MILF"). MILF was responsible for several bombings and attacks on remote villages in the Philippines that forced 400 civilians to flee in January of 1999. In February of 1999, MILF Chief Hashim Salamat publicly confirmed that MILF had received funds from Osama bin Laden.

411.    Statements by government officials and press reports in the years preceding the September 11th Attacks also reveal WAMY's extensive role in supporting al Qaeda activities in Kashmir.  According to a December 8, 1995 article in the periodical *Money Clips*, *Kashmiri Leader Thanks WAMY for Help*, a Kashmiri leader publicly thanked WAMY during a press conference for "helping the Mujihadeen in their struggle for independence from India." Separate articles published prior to September 11, 2001 reveal that WAMY funneled support to the Students' Islamic Movement of India (SIMI), Lashkar-e-Taibah and Hizb ul Mujahideen, three violent jihadist groups operating under the broader al Qaeda umbrella. *See SIMI: Nursery of Hate, India*

*Today*, April 2, 2001; *ISI Twin Plan – Attack Christians, Defame Hindu Outfits, The Economic Times of India*, July 15, 2000; *Kashmir: Hizb-Ul-Mojahedin Chief Explains Reasons Behind Cease Fire, BBC Worldwide Monitoring*, August 23, 2000; *Pakistani Behind Church Blast Say Police, The Statesmen (India)*, July 14, 2000. In an interview contained in one of the articles, SIMI head Safdar Nagori publicly confirmed his organization's allegiance to al Qaeda:

> Q: In your conferences, you have openly eulogized Osama bin Laden.

> A: Not once, but dozens of times. We believe he has shown great character in standing up the Americans, the biggest terrorists in the World.

412.    In March of 2003, al Qaeda military chief Abu Zubaydah was arrested at a Lashkar-e-Taibah safehouse in Islamabad, confirming the depth of collaboration and reciprocal support between those two terrorist organizations.

413.    WAMY Secretary General, Dr. Maneh al Johani, said that Muslims should come forward to wage jihad to liberate Kashmir. Speaking at a Muslim World League auditorium in 1991, al Johani stated that jihad could be performed in many forms, asserting that Muslims can go to the battlefield to wage a war against the enemies of Islam or they can give their moral, physical and financial support to the cause of jihad.

414.    WAMY's sponsorship of jihadist activity in Kashmir was channeled through its offices in Pakistan, which sponsored al Qaeda activity in that country as well. In connection with a crackdown on terrorist activity prompted by the September 11th Attacks, Pakistani authorities deported 89 employees of ostensible NGOs in October of 2001, based on their suspected ties to terrorism. WAMY was among the organizations whose "employees" were specifically targeted by the measure. Pakistani intelligence officials, operating in conjunction with agents of the Federal Bureau of Investigations of the United States, raided WAMY's Pakistani offices approximately

one year later, as part of ongoing counter-terrorism efforts. WAMY's close ties to senior al Qaeda cells in Afghanistan and Pakistan were revealed just one week after the raid, when an employee of WAMY hand delivered a recorded message from Osama bin Laden to an Arab television network in Islamabad.

415.    That incident did not represent the first occasion on which WAMY was involved in transferring information on behalf of al Qaeda. During the investigation into the 1993 World Trade Center bombing, U.S. officials discovered an al Qaeda training manual in the possession of Ahmed Ajaj, who was later convicted for his role in that attack. The manual, entitled "*Military Lessons In The Jihad Against The Tyrants,*" was distributed to Ajaj by WAMY and detailed how to establish and maintain clandestine operational sales. The same manual was subsequently recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998.

416.    WAMY also had extensive ties and provided publication support to Anwar Aulaqi, a Yemeni American who directly assisted the 9/11 hijackers from inside the United States in the months and weeks before the 9/11 attacks to support their objective to attack America.

417.    Early in 2001, WAMY hired Sayid Rageah a Somali born Islamic scholar.  Rageah was a graduate of the Institute of Islamic and Arabic Sciences in America, a Saudi funded radical center based in Virginia.  Rageah had also been a fund raiser for the Global Relief Foundation, a charity with extensive ties to al Qaeda.  The head of Global Relief had worked for WAMY/LBI in Pakistan during the time it supported al Qaeda.

418.    On September 9, 2001, two of the hijackers Nawaf al Hazmi and Khalid al Mihdhar visited Rageah's mosque in Laurel, MD. They left behind a bag.  On September 11, 2001, the FBI recovered the bag to find all that was left in it was fruit, clothing, flight logs and a note stating "gift for the brothers."

419.    In Pompano Beach, Florida, Rageah's friend, the Imam Hassan Sabri also received at his mosque a bag from hijacker Mohamed Atta.

420.    Until shortly after the September 11th Attacks, WAMY also maintained a physical presence in the United States, from which the organization channeled material support and resources to al Qaeda. WAMY's U.S. offices were established in Falls Church, VA in 1992 by Abdullah bin Laden and Omar bin Laden, blood nephews of al Qaeda leader Osama bin Laden. Under Abdullah bin Laden's leadership, WAMY's U.S. branch was deeply involved in the terrorist activities of the SAAR Network of businesses and charities.  Federal authorities raided WAMY's U.S. offices in 2004, in connection with an ongoing investigation of the SAAR Network's role in sponsoring al Qaeda. Abdullah bin Laden was specifically selected by the Saudi Ministry of Islamic Affairs to head WAMY's branch office in the United States and maintained an office at the Saudi Embassy in Washington, D.C.

421.    Despite the increased scrutiny of WAMY's operations following the September 11th Attacks, the organization continues to sponsor al Qaeda and associated terrorist organizations and separatist movements to this day, demonstrating the organization's deep and longstanding commitment to al Qaeda's global jihad.

422.    In June of 2002, Indian authorities arrested two men under the Prevention of Terrorism Act, after determining that they had transferred funds to Sayed Ali Shah Geelani, the leader of the Fundamentalist Jamaat-e-Islami party. According to sources within India's government, the two men, Farooq Ahmed and Mohammed Maqbool, were given funds by Nazir Qureshi, a senior WAMY official, to be covertly delivered to Geelani.  Geelani previously had been arrested under the Prevention of Terrorism Act based on his involvement in transferring money to militant organizations in Kashmir.

423.    In September of 2003, Romanian intelligence officials implicated WAMY in an al Qaeda plot to hijack a plane departing from Romania and crash it into Heathrow Airport in London. According to an article published by the *Global New Wire* on September 5, 2003, *Intelligence Service "Alert" Watches Egypt's "Muslim Brothers" in Romania*, the plot was being coordinated by al Qaeda affiliated members of the Muslim Brotherhood in Romania. Quoting information obtained from Romanian intelligence officials, the article asserts that the Romanian wing of the Muslim Brotherhood acts under the cover of various humanitarian organizations, and receives most of its funds from WAMY.

424.    As recently as March 2012, the Canadian government concluded an investigation revealing that WAMY's Canadian branch office "maintained close relationships with and provided funding to organizations that were engaged in providing resources to entities engaged in terrorist activities."

425.    The Canada Revenue Agency ("CRA"), the government agency responsible for administering provincial and territorial tax programs, promoting compliance with Canada's tax legislation and regulations, and ensuring the administration and enforcement of the country's tax laws, undertook an extensive investigation into the operations and activities of WAMY's Canadian branch office, located at 3024 Cedarglen Gate, Unit 70, Mississauga, Ontario, arising from concerns that the branch office was failing to comply with certain reporting requirements expected of charitable organizations that wish to maintain their tax exempt status under Canadian law.

426.    As part of that investigation, the CRA conducted an audit of the WAMY branch office's financial and operations records, including a review of the office's Registered Charity Information Returns (T3010). Upon completion of the audit, the CRA determined that the WAMY branch office was in serious non-compliance with the core requirements of the Canadian Income

Tax Act, including: (1) failure to comply with Section 230 of the Act requiring WAMY to maintain proper financial books and records; (2) ceasing to comply with certain provisions of the Act requiring WAMY to devote all of its resources to charitable purposes and activities; and (3) failing to file Registered Charity Information Returns as and when required under the Act.

427.    More importantly, the investigation conducted by the CRA uncovered documentation and information linking the WAMY Canadian branch office, and the WAMY headquarters in Saudi Arabia, to terrorism. For instance, the CRA uncovered evidence that the WAMY branch office shared common officers, office space, contact information, and bank accounts with Executive Order 13224 Specially Designated Global Terrorist ("SDGT") entity Benevolence International Fund-Canada ("BIF-Canada"). In addition, the CRA's investigation discovered that the WAMY branch office was funding Executive Order 13224 SDGT entity Benevolence International Foundation ("BIF") in the United States.

428.    On November 19, 2002, the U.S. Department of the Treasury designated Benevolence International Foundation and Benevolence International Fund-Canada as "financiers of terrorism." According to Treasury, the organization's leadership, including BIF's Chief Executive Officer, Enaam Arnaout, were closely associated with Osama bin Laden and "worked with others – including members of al Qaida – to purchase rockets, mortars, rifles, and offensive and defensive bombs, and to distribute them to various mujahideen camps, including camps operated by al Qaida."

429.    As a result of those findings, the CRA revoked WAMY's designation as a tax exempt registered charitable organization.

430.    Further, the United Nations refused to accredit WAMY due to its ties to terror.

431.    Statements by Treasury Department officials, testifying before Congress, further confirm that WAMY continues to serve as a front for al Qaeda and other terrorist organizations. During a July 13, 2005 Hearing on Money Laundering and Terror Financing Issues in the Middle East before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, Treasury Under Secretary Stuart Levey asserted that "wealthy Saudi financiers and charities have funded terrorist organizations and causes that support terrorism and the ideology that fuels the terrorists' agenda… Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq." Levey expressed particular concern about the continued involvement of WAMY, the IIRO and MWL in the financing of terrorist activities throughout the globe.

432.    As is the case with the MWL and IIRO, the United States has detained a number of WAMY employees as enemy combatants, and the unclassified evidentiary summaries prepared by the Department of Defense for those detainees specifically detail WAMY's support for al Qaeda and other terrorist organizations.

433.    For instance, the United States government's unclassified evidentiary summaries relating to detainee Mammar Ameur (ISN No. 939) state the following regarding WAMY: "In 1996, the detainee resigned from the EHRO [Egyptian Human Relief Organization] and remained unemployed afterward. The detainee was arrested with an individual, who worked for several years for a Saudi organization called WAMY. The World Assembly of Muslim Youth (WAMY) is an NGO operating in Afghanistan and may be associated with Usama Bin Laden and/or al Qaeda."

434.    Detainee Adel Hassan Hamed (ISN No. 940) was employed by Lajnat al Daawa al Islamiya ("LDI") in Afghanistan and Pakistan from 1986-1999. LDI is a non-governmental organization that operates in Afghanistan and is affiliated with Osama bin Laden and al Qaeda

operations. When Hamed was laid off from the LDI in 1999, he was hired as the Director of the WAMY hospital in Afghanistan. "WAMY is a non-government organization operating in Afghanistan that may be affiliated with Usama Bin Ladin and al Qaeda operations. According to top WAMY officials, both the United States and Israel must be destroyed. WAMY provides financial support to the Palestinians fighting against Israel. In addition, WAMY has put forward a proposal that the Palestinians should declare open war on Israel."

435. The preceding paragraphs demonstrate that WAMY and its founders, directors, officers and employees knowingly and purposely supported al Qaeda with money, weapons, logistical support, travel and more to support their goal to attack America.

## AL HARAMAIN ISLAMIC FOUNDATION

436. Defendant al Haramain Islamic Foundation ("al Haramain" or "AHF") is a Saudi Arabia- based ostensible charity, with branch offices in approximately 50 countries.

437. International investigations have confirmed al Haramain's direct and pervasive complicity in al Qaeda's operations and attacks throughout the world.

438. In 2002, an intelligence report from the Bosnian Intelligence Services (Agency for Investigation and Documentation or "AID") revealed the active role of Vakufska Banka D.D. in terrorism funding. Indeed, AID described Vakufska Banka D.D. and the merged Depozitna Banka D.D., as a financial platform assisting al Haramain Islamic Foundation and al Qaeda activities:

> The HO (al Haramain) spent around 13 KM ($7,647,000) between its foundation in 1997 and the end of last year 2000. Financial transactions were through accounts at the Depozit[na] Bank, now the Vakufska Bank, whose major shareholders have been linked with PIS operating illegal money laundering.

The Bosnian Intelligence memo regarding the activities of al Haramain states the following:

> Given all the above security factors, we believe that the clear lack of any concrete humanitarian projects indicates that the existence of this HO [Humanitarian Organization] was a fictitious cover (…)

The report establishes al Haramain's role in financing and assisting Osama bin Laden operations:

> Saudi HO [Humanitarian Organization] Al Haramain, (…) has acted as a channel for financing the activities of terrorist organizations. (…) According to available intelligence, the Sarajevo office assisted the terrorist organization Gama Al Islamija, while members of Bin Laden's El Itihad al Islamija (AIAI) terrorist groups were employed at the Somalia offices, which also financed their operations.

439.    The charity allegedly wired $1 million to Chechen rebels in 1999 and arranged to buy 500 heavy weapons for them from Taliban units. The Russian security service, FSB, has publicly alleged that Al Baraka Bank was used by al Haramain to funnel money to Islamic resistance fighters in Chechnya.

440.    On March 11, 2002, the United States designated the Bosnia-Herzegovina and Somalia branches of al Haramain as terrorists, based on their extensive and pervasive involvement in the funding of al Qaeda's activities in those two countries. According to the designation:

> The Bosnia office of Al Haramain is linked to Al-Gama'at al-Islamiyya, an Egyptian terrorist group (designated under Executive Order 13224 on October 31, 2001) that was a signatory to UBL's February 23, 1998 fatwa against the United States.

441.    U.S. Treasury Department officials further noted the Somalia branch's support for the al Qaeda network and a Somali terrorist organization:

> The Somalia office … is linked to Usama bin Laden's al Qaida network and Al-Itihaad al-Islamiyya (AIAI), a Somali terrorist group (designated under Executive Order 13224 on September 23, 2001). Al Haramain Somalia employed AIAI members and provided them with salaries through al Barakaat Bank (designated under Executive Order 13224 on November 7, 2001), which was a primary source of terrorist funding. Al Haramain Somalia continued to provide material and financial support for AIAI even after the group's designation under E.O. 13224 and UNSCR 1333. Money

was funneled to AIAI by disguising funds as if they were intended
for orphanage projects or Islamic schools.

442.    On January 22, 2004, the United States designated the al Haramain branches in

Indonesia, Kenya, Tanzania and Pakistan as terrorists for providing "financial, material and

logistical support to Usama bin Laden's (UBL's) al-Qaida network and other terrorist

organizations."

443.    The Indonesian Office of al Haramain had diverted funds to al Qaeda affiliated

terrorists for weapons procurement, and directly funded the deadly October 12, 2002 Bali

nightclub bombing. In addition to providing financial support to al Qaeda operatives in the country

and to the Jemaah Islamiyah terrorist group, a senior al Qaeda official apprehended in Southeast

Asia, Omar al Faruq, told authorities that al Haramain served as a primary source of al Qaeda

funding throughout Southeast Asia.

444.    In the press release issued in conjunction with the designation of the Kenyan and

Tanzanian offices of al Haramain, the U.S. Treasury Department described al Haramain's

extensive involvement in terrorist activity within Africa as follows:

> As early as 1997, U.S. and other friendly authorities were informed
> that the Kenyan branch of AHF was involved in plotting terrorist
> attacks against Americans. As a result, a number of individuals
> connected to AHF in Kenya were arrested and later deported by
> Kenyan authorities.
>
> In August 1997, an AHF employee indicated that the planned attack
> against the U.S. Embassy in Nairobi would be a suicide bombing
> carried out by crashing a vehicle into the gate of the Embassy. A
> wealthy AHF official outside East Africa agreed to provide the
> necessary funds. Information available to the U.S. shows that AHF
> was used as a cover for another organization whose priorities
> include dislike for the U.S. government's alleged anti-Muslim
> stance and purposed [sic] U.S. support for Christian movements
> fighting Islamic countries.

Also in 1997, AHF senior activities in Nairobi decided to alter their (then) previous plans to bomb the U.S. Embassy in Nairobi and instead sought to attempt the assassination of U.S. citizens. During this time period, an AHF official indicated he had obtained five hand grenades and seven "bazookas" from a source in Somalia. According to the information available to the U.S., these weapons were to be used in a possible assassination attempt against a U.S. official.

Information available to the U.S. shows that a former Tanzania AHF director was believed to be associated with UBL [Usama Bin Laden] and was responsible for making preparations for the advance party that planned the August 7, 1998 bombings of the U.S. Embassies in Dar Es Salaam, Tanzania, and Nairobi, Kenya. As a result of these attacks, 224 people were killed.

Shortly before the dual-Embassy bombing attacks in Kenya and Tanzania, a former AHF official in Tanzania met with another conspirator to the attacks and cautioned the individual against disclosing knowledge of preparations for the attacks. Around the same time, four individuals led by an AHF official were arrested in Europe. At that time, they admitted maintaining close ties with EIJ and Gamma Islamiyah.

Wadih-El-Hage, a leader of the East African al Qaida cell and personal secretary to UBL [Osama Bin Laden], visited the Kenya offices of AHF before the 1998 dual Embassy attacks. Searches conducted by authorities revealed that El-Hage possessed contact information for a senior AHF official who was head of AHF's Africa Committee, then overseeing authority for AHF's offices in Kenya and Tanzania.

In early 2003, individuals affiliated with AHF in Tanzania discussed the status of plans for an attack against several hotels in Zanzibar. The scheduled attacks did not take place due to increased security by local authorities, but planning for the attacks remained active.

Information made available to the U.S. shows that AHF offices in Kenya and Tanzania provided support, or act for or on behalf of al Qaida and AIM.

445.    The Pakistan office of al Haramain provided funding and logistical support for the acquisition and delivery of Zenit missiles, Sting anti-aircraft missiles, and hand-held anti-tank weapons to al Qaida and al Qaida affiliated militants. In addition:

Before the removal of the Taliban from power in Afghanistan, the AHF in Pakistan supported the Taliban and other groups. It was linked to the UBL-financed and designated terrorist organization, Makhtab al-Khidemat (MK). In one instance, sometime in 2000, the MK director instructed funds to be deposited in AHF accounts in Pakistan and from there transferred to other accounts.

At least two former AHF employees who worked in Pakistan are suspected of having al-Qaida ties. One AHF employee in Pakistan is detained at Guantanamo Bay on suspicion of financing al-Qaida operations. Another former AHF employee in Islamabad was identified as an alleged al-Qaida member who reportedly planned to carry out several devastating terrorist operations in the United States. In January 2001, extremists with ties to individuals associated with a fugitive UBL lieutenant were indirectly involved with a Pakistani branch of the AHF.

As of late 2002, a senior member of AHF in Pakistan, who has also been identified as a "bin Laden facilitator," reportedly operated a human smuggling ring to facilitate travel of al-Qaida members and their families out of Afghanistan to various other countries.

AHF in Pakistan also supports the designated terrorist organization, Lashkar E-Taibah (LET).

446.    On June 2, 2004, the United States designated the al Haramain branches in Afghanistan, Albania, Bangladesh, Ethiopia and the Netherlands "for the financial, material and logistical support they provided to the al-Qaida network and other terrorist organizations." The designation stated the following regarding the al Haramain branch in Afghanistan:

In Afghanistan, prior to the removal of the Taliban from power, AHF supported the cause of Jihad and was linked to the UBL financed Makhtab al-Khidemat (MK), a pre-cursor organization of al Qaida and a Specially Designated Global Terrorist pursuant to the authorities of E.O. 13224.

Following the September 11, 2001 terrorist attacks, activities supporting terrorism in Afghanistan continued. In 2002, activities included involvement with a group of persons trained to attack foreigners in Afghanistan. A journalist suspected of meeting with al Qaida and Taliban members in Afghanistan was reportedly transferring funds on behalf of the al Qaida-affiliated AHF and forwarding videotapes from al Qaida leaders to an Arabic language TV network for broadcast.

447.   The Albanian branch of al Haramain was closely linked to Osama bin Laden according to U.S. Treasury officials:

> The U.S. has information that indicates UBL may have financed the establishment of AHF in Albania, which has been used as cover for terrorist activity in Albania and in Europe. In late 2000, a close associate of a UBL operative moved to Albania and was running an unnamed AHF subsidiary. In 1998, the head of Egyptian Islamic Jihad in Albania was reportedly also a financial official for AHF in Albania. This individual, Ahmed Ibrahim al- Nagar, was reportedly extradited from Albania to Egypt in 1998. At his trial in Egypt, al-Nager reportedly voiced his support for UBL and al Qaida's August 1998 terrorist attacks against the U.S. embassies in Kenya and Tanzania.

448.   The al Haramain office in Bangladesh conducted surveillance for potential al Qaida attacks on U.S. targets in India:

> Information available to the U.S. shows that a senior AHF official deployed a Bangladeshi national to conduct surveillance on U.S. consulates in India for potential terrorist attacks. The Bangladeshi national was arrested in early 1999 in India, reportedly carrying four pounds of explosives and five detonators. The terrorist suspect told police that he intended to attack U.S. diplomatic missions in India. The suspect reportedly confessed to training in al Qaida terrorist camps in Afghanistan, where he met personally with Usama bin Laden in 1994. The suspect first heard of plans for these attacks at the AHF office in Bangladesh.

449.   In Ethiopia, the al Haramain branch provided support to Al Itihaad al Islamiyya ("AIAI").  AIAI has engaged in attacks against Ethiopian defense forces and has been designated both by the United States and the U.N. 1267 Sanctions Committee.  Dutch officials confirmed that the al Haramain Humanitarian Aid Foundation located in Amsterdam is part of the larger al Haramain network which has supported terrorism.

450.   Additionally, on June 2, 2004, the United States designated, "the founder and long-time leader of AHF [al Haramain Islamic Foundation] and a suspected al Qaida supporter," Aqeel Abdulaziz al Aqil. Al Aqil has been identified as al Haramain's Chairman, Director General and

President. As al Haramain's founder and leader, al Aqil controlled the organization and was responsible for all of its activities, including its support for al Qaeda and other terrorist organizations. According to U.S. Treasury officials:

> When viewed as a single entity, AHF is one of the principal Islamic NGOs providing support for the al Qaida network and promoting militant Islamic doctrine worldwide. Under Al Aqil's leadership of AHF, numerous AHF field offices and representatives operating throughout Africa, Asia, Europe and North America appeared to be providing financial and material support to the al Qaida network. Terrorist organizations designated by the U.S. including Jemmah Islammiya, Al-Ittihad Al-Islamiya, Egyptian Islamic Jihad, HAMAS and Lashkar E- Taibah received funding from AHF and used AHF as a front for fundraising and operational activities.
>
> Under Al-Aqil's leadership, AHF implemented its tasks through its offices and representatives, which span more than 50 countries around the world. AHF maintained nine general committees and several other "active committees" that included the "Continuous Charity Committee, African Committee, Asian Committee, Da'wah and Sponsorship Committee, Masjid Committee, Seasonal Projects Committee, Doctor's Committee, European Committee, Internet and the American Committee, the Domestic Committee, Zakaat Committee and the Worldwide Revenue Promotion Committee."

451. According to the U.S. Treasury Department evidentiary memorandum detailing al Aqil's designation pursuant to Executive Order 13224, Mansour Al-Kadi, a Saudi and deputy director general of the al Haramain headquartered in Saudi Arabia, issued an Internet posting which identified al Aqil as the "only individual with final decision making on spending … and the one with authority to hire employees, even if it is just a janitor …." Al Kadi is also "head" of al Haramain's Africa Committee, and vice president of the United States al Haramain branch.

452. On September 9, 2004, the United States designated the United States branch of al Haramain, along with one of its directors, Soliman al Buthe. In support of the designation, Stuart Levey, U.S. Treasury's Under-Secretary for Terrorism and Financial Intelligence, said this: "We continue to use all relevant powers of the U.S. government to pursue and identify the channels of

terrorist financing, such as corrupted charities, at home and abroad. Al Haramain has been used around the world to underwrite terror, therefore we have taken this action to excommunicate these two branches and Suliman Al-Buthe from the worldwide financial community."

453.    The United States branch of al Haramain was formally established in 1997. On the United States branch's tax Form 990 for 2001 filed with the Internal Revenue Service ("IRS"), al Aqil is identified as the President, al Kadi as the Vice-President, al Buthe as the Treasurer, and Perouz Sedaghaty as the Secretary. The U.S. branch's Article of Incorporation and application to the IRS for tax-exempt status also list al Aqil and al Kadi as members of the board of directors. Additional documents naming al Buthe as the organization's attorney and providing him with broad legal authority were signed by al Aqil.

454.    The assets of the al Haramain branch, which is headquartered in Ashland, Oregon, were blocked as a result of an investigation involving agents from the Internal Revenue Service – Criminal Investigations ("IRS-CI"), the Federal Bureau of Investigation ("FBI"), and the Department of Homeland Security's Immigration and Customs Enforcement ("ICE").

455.    In February 2004, the United States Attorney's Office for the District of Oregon announced the execution of a federal search warrant against the Ashland, Oregon property which has been purchased on behalf of the Al Haramain Islamic Foundation, Inc. The search was conducted pursuant to a criminal investigation into violations of the Internal Revenue Code, Money Laundering Control Act and Bank Secrecy Act. The accompanying affidavit by IRS Special Agent Colleen Anderson alleges al Haramain and its officers attempted to conceal the transfer of $130,000 in American Express traveler's checks and a $21,000 cashier's check intended for aid to Muslims in Chechnya in mid-March of 2000. The affidavit also states that on several occasions from 1997 to 2001, Soliman H. al Buthe, co-founder of the U.S. branch of Al Haramain,

brought significant sums of traveler's checks into the United States, according to declarations he made when entering the country. In 13 trips, he reported bringing in $777,845, of which $206,000 was used to buy the Ashland headquarters in 1997. But there is no explanation for the balance, Anderson wrote.

456.   In early 2000, an Egyptian doctor wired a $150,000 donation from his London bank account to al Haramain's Ashland bank, according to the affidavit. An e-mail from the doctor said the money was meant "to participate in your noble support to our Muslim brothers in Chechnya." At the time, Russian forces were battling Chechen rebels for control of the region. The fight was considered a jihad, or holy war, by some Muslim factions.

457.   The affidavit said that eleven (11) days after the doctor's donation showed up in Oregon, al Buthe traveled to Ashland from Saudi Arabia. He joined Perouz Sedaghaty (a/k/a "Pete Seda"), co-founder of the U.S. branch of al Haramain, at an Ashland bank and the two took out $130,000 – buying 130 traveler's checks in $1,000 denominations, the affidavit said. A bank clerk suggested it would be easier to issue a cashier's check, the affidavit said.

458.   "Seda said he could not take a cashier's check because the money was to help people and a lot of times these people may not be able to negotiate a cashier's check," the affidavit said Seda took an additional $21,000 in a cashier's check, giving that to al Buthe, the affidavit said. The check had the notation: "Donations for Chichania [sic] Refugees," the affidavit said. The affidavit said Seda – using the name Abu Yunus – signed an agreement with al Buthe saying he was relinquishing the money for "brothers and sisters in Chechnya."

459.   Within days, al Buthe returned to Saudi Arabia, failing to declare to Customs, as required, that he was taking the traveler's checks out of the United States, the affidavit said. Once back in Saudi Arabia, al Buthe cashed the traveler's checks in for Saudi riyals at the Al Rajhi Bank.

The money then disappeared, presumably to be smuggled into Chechnya. Al Buthe deposited the remainder into his bank account.

460.    Al Haramain's 2000 tax return underreported income by $21,000, underreported grants by $150,000, and overstated the price of a second prayer house that al Haramain bought in Missouri. The tax return shows that Sedaghaty, or one of his associates, improperly listed the $131,300 disbursement to al Buthe as funds used to purchase the Springfield prayer house.

461.    On September 9, 2010, a grand jury in Eugene, Oregon convicted Sedaghaty of two felonies related to the organization's efforts to send nearly $150,000 to support religious extremist militants in Chechnya. He was convicted of all charges, which included a charge that he filed a false tax return and conspired to file a false tax return as part of al Haramain's efforts to hide the trail of money.

462.    The United States also further designated the al Haramain branch located in the Union of the Comoros on September 9, 2004 based on information that two associates of that branch were linked to al Qaeda. According to the transcript from *U.S. v. Usama Bin Laden*, the Union of the Comoros was used as a staging area and exfiltration route for the perpetrators of the 1998 bombings of the U.S. embassies in Kenya and Tanzania. The al Haramain branches in Kenya and Tanzania were previously designated for providing financial and other operational support to these terrorist attacks.

463.    Finally, on June 19, 2008, the U.S. Treasury Department designated the Saudi-based headquarters of the al Haramain Islamic Foundation "for having provided financial and material support to al Qaida, as well as a wide range of designated terrorists and terrorist organizations." According to the designation:

> Today's action targets the entirety of the AHF organization, including its headquarters in Saudi Arabia. Evidence demonstrates that the AHF organization was involved in providing financial and logistical support to the al Qaida network and other terrorist organizations designated by the United States and the United Nations.

464.     Al Haramain has also sponsored al Qaeda activity within Europe, through the al Nur Mosque. According to German officials, the al Nur Mosque served as a meeting place, recruitment center and base of operations for al Qaeda within Germany. At the direction of the Kingdom of Saudi Arabia, al Haramain contributed in excess of $1 million dollars to the Mosque, funding the purchase of the land for the Mosque as well as its construction.

465.     Al Haramain also sponsored al Qaeda operations in Chechnya and Kosovo through its participation in the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC").  As set forth previously, the SJRC offices in Pristine, Kosovo served as a cover for al Qaeda operatives. Furthermore, between 1998 and 2000, the Kingdom of Saudi Arabia, through the SJRC, diverted more than $74 million to al Qaeda members and loyalists affiliated with SJRC bureaus.

466.     Al Haramain has advertised its connection to al Qaeda. Al Haramain's website used to have a direct link to the al Qaeda site about the Chechen operations (qoqaz.com). The website is part of the al Qaeda propaganda organization, Azzam Publications group of websites, including qoqaz.com, qoqaz.net, and azzam.com (among others).

467.     According to the 1996 Central Intelligence Agency Report, al Haramain directly funded and supported a mujahideen battalion in Zenica, was involved in illegal smuggling activities, and has further been linked to illegal funding through drugs and prostitution.

468.     Predictably, al Haramain employees and associates feature prominently among the persons detained as enemy combatants at Guantanamo Bay, Cuba following the September 11th Attacks.

469.     Detainee Zaid Muhamamd Sa'ad al Husayn (ISN No. 050) left Saudi Arabia for Afghanistan in July 2001 after being inspired by flyers posted by al Haramain. According to the U.S. government: "The al Haramayn Foundation (aka Al Haramayn Islamic Foundation [HIF]) is designated as a Tier 1 Non-Governmental Organization (NGO). Tier 1 targets are defined as terrorist groups, especially those with state support, that have demonstrated the intention and the capability to attack United States Persons or interests."

470.     Detainee Abdel Hadi Mohammed Badan al Sebaii Sebaii (ISN No. 064) worked as a volunteer for al Haramain. Department of Defense documentation states that al Haramain "is an NGO with known ties to al Qaida and Usama Bin Laden" and further asserts: "Al Haramain has been connected with violent Islamic groups and possible financial support of militant groups. They're known to support Islamic extremist elements in 17 countries or regions."

471.     Detainee Abdul Rahman Owaid Mohammad al Juaid (Detainee No. 179) provided monetary support to al Haramain, traveled from Saudi Arabia to Afghanistan in 2001, and was identified on a jihadist website on a list of mujahideen captured by the U.S. military in Afghanistan. According to the unclassified evidentiary summaries submitted in support of his continued detention: "The Al Haramain Islamic Foundation is on a terrorism blacklist because of 'financial, material and logistical support' they provided to the al Qaida network and other terrorist organization." "Foreign Government Services officials believe that Al Haramain might be a cover organization for Osama Bin Laden's al Qaida network. Saudi mujahedin are known to work in Al Haramain regional offices around the world."

472.     Detainee Said Muhammad Husayn Qahtani (Detainee No. 200) traveled multiple times from Saudi Arabia to Afghanistan between 2000 and 2001. In May 2000, Qahtani met and stayed with Abu Zubaydah in a safehouse while waiting to travel to Afghanistan. Moreover,

during a trip in June 2000, Qahtani joined the Taliban against the Northern Alliance and spent a considerable amount of time on the front lines. Qahtani joined al Qaeda after giving an oath of allegiance ("al bay'ah") to Osama bin Laden, and further met 2 of the 9-11 hijackers – Saeed al Ghamdi and Ahmed Alnami. According to Department of Defense documentation, Qahtani contacted relief organizations such as the IIRO and al Haramain with the intention "to join a relief organization because those entities would offer him a way to get into Chechnya, whose borders were closed at that time. Once there, the detainee would be free to leave the relief organization and join the fighting."

473.   Detainee Fahd Muhammed Abdullah al Fouzan (Detainee No. 218), an al Haramain employee, traveled to Afghanistan after September 11, 2001 and was identified as having attended the Abu Nasir military camp in Afghanistan. Al Fouzan fought in Tora Bora and was a fundraiser and recruiter for both al Qaeda and the Taliban in Saudi Arabia. According to the U.S. government: "The detainee was identified as an employee of the al Haramayn Charitable Institute. Al Haramayn was added on 11 March 2002 to the list of organizations identified under Executive Order 13224 blocking property and prohibiting transactions with persons who commit, threaten to commit, or support terrorism."

474.   Detainee Wasm Awwad Umar Wasim (Detainee No. 338), traveled from Saudi Arabia to Afghanistan in late 2001 with another member of al Qaeda. According to the unclassified evidentiary summaries submitted in support of his continued detention: "The detainee volunteered to work with the Al Haramain charity/non-governmental organization (NGO) from time to time. Executive Order 13224, which blocks property and prohibits transactions with persons who commit, threaten to commit, or support terrorism, designated Al-Haramain as a global terrorist entity. The detainee stated he was a colleague of the Al-Haramain Director." In

response to allegations concerning his association with al Haramain, Wasim testified that "al Haramain is an official governmental organization, registered under the administration of the government and the Kingdom of Saudi Arabia. It is officially registered and included in the Humanitarian Aid Association, and under the administration of Internal Affairs, led by the Minister of Internal Affairs." Wasim further stated that al Haramain is "not a secret organization; it's a governmental organization."

475.    Detainee Sami al Haj (Detainee No. 345), a senior al Qaeda operative and logistics expert, traveled to Azerbaijan at least 8 times to courier money to al Haramain, particularly between 1997-1999.  The United States government's unclassified evidentiary summaries relating to al Haj assert: "A source stated the al Haramain Saudi Arabian Foundation's main mission is to implement and teach true Wahhabism religious doctrine worldwide.  Al Haramain has connections with al Qaida. A former head of the al Haramain has been accused of controlling the financial, material and logistical support to al Qaida and other terrorist organizations.  Al Haramain is suspected of involvement in weapons smuggling to Algeria and the transfer of radical fundamentalists to Bosnia during the war in the former Yugoslavia."

476.    Detainee Jamal Muhammad Alawi Mari (Detainee No. 577), began working with al Haramain as a student in 1995 and was later hired in 1997 to work at the al Haramain office in Baku, Azerbaijan.  In August 1998, Mari was appointed as director of the al Haramain office in Baku.  A foreign government agency has stated that Mari took part in high-level illegal activity, and further reported that the al Haramain office disseminated propaganda of an extremist and separatist nature in the guise of providing humanitarian assistance.

477.    The unclassified evidentiary summaries filed in support of Mari's continued detention at Guantanamo Bay detail al Haramain's long-standing support for Islamic extremist

groups, families of Islamic suicide attackers, the al Qaeda network, and mujahideen fighters in

Chechnya:

> Al Haramayn was founded in 1992 to disseminate the Saudi Arabian version of the Sunni Islamic religion with Wahabistic influences/teachings. In addition to providing legitimate humanitarian aid to promote Islamic teachings, this organization has provided support to families of Islamic suicide attackers, freed activists from prisons, procured fraudulent travel documents, provided medical care for wounded Mujahedin, smuggled weapons into Algeria and transferred radical fundamentalists into Bosnia.
>
> Al Haramayn has provided logistical support to the Mujahedin fighting in Afghanistan since the 1980's. Their annual budget was between 50 to 60 million United States Dollars. Al Haramayn provides support to Islamic extremist elements in seventeen countries or regions that includes freeing of activists from prisons, procurement of fraudulent travel documents and weapons smuggling to Algeria. Forty bank accounts connect to terrorist activities have been linked to offices and sub-departments of al Haramayn.
>
> A source stated al Haramayn worked closely with members of al Wafa. A former al Qaida member stated organizations such as al Haramayn and al Wafa allowed easier access to funds which financed al Qaida. These organizations provided a legitimate cover for al Qaida members to travel world-wide under the guise of humanitarian operations. These groups would build mosques for the purpose of recruiting future al Qaida members.
>
> Al Haramayn established an office in Azerbaijan to provide a legitimate organization, which was also providing money and materials to Mujahedin, military leaders throughout Chechnya. Authorities accused Al Haramayn of supporting activities not in alignment with the humanitarian aims of the organization in January 2000 and the office was subsequently closed.

478.    Detainee Khalid Mahomoud Abdul Wahab al Asmr (Detainee No. 589), identified

as an Afghan jihad veteran who had connections with Islamic extremists worldwide, told U.S.

military investigators that he had been providing aid to al Qaeda and other extremists since 1996.

According to the U.S. government, Al Asmr met with Muhamed Krimi, the director of the al

Haramain office in Zenica, Bosnia in July 1999 to discuss a plan to attack the British and American

embassies: "HIF [al Haramain] has been sanctioned under Executive Order 13224 for supporting terrorism. HIF has been linked to the Mujahedin Brigade in Bosnia and the Islamic Cultural Institute (ICI) in Milan. HIF uses links to the ICI to remain active in support of the former mujahideen in Bosnia." In response to the Tribunal's contention that al Haramain is associated with al Qaeda, Al Asmr stated: "If you consider al Haramayn as a terrorist organization, you should [be] talking to Saudi Arabia, because Saudi Arabia was the country that established al-Haramayn. Its president is the Royal Prince there. Why don't you go over there and ask him."

479.    The preceding paragraphs demonstrate that all of the al Haramain offices, including its headquarters in Saudi Arabia knowingly, purposefully and intentionally provided money, weapons, logistics and other support to al Qaeda and its members to support al Qaeda's stated plans to attack America.

## DALLAH AVCO

480.    At all relevant times herein, Dallah Al Baraka Group LLC ("DABG") was and is a privately owned multinational corporation based in Jeddah, Saudi Arabia.

481.    DABG was and is a multinational conglomerate with investment holdings in major industries, including but not limited to, financial and banking services, healthcare, manufacturing, real estate, and/or transportation operations and maintenance services.

482.    DABG's former chief executive and current chairman was and is Saudi resident and billionaire Saleh Abdullah Kamel.

483.    Dallah Avco Trans Arabia ("Dallah Avco") was and is a wholly owned subsidiary of DABG, specializing in aviation services.

484.    Dallah Avco has extensive contracts with the Saudi Ministry of Defense and Aviation.

485.   In the years prior to September 11, 2001, Dallah Avco provided financial, logistical, and/or ideological support, either directly and/or indirectly through its agents, servants, representatives, and/or employees, to those individuals responsible for plotting and, ultimately, carrying out the terror attacks on American citizens on U.S. soil, and specifically the attacks of September 11, 2001.

*Dallah Avco's relationship with Omar al Bayoumi*

486.   From 1994 through 2001, Dallah Avco knowingly and willfully paid Saudi national Omar al Bayoumi (a/k/a "Omar Ahmad Mustafa Al-Baioomi") a salary and provided him with unlimited funds in furtherance of his work integrating the 9/11 hijackers into the Islamic radical community within the United States and helping them secure the means and support to plan, plot, and ultimately, carry out acts of terror on American citizens on U.S. soil, and specifically those attacks which occurred on September 11, 2001.

487.   Due to his long-standing, yet murky, relationship with the Saudi government, both American intelligence officers and members of his own Arab expat community, believed Omar al Bayoumi served as a covert Saudi intelligence agent in the years leading up to the September 11th attacks.

488.   From mid-1980s until at least 2001, Omar al Bayoumi purportedly worked as an employee of the Saudi Arabian government in the Saudi Arabian Presidency of Civil Aviation ("PCA"), a branch of the Saudi Ministry of Defense.

489.   In August 1994, while still a paid employee of PCA, Bayoumi moved to San Diego California at the direction of the Saudi government.

490.   In 1994, Bayoumi was granted a secondment by the PCA to work with Dallah Avco in Saudi Arabia.

491.     Bayoumi remained in the United States for the next seven years, from 1994 to 2001.

492.     In or around 1995, Bayoumi began receiving a $3,000 monthly salary from Dallah Avco.  Dallah Avco reported that the $3,000 salary was for Bayoumi's work on an aviation project commissioned by the Saudi government and taking place in Saudi Arabia.

493.     Bayoumi enrolled in English as a Second Language Classes at San Diego State University, and held himself out to the public as a "low-income student."

494.     Bayoumi's derived his primary source of income from his employment with Dallah Avco.   Dallah Avco financed all of Bayoumi's personal and educational expenses for the seven years he resided in San Diego, California.

495.     Bayoumi showed up for work only once during the seven years he was receiving a salary from Dallah Avco.

496.     Bayoumi's chronic absence led employees at the company to describe him as a "ghost employee," one of many Saudis on the payroll who were not required to work.

497.     According to U.S. intelligence, there were approximately fifty (50) individuals who, like Bayoumi, were being carried on the books at Dallah Avco and were being paid for doing nothing.

498.     Using the funds he received from Dallah Avco, Bayoumi rented an apartment in a San Diego suburb.

499.     On his rental application, Bayoumi falsely reported his job as "student".  He stated on that application that his income was $2,800 a month.

500.     Despite Bayoumi's representations that he was a student with a modest income, the Report of the Congressional Joint Inquiry into the Terrorist Attacks of September 11, 2001 ("9/11 Joint Inquiry Report"), concluded that Bayoumi "had access to seemingly unlimited funding from

Saudi Arabia."

501.    According to the Joint Inquiry Report, "one of the FBI's best sources in San Diego informed the FBI that he thought that al-Bayoumi must be an intelligence officer for Saudi Arabia or another foreign power."

502.    Several people interviewed by the FBI considered al Bayoumi to have a relationship with Saudi Intelligence known as the Saudi General Intelligence Directorate ("GID").

503.    While living in San Diego, Bayoumi ingratiated himself within the San Diego Muslim community, spending much of his time interacting with the regional mosques, including the Islamic Center of San Diego.

504.    Bayoumi became well-established and widely accepted in the local San Diego Muslim community.

505.    In 1998, a FBI source identified Bayoumi as the individual who delivered approximately $400,000 from Saudi philanthropist Saed al Habib (a/k/a Mohamed Barak) for the construction of a Kurdish mosque in in El Cajon, CA, approximately 15 miles northeast of San Diego.

506.    The substantial donation was made on the condition that the mosque hire Bayoumi as the building manager and provide him with a private office.

507.    Following completion of the mosque, however, the mosque's leadership became unhappy with Bayoumi due to his failure to show up for work and the discovery of financial irregularities relating to his collection and distribution of funds.  They neither liked or trusted him and eventually asked Bayoumi to leave the premises.

508.    Between December 1998 and December 2000, Bayoumi communicated via telephone with Fahad al Thumairy, an official from the Consulate of Saudi Arabia's Ministry of

Islamic Affairs office in Los Angeles, California. Bayoumi regarded Thumairy as a religious and spiritual advisor.   Phone records between Bayoumi and Thumairy reveal that the two men exchanged phone calls on at least twenty-one occasions, between December 1998 and December 20, 2000, a month before 9/11 hijackers, Nawaf al-Hazmi and Khalid al-Mindhar, arrived in the United States and began appearing at Thumairy's mosque in Los Angeles.

509.    Witnesses told 9/11 Commission Investigators that they had seen Thumairy meeting with Bayoumi on several occasions at the King Fahd Mosque.

510.    Thumairy, like Bayoumi, had extensive ties to the Islamic community in Southern California.

511.    Thumairy graduated with a degree in Islamic studies from the Imam Muhammad Bin Saudi Islamic University in Saudi Arabia.  After graduation, Thumairy immediately joined the Saudi Ministry of Islamic Affairs.   The Ministry sent Thumairy to the Saudi Embassy in Washington, D.C. before assigning him to the Saudi Consulate in Los Angeles.

512.    From 1996 to 2003, Thumairy served as an accredited diplomat at the Saudi Consulate and was a religious leader at the King Fahd Mosque in Culver City, CA, a mosque that had been built with funds from the government of Saudi Arabia.

513.    Thumairy was an Islamic fundamentalist who believed in strict adherence to the orthodox Wahhabi doctrine.  Thumairy was associated with a particularly radical faction within the community of local worshippers, and had a network of contacts in other cities in the United States."

514.    While a religious leader at the King Fahd Mosque, Thumairy openly espoused radical fundamentalist ideals through his religious teachings.

515.    Due to his suspected ties to terrorism and attacks on America, the United States

eventually revoked Thumairy's diplomatic visa, deported him, and banned him from re-entering the United States in May 2003.

516.   In January 2000, Thumairy was appointed by his superiors at the Ministry of Islamic Affairs to serve as the Saudi Consulate's liaison to the King Fahd Mosque, per the request of his superiors at the Ministry of Islamic Affairs.

517.   On January 15, 2000, future 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar arrived in the United States via a United Airlines flight from Bangkok, Thailand after attending an al Qaeda summit in Kuala Lumpur, Malaysia.   Attendees at the summit included al Qaeda members, Ramzi Binalshibh, Tawfiq bin Attash, and Abu Bara al Yemeni as well as the leader of the al Qaeda affiliate in Asia, Hambali, who hosted the meeting.   Key details of the 9/11 attacks were discussed at this summit.

518.   Despite there being over 50 mosques in the Los Angeles area, between January 15, 2000 through February 1, 2000, future hijackers, Hazmi and Mihdhar, spent time at the King Fahd Mosque where Thumairy was an active leader.

519.   On February 1, 2000, Bayoumi, along with a cohort from the San Diego Islamic Center who he had recently met, drove nearly two hours from San Diego to the Saudi Arabian Royal Consulate in Los Angeles to meet with Thumairy.   Bayoumi had previously disclosed to friends at the Islamic Center that he had friends at the Saudi Consulate.   Although the stated purpose of the trip was to resolve a visa issue and obtain Islamic religious materials and Korans, Bayoumi had told at least one other person prior to the trip that he was going to Los Angeles to pick up visitors.

520.   Bayoumi met with Thumairy for over an hour. U.S. officials believe that Thumairy and Bayoumi discussed the recent arrival of future 9/11 hijackers Nawaf al Hazmi and Khalid al

Mihdhar in the United States, and Bayoumi was tasked with getting them welcomed and assimilated into the San Diego Muslim community.

521.    When Thumairy was later questioned on February 23, 2004 by 9/11 Commission members, Dietrich Snell and Raj De, about his relationship with Bayoumi he stated:

> He did not recognize the name Omar al-Bayoumi.  When shown a photo of al-Bayoumi, al-Thumairy first denied recognizing him.  At this time, Major Khalid [a Saudi official with the Mahabith (the police agency of the Ministry of Interior)] whispered something to him in Arabic, and Thumairy said in English, "Oh Bayoumi."  Al-Thumairy then acknowledged that recognized al-Bayoumi because he had seen him on television, but denied ever seeing him in Los Angeles.

522.    On February 1, 2000, following the meeting with Thumairy, Bayoumi and his cohort drove to the King Fahd Mosque.  The two men then traveled to a nearby Middle Eastern restaurant known as the Mediterranean Café, where they met with 9/11 hijackers, Hazmi and Mihdhar, over lunch.

523.    During the February 1, 2000 meeting with the future hijackers, Bayoumi offered to help Hazmi and Mihdhar relocate to San Diego.  Hazmi and Mihdhar accepted Bayoumi's offer.

524.    On February 4, 2000, Hazmi and Mihdhar arrived in San Diego and Bayoumi began undertaking extraordinary efforts to get the future hijackers assimilated into the local Muslim community, so that they could eventually carry out Osama Bin Laden's plan to attack America.

525.    As the 9/11 Commission observed, the two hijackers were "ill prepared for a mission in the United States.  Their only qualifications for this plot were their devotion to Usama Bin Ladin, their veteran service, and their ability to get valid U.S. visas.  Neither had spent any time in the West, and neither spoke much, if any, English."  It was therefore "unlikely that Hazmi and Mihdhar – neither of whom, in contrast to the Hamburg group, had any prior exposure to life in the West – would have come to the United States without arranging [for them] to receive assistance from one or more individuals informed in advance of their arrival."

526.     The hijackers required a support network in the United States to help them "hide in plain sight" in order to finance, plan, and ultimately carry out the attacks on Americans in the United States.

527.     Dallah Avco employed Bayoumi and paid him a monthly salary to serve as the point person to facilitate the future hijackers' transition and preparations in the United States, and to also act as a conduit through which Dallah Avco could transfer funds into the San Diego terrorist cell housing the future 9/11 attackers.

528.     Telephone records from January 2000 through March 2000, and specifically the timeframe when 9/11 hijackers Hazmi and Mihdhar arrived in Los Angeles and subsequently settled in San Diego with Bayoumi's assistance, reveal extensive contacts between Bayoumi's phone and Saudi officials in Washington D.C. and Los Angeles, CA.  Bayoumi's phone made approximately 141 calls to Saudi officials in Washington D.C. at the Saudi Arabian Royal Embassy, the Saudi Islamic Affairs Department, the Saudi Arabian Cultural Mission, the Saudi Arabian Education Mission, and the Saudi National Guard.  Bayoumi's phone also made approximately 34 calls to the Saudi Arabian Royal Consulate in Los Angeles.

529.     FBI records indicate the two future hijackers used Bayoumi's phone during the months of February and March, 2000.

530.     The two hijackers initially moved in with Bayoumi and his family at their residence at the Parkwood Apartment complex in San Diego, until Bayoumi was able to secure similar housing for them at the same apartment building.

531.     Bayoumi recommended Hazmi and Mihdhar to the property manager of the Parkwood Apartments and acted as a co-signer and guarantor for them on their rental application

because they did not have established credit.   On the application Bayoumi is listed as a "friend" by Hazmi and Mihdhar.

532.    Bayoumi helped Hazmi and Mihdhar open a bank account and deposited $9,000 into it.

533.    Bayoumi paid the hijackers' security deposit and first month's rent.

534.    After Hazmi and Mihdhar moved into their own apartment at the Parkwood Apartments, Bayoumi organized a party to welcome the two men to San Diego.  The party was attended by approximately 20 men from the local Muslim community, including members of the ICSD.  Cayson bin Don attended the party and used Bayoumi's video camera to videotape the party.

535.    In or around March 2000, after Bayoumi invited Hazmi and Mihdhar to relocate to San Diego, found them an apartment, opened a bank account for them, and introduced them to the local Muslim community, Dallah Avco gave Bayoumi a promotion, raised his salary, and further increased his "other allowances" stipend from approximately $465 to $3,925 a month.

536.    In his new, upgraded, better paid position, and at the direction of his employer Dallah Avco, Bayoumi followed his instructions and used his established connections within the Islamic radical community to introduce Hazmi and Mihdar and future 9/11 hijacker Hani Hanjour, who was also seen in Bayoumi's apartment on at least two occasions, to key members of San Diego Muslim community that not only shared their extremist beliefs and hatred for the United States, but would also provide significant logistical and ideological support to the hijackers as they plotted the attacks.

537.    Bayoumi used his good will within the community to help the future 9/11 attackers form trusted relationships with radical leaders in the San Diego community.

538.    On June 23, 2001, just a few months before the September 11, 2001 terror attacks, Bayoumi and his family moved out of their apartment in San Diego.  Bayoumi advised he was leaving the United States, but left no forwarding address with the property management company.

*Bayoumi's Connections – Osama Yousef Basnan*

539.    Bayoumi used his relationship with Osama Yousef Basnan to help secure support, backing, and financial assistance for the future 9/11 hijackers.

540.    Basnan, known as a vocal al Qaeda sympathizer and further described by U.S. intelligence as an "ardent UBL [Osama Bin Laden] supporter" who "has been in contact with UBL family members," was a target of FBI investigations as early as 1992.

541.    In May 1992, the FBI recovered a box of documents from Basnan's car which had been abandoned in the area of Washington D.C. The documents, consisting of jihadist literature, included a "Confidential" newsletter written in Arabic to supporters of the Eritrean Islamic Jihad (EIJ) Movement, providing updates on the EIJ's council.  A high level EIJ member reportedly sat on al Qaeda's Shura Council.  The documents also included a number of letters addressed to Basnan outlining plans to import used cars to the United States.

542.    On October 17, 1992, Basnan hosted a party in Washington D.C. for Omar Abdul Rahman (a/k/a the "Blind Sheikh") who is currently serving a life sentence following his conviction for his role in supporting the 1993 World Trade Center bombing and for plotting a "day of terror" in which he planned to attack the United Nations in New York City, bomb the Holland and Lincoln tunnels, and assassinate then-Senator Alfonse D'Amato.

543.    According to FBI documents, Bassnan was an employee of the Saudi Embassy in Washington D.C. and was being groomed to replace Bayoumi in San Diego.

544.    Witnesses described Bayoumi and Basnan as the "closest of friends."

545.    Bayoumi and Basnan and their families both lived at the Parkwood Apartments at

the same time Hazmi and Mihdhar resided there in 2000.  Bayoumi and Basnan's wives were arrested together in April 2001 for shoplifting at a J.C. Penney.

546.    Phone records revealed roughly 700 calls between various phones subscribed to by Bayoumi and Basnan over a one year period, during which the 9/11 hijackers were being integrated into the San Diego radical Islamic community.

547.     Both Bayoumi and Basnan were well known at the San Diego Islamic Center.

548.    At the Islamic Center Hazmi make the acquaintance of a Saudi military officer. Following this encounter Hazmi and the Saudi military were in contact at least eleven times in March 2000.

549.    Bayoumi transferred monies to Hazmi and Mihdhar.

550.    9/11 Commission member Dietrich L. Snell, who conducted the October 2003 interview of Basnan in Riyadh, Saudi Arabia with representatives of the Mabahith in attendance, noted the deceitful and misleading nature of Basnan's testimony:

> The interview failed to yield any new information of note.  Instead, in the writer's opinion, it established beyond cavil the witness' utter lack of credibility on virtually every material subject.  This assessment is based on: the witness' demeanor, which engendered a combination of confrontation, evasiveness, and speechmaking, presumably for the benefit of his Mabahith audience; his repudiation of statements made by him on prior occasions; and the inherent incredibility of many of his assertions when viewed in light of the totality of the available evidence.

### *Bayoumi's Connections – Anwar Aulaqi*

551.    Witness testimony further confirms that Bayoumi had close ties to other persons connected to the hijackers, and made a number of in-person visits to the Saudi Consulate in Los Angeles.

552.    Bayoumi introduced the future 9/11 hijackers to Anwar Aulaqi, who was covertly acting as a senior recruiter for al Qaeda and affiliated terrorist organizations and advocating jihad

against the United States.

553.    On February 4, 2000, the very day that Hazmi and Mihdar came to live with Bayoumi, four telephone calls took place between Bayoumi and Anwar Aulaqi, a senior al Qaeda recruiter who was involved in planning terrorist operations for al Qaeda.  Additional calls from Bayoumi's cell phone to Aulaqi took place on February 10, 16, and 18.

554.    Aulaqi had spent nearly five years in the public eye as the imam of the Al Ribat Al Islami Mosque in La Mesa, CA, near San Diego.  Aulaqi became an important religious leader to Hazmi and Mihdhar.

555.    Aulaqi has been linked to Fort Hood shooter Nidal Malik Hasan, as well as Christmas Day bomber Umar Farouk Abdulmutallab.  According to U.S. intelligence, Aulaqi was one of Abdulmutallab's al Qaeda trainers who assisted in planning the attack and providing religious justification for it.  Moreover, Faisal Shahzad, the individual responsible for the failed New York Times Square car bombing attempt on May 1, 2010, told U.S. investigators that he was inspired by Aulaqi.

556.    Aulaqi was also the subject of FBI investigations in 1999 and 2000 after learning that he may have been contacted by a "possible procurement agent" for Osama Bin Laden.  During the investigation, the FBI learned that Aulaqi knew individuals with the Holy Land Foundation and others involved in raising money for Hamas.

557.    Aulaqi had other extremist connections.  U.S. intelligence reports link Aulaqi to other FBI counter-terrorism investigations, including the activities of "the Palestinian Islamic Jihad (PIJ) in the United Sates."  Moreover, according to the Joint Inquiry Report, Aulaqi was visited in early 2000 "by a subject of a Los Angeles investigation closely associated with Blind Sheikh [Omar Abdel] al-Rahman."  The FBI closed its inquiry into Aulaqi's activities in March

2000, two months after Hazmi and Mihdhar arrived in San Diego, claiming that the evidence collected by the agency was not considered strong enough to support a criminal prosecution at the time.

558.    Aulaqi, Hazmi, and Mihdhar developed a very close relationship and FBI sources reported that "Aulaqi met consistently and privately with Alhazmi and Almidhdir for prayers." Another witness recalled meeting Hazmi through Aulaqi and Mohdar Abdullah, and later meeting Mihdhar at Aulaqi's mosque.  The witness also remembered seeing Hazmi and Mihdhar in the guest room on the second floor of the mosque and, on one occasion, leaving the room just after Aulaqi, at the conclusion of a meeting. Other witnesses "informed the FBI after September 11 that [Aulaqi] had closed-door meetings in San Diego with al-Mihdhar, al-Hazmi, and another individual, whom al-Bayoumi had asked to help the hijackers."

559.    Aulaqi eventually left San Diego in mid-2000 and relocated to Virginia in where he took a position at the Dar al Hijra Mosque in Falls Church, VA, a suburb of Washington, DC.

560.    Hazmi and 9/11 hijacker Hani Hanjour arrived at Dar al Hijra in early April 2001. Upon their arrival, Aulaqi tasked a Jordanian named Eyad al Rababah to assist the hijackers in getting settled and finding an apartment.  They eventually moved into Rababah's friend's apartment in Alexandria, VA.  On May 8, 2001, hijackers, Ahmed al Ghamdi and Majed Moqed, came to live with the other three hijackers in their Alexandria apartment

561.    Following the September 11th attacks, Aulaqi submitted to four FBI interviews between September 15 and 19, 2001.  During an interview on September 17, the FBI showed Aulaqi a picture of the American Airlines Flight #77 hijackers.  Aulaqi stated that he knew Hazmi from the Al Ribat Al Islami Mosque in San Diego, provided a physical description of him, and further described some of his personality traits, explaining that Hazmi was "a loner who did not

have a large circle of friends," "was slow to enter into personal relationships," and "was always very soft spoken, a very calm and extremely nice person." Although Aulaqi admitted meeting with Hazmi several times, he claimed not to remember any specifics of what they discussed.

562. Aulaqi told the FBI that he did not recognize Mihdhar, but did admit to knowing Hani Hanjour. According to the FBI, information in their possession at the time of the interviews suggested "a more pervasive connection" between Aulaqi and the 9/11 hijackers than he was willing to admit.

*Bayoumi's Connections – Mohdhar Abdullah*

563. In addition to connecting the future 9/11 terrorists to Aulaqi, Bayoumi was also responsible for introducing Hazmi and Mihdhar to Mohdhar Abdullah. Abdullah, who was a friend to both Bayoumi and Aulaqi, and lived in an apartment complex around the corner from Aulaqi's mosque. According to the 9/11 Commission, in a post-9/11 interview with law enforcement, Abdullah claimed that Bayoumi specifically asked him "to be the individual to acclimate the hijackers to the United States, particularly San Diego, CA."

564. Per Bayoumi's instructions, Abdullah helped Hazmi and Mihdhar locate and apply to language and flight schools, and assisted them in translating between English and Arabic.

565. Per Bayoumi's instructions, Abdullah also helped Hazmi and Mihdhar obtain fake driver's licenses with false names from an unknown individual in Los Angeles. Abdullah drove the hijackers from San Diego to an area in Los Angeles, near McArthur Park and a second location near Huntington Park where the unknown individual was selling the fake cards. Abdullah purchased approximately four or five fraudulent California Department of Motor Vehicle identification cards and gave them to Hazmi and Mihdhar.

566.   Abdullah further helped Hazmi conduct surveillance of the Los Angeles International Airport in June 2000.

567.   On June 9, 2000, the day before Mihdhar left the United States and returned to Yemen to visit his family, Abdullah traveled with Hamzi and Mihdhar to Los Angeles where they visited the King Fahd Mosque.  Abdullah was surprised that the hijackers already knew several people at the mosque, including an individual named Khallad.  FBI investigators and a CIA report state that the individual was Khallad bin Attash, an al Qaeda operative and trusted member of Osama Bin Laden's inner circle who is linked to the 1998 U.S. Embassy bombings and the mastermind behind the U.S.S. Cole bombing.  The FBI and CIA reports are based on witness reporting that Khallad was in the United States that same month and was seen in the company of Fahad al Thumairy.

568.   On June 10, 2000, Los Angeles International security tapes show Abdullah, Hazmi, and an unidentified man using a video camera to scout out the airport.

569.   During a number of interviews with the FBI following the 9/11 attacks, Abdullah reportedly admitted knowing of Mihdhar's and Hazmi's extremist leanings and Mihdhar's involvement with the Islamic Army of Aden, an Islamic extremist group in Yemen with ties to al Qaeda.  According to the 9/11 Commission, Abdullah was clearly sympathetic to those extremist views and expressed hatred for the U.S. government.

570.   Although Abdullah denied having advance knowledge of the 9/11 attacks when interviewed by the FBI, Abdullah bragged to fellow inmates in September-October 2003 (during his incarceration for immigration charges), that he knew that Hazmi and Mihdhar intended to carry out a terrorist attack in the United States.  Abdullah told the inmates that he first learned of the terrorist plot from Hazmi and Mihdhar themselves during a dinner at a restaurant in San Diego

after praying together at a nearby mosque.  Hazmi and Mihdhar invited Abdullah to join them on the airplane and participate in the attack.  Abdullah knew that the attack would consist of an airplane flying into a building, but Abdullah reportedly did not know any further details.

571.    Abdullah further boasted that he was responsible for driving Hazmi and Mihdhar from Los Angeles to San Diego after their meeting with Bayoumi in the Mediterranean Café.

572.    Bayoumi, as a result of his financing and support from Dallah Avco, successfully helped the 9/11 hijackers assimilate into the San Diego terror network and find funding and support to plan and carry out the September 11th attacks.

573.    Dallah Avco hired, paid, and instructed Bayoumi for the specific purpose of his gathering intelligence from the radical Islamic community in San Diego, ingratiate himself within the community, and using his connections with other al Quaeda sympathizers to form a financial and practical support network which enabled the 9/11 hijackers to successfully carry out the terror attack on American citizens on American soil.

574.    Absent the critical financial and logistical support for an attack on America which Dallah Avco knowingly and willingly provided to Bayoumi, under the guise of employment, the 9/11 hijackers would have been incapable of plotting, preparing for, and conducting the September 11, 2001 terrorist attacks.

## COUNT I

### AIDING AND ABETTING AL QAEDA AND THE SEPTEMBER 11th ATTACKS IN VIOLATION OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); 18 U.S.C. § 2332(c) AND 18 U.S.C. § 2333

575.    Plaintiffs incorporate all previous allegations by reference.

576.    The relentless campaign by al Qaeda and its materials supporters to carry out terrorist attacks against the United States and its citizens, which culminated in the September

11th Attacks, involved continuous acts of violence and acts dangerous to human life, that violate the criminal laws of the United States, including the prohibitions set forth in 18 U.S.C. § 2332. *See* 18 U.S.C. § 2332(a) (prohibiting through conduct transcending national boundaries: killing or attempting to kill persons within the United States; causing serious bodily injury or attempting to cause serious bodily injury to persons within the United States; destroying or damaging any structure, conveyance, or other real or personal property within the United States; or attempting or conspiring to destroy any or damage any structure conveyance, or other real or personal property within the United States).

577.    The relentless campaign by al Qaeda and its material supporters to carry out terrorist attacks against the United States and its citizens, including the September 11th Attacks, was intended (a) to intimidate or coerce the civilian population of the United States, (b) to influence the policy of the government of the United States by intimidation or coercion, and (c) to affect the conduct of the government of the United States by mass destruction and murder.

578.    The extraordinary material support and resources that Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco provided to al Qaeda over many years, as described above, substantially assisted al Qaeda in successfully planning, coordinating, and carrying out the September 11th Attacks, and was essential to the success of those Attacks.

579.    Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco knew at all times that they were providing material support for al Qaeda's campaign to carry out acts of international terrorism against the United States and its citizens, and were both aware and intended that the resources they provided would substantially assist al Qaeda in that objective.

580.    As set forth more fully above, but for the assistance provided by Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco al Qaeda could not have successfully planned, coordinated, and carried out the September 11th Attacks, which were a foreseeable and intended result of their material support and sponsorship of al Qaeda.

581.    By aiding and abetting violations of 18 U.S.C. § 2332 that have caused injuries to plaintiffs' insureds and plaintiffs themselves, Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs and/or their insureds have sustained as a result of such injuries.

WHEREFORE, Plaintiffs demand judgment against the defendants, jointly and severally, for an amount in excess of $1,400,000,000.00, together with treble damages, punitive damages, pre and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

### COUNT II

### CONSPIRING WITH AL QAEDA IN VIOLATION OF
### 18 U.S.C. §§ 2332(b) and 2333

582.    Plaintiffs incorporate all previous allegations by reference.

583.    Plaintiffs and their insureds suffered injuries to their persons, property or businesses by reason of acts committed by al Qaeda that involved the murder and attempted murder of persons within the United States, and the mass destruction of real and personal property within the United States, in violation of the criminal laws of the United States, including the prohibitions set forth in 18 U.S.C. § 2332.

584.    The relentless campaign by al Qaeda and its material supporters to carry out

terrorist attacks against the United States and its citizens, including the September 11th Attacks, was intended (a) to intimidate or coerce the civilian population of the United States, (b) to influence the policy of the government of the United States by intimidation or coercion, and (c) to affect the conduct of the government of the United States by mass destruction and murder.

585.   Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco agreed to combine and conspire with al Qaeda and other persons to act unlawfully, in the manners set forth in this complaint, and committed overt acts in furtherance of the conspiracy. At all relevant times, Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco knew of the conspiracy, including in the cases of Al Rajhi Bank and NCB of the roles of the charitable front organizations and their leaders in furtherance of the conspiracy.

586.   The actions of Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco facilitated and advanced the conspiracy to conduct terrorist attacks against the United States and its citizens.

587.   By conspiring to act with al Qaeda and other components of that terrorist organization's financial, logistical, and operational infrastructures, in furtherance of their campaign to conduct terrorist attacks against the United States and its citizens, in violation of 18 U.S.C. § 2332, Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs and/or their insureds have sustained by reason of the September 11th Attacks.

WHEREFORE, Plaintiffs demand judgment against the defendants, jointly and severally, for an amount in excess of $1,400,000,000.00, together with treble damages, punitive damages,

pre and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT III

### PROVISION OF MATERIAL SUPPORT TO TERRORISTS IN VIOLATION OF 18 U.S.C. § 2339A, 18 U.S.C. § 2339B(1), AND 18 U.S.C. § 2333

588.   Plaintiffs incorporate all previous allegations by reference.

589.   As set forth above, Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco knowingly and/or recklessly provided material support and resources to al Qaeda, with an awareness of and intent to further al Qaeda's campaign to carry out to terrorist attacks against the United States and its citizens.

590.   As set forth above, but for the assistance provided by Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco, al Qaeda could not have successfully planned, coordinated, and carried out the September 11th Attacks, which were a foreseeable and intended result of their material support and sponsorship of al Qaeda.

591.   By participating in the commission of violations of 18 U.S.C. § 2339A and 18 U.S.C. § 2339B that have caused Plaintiffs and their insureds to be injured in their persons, businesses, or property, defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs and/or their insureds have sustained as a result of such injuries.

WHEREFORE, Plaintiffs demand judgment against the defendants, jointly and severally, for an amount in excess of $1,400,000,000.00, together with treble damages, punitive damages, pre and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT IV

## COMMITTING ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. §2339B(2) AND 18 U.S.C. § 2333

592.     Plaintiffs incorporate all previous allegations by reference.

593.     As set forth above, defendants Al Rajhi Bank and NCB are sophisticated international financial institutions.

594.     By knowingly collecting funds on behalf of, and transferring funds for the benefit of, al Qaeda's charity agents, with an awareness of al Qaeda's interest in those funds, Al Rajhi Bank and NCB have provided material support to a designated Foreign Terrorist Organization under the Anti-Terrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. §§ 2339B(2)(a) and 2339B(2)(b).

595.     As set forth above, Defendants Al Rajhi Bank and NCB were aware of the charities' roles as fronts for al Qaeda, or at a minimum recklessly disregarded information that would have caused them to know that those charities were agents of al Qaeda.

596.     In connection with their provision of material support and resources to al Qaeda in violation of 18 U.S.C. §§ 2339B(2)(a) and 2339B(2)(b), Defendants Al Rajhi Bank and NCB aided and abetted and conspired with persons who are subject to the jurisdiction of the United States.

597.     As sophisticated international financial institutions, Defendants Al Rajhi Bank and NCB were legally obligated to retain possession of, or maintain control over, all funds belonging to or destined to be transferred to agents of al Qaeda, and to report to the Secretary of the Treasury the existence of such funds in accordance with regulations issued by the Secretary.  By failing to do so, Defendants Al Rajhi Bank and NCB have violated 18 U.S.C. § 2339B(2), and their actions in violation of § 2339B(2) proximately caused injuries to Plaintiffs and their insureds.

598.     Accordingly, Defendants Al Rajhi Bank and NCB are jointly and severally liable

pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs and/or their insureds have sustained as a result of such injuries.

WHEREFORE, Plaintiffs demand judgment against the defendants, jointly and severally, for an amount in excess of $1,400,000,000.00, together with treble damages, punitive damages, pre and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT V

### FINANCING OF TERRORISM IN VIOLATION OF 18 U.S.C. § 2339C and 18 U.S.C. § 2333

599.    Plaintiffs incorporate all previous allegations by reference.

600.    As set forth above, Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco willfully and unlawfully provided funding and related services to al Qaeda and its agents, with the knowledge and intent that such funds be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians such as the victims of the September 11th Attacks, who were not taking part in any armed conflict.

601.    The acts committed by Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco in providing funding and related services to al Qaeda and its agents were intended (a) to intimidate or coerce the civilian population of the United States, (b) to influence the policy of the government of the United States by intimidation or coercion, and (c) to affect the conduct of the government of the United States by mass destruction and murder.

602.    As set forth above, but for the assistance provided by Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco, al Qaeda could not have successfully planned, coordinated, and carried out the September 11th Attacks, which

were a foreseeable and intended result of their material support and sponsorship of al Qaeda.

603.    By virtue of their willful violations of 18 U.S.C. § 2339C, which proximately caused the injuries suffered by Plaintiffs and their insured, Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs and/or their insureds have sustained as a result of such injuries.

WHEREFORE, Plaintiffs demand judgment against the defendants, jointly and severally, for an amount in excess of $1,400,000,000.00, together with treble damages, punitive damages, pre and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## **COUNT VI**

### **COMMITTING ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18. U.S.C. § 2333**

604.    Plaintiffs incorporate all previous allegations by reference.

605.    The actions of Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco in providing funding and other forms of material support to al Qaeda and its agents would constitute "a criminal violation if committed within the jurisdiction of the United States or of any State" and "appear to be intended to intimidate or coerce a civilian population ... to influence the policy of a government by intimidation or coercion or to affect the conduct of a government by mass destruction" within the meaning of 18 U.S.C. § 2331.

606.    The actions of Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco in providing funding and other forms of material support to al Qaeda and its agents, provided substantial assistance to al Qaeda and its agents in planning, coordinating and carrying out the September 11th Attacks in violation of 18 U.S.C. § 2333, and

caused injuries to Plaintiffs and their insureds.

607.    The actions of Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco in providing funding and other forms of material support to al Qaeda and its agents were dangerous to human life, by their nature and as evidenced by their consequences.

608.    The actions of Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco in providing funding and other forms of material support to al Qaeda and its agents either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

609.    Accordingly, the actions of Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco in providing funding and other forms of material support to al Qaeda and its agents constitute acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2333.

610.    Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco knowingly provided substantial assistance to acts of international terrorism and accordingly, their acts constitute aiding and abetting acts of international terrorism.

611.    Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco also agreed to combine with other persons to act unlawfully in the manner set forth above and committed overt acts in furtherance of the conspiracy.  At all relevant times, Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco knew of the conspiracy, including in the cases of Al Rajhi Bank and NCB of the roles of the charitable front organizations and their leaders in furtherance of the conspiracy.

612.    As set forth above, but for the assistance provided by Defendants Al Rajhi Bank,

NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco, al Qaeda could not have successfully planned, coordinated, and carried out the September 11th Attacks, which were a foreseeable and intended result of their material support and sponsorship of al Qaeda.

613.   For the reasons set forth above, Defendants Al Rajhi Bank, NCB, SBG, MBC, MBO, MWL, IIRO, WAMY, al Haramain, and Dallah Avco are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs and/or their insureds have suffered to their persons, businesses or property as a result of the September 11th Attacks.

WHEREFORE, Plaintiffs demand judgment against the defendants, jointly and severally, for an amount in excess of $1,400,000,000.00, together with treble damages, punitive damages, pre and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## **JURY DEMAND**

Plaintiff demands a trial by jury as to all claims so triable.

Date:   April 12, 2017
        Huntington, New York

SHEPS LAW GROUP, P.C.

By:     /s/ Robert C. Sheps
        ROBERT C. SHEPS, ESQ. (RS 5388)
        *Attorney for Plaintiffs*
        25 High Street
        Huntington, New York 11743
        (631) 249-5600
        (631) 249-5613 (fax)
        rsheps@shepslaw.com